**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE NO.** |
| | : | **1:09-CR-490-TWT/AJB** |
| **THE PUBLIC WAREHOUSING** | : | |
| **COMPANY K.S.C.,** *a/k/a Agility*; | : | |
| **AGILITY DGS HOLDINGS, INC.,** | : | |
| *f/k/a Agility Defense &* | : | |
| *Government Services, Inc., f/k/a* | : | |
| *PWC Logistics Services, Inc.*; **and** | : | |
| **AGILITY DGS LOGISTICS** | : | |
| **SERVICES COMPANY, K.S.C.(c)** | : | |
| *d/b/a PWC Logistics Services* | : | |
| *K.S.C.(c),* | : | |
| | : | |
| **Defendants.** | : | |

**ORDER FOR SERVICE OF**
**REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation ("R&R") of the United States

Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and

N.D. Ga. CrR. 58.1(A)(3)(a), (b).  A copy of the R&R and this order shall be served

upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the

R&R within **fourteen (14)** days of service of this Order.  Should objections be filed,

they shall specify with particularity the alleged error(s) made (including reference by

page number to the transcript if applicable) and shall be served upon the opposing party. *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990). The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the R&R may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review. *United States v. Slay*, 714 F.2d 1093 (11th Cir. 1983).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.** If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge. 18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986); *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983). The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

2

**IT IS SO ORDERED and DIRECTED**, this  2d   day of    September   , 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE NO.** |
| | : | **1:09-CR-490-TWT/AJB** |
| **THE PUBLIC WAREHOUSING** | : | |
| **COMPANY K.S.C.,** *a/k/a Agility*; | : | |
| **AGILITY DGS HOLDINGS, INC.,** | : | |
| *f/k/a Agility Defense &* | : | |
| *Government Services, Inc., f/k/a* | : | |
| *PWC Logistics Services, Inc.*; **and** | : | |
| **AGILITY DGS LOGISTICS** | : | |
| **SERVICES COMPANY, K.S.C.(c)** | : | |
| *d/b/a PWC Logistics Services* | : | |
| *K.S.C.(c),* | : | |
| | : | |
| **Defendants.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## NON-FINAL REPORT AND RECOMMENDATION

The Court currently considers the following five motions: (1) the Motion to Quash Service of Process on Indictment by Defendant The Public Warehousing Company, K.S.C., a/k/a Agility ("PWC" or "Public Warehousing"), [Doc. 25]; (2) Public Warehousing's Amended Motion to Quash Service of Process on Indictment, [Doc. 54]; (3) the Motion to Quash Service of Process on Indictment and Motion to Extend Time for Filing Pre-Trial Motions by Agility DGS Logistics Services Company KSC(C) ("DGS Logistics"), [Doc. 81]; (4) Public Warehousing's Second Amended

Motion to Quash Service of Process, [Doc. 118]; and (5) the Government's Motion for Leave to File a Supplemental Response to Defendant PWC's Second Motion to Quash Service of Process and Supplemental Response, [Doc. 126].  For the reasons set forth herein, the undersigned **RECOMMENDS** that the District Court: (1) **GRANT** Public Warehousing's initial motion to quash service, [Doc. 25]; (2) **GRANT** Public Warehousing's first amended motion to quash service, [Doc. 54]; (3) **GRANT** DGS Logistics' motion to quash service and **DENY AS UNNECESSARY** DGS Logistics' motion to extend time for filing pre-trial motions,[1] [Doc. 81]; (4) **GRANT** Public

---

[1]        Since the undersigned recommends that the District Court conclude that the Government has not properly served process on DGS Logistics, the Court does not have personal jurisdiction over DGS Logistics.  *See United States v. Chitron*, 668 F. Supp. 2d 298, 304 (D. Mass. 2009); *see also Baragona v. Kuwait Gulf Link Transp. Co.*, 594 F.3d 852, 855 (11th Cir. 2010) (quoting *Prewitt Enters., Inc. v. OPEC*, 353 F.3d 916, 925 n.15 (11th Cir. 2003)), for the proposition that "[s]ervice of process is simply the physical means by which [personal] jurisdiction is asserted").  Without personal jurisdiction over the company, there is no need for the Court to set pretrial filing deadlines for DGS Logistics at this time.  As a result, it is currently unnecessary for DGS Logistics to seek an extension of time for filing pretrial motions.  Accordingly, the undersigned **RECOMMENDS** that the motion for an extension to file pretrial motions be **DENIED AS UNNECESSARY**.   The undersigned issues a recommendation as to this motion rather than an order because the undersigned has exhausted any authority to further extend the pretrial motion deadline under N.D. Ga. CrR 12.1(B).

2

Warehousing's second amended motion to quash, [Doc. 118]; and (5) **DENY** the Government's motion for leave to file a supplemental response.[2] [Doc. 126].

### Introduction

On November 9, 2009, a grand jury in this District returned a six-count indictment charging Public Warehousing with: (1) conspiracy to defraud the United States from September 2004 through at least mid-2006, in violation of 18 U.S.C. § 371 (Count 1; Indictment ¶¶ 1-28); (2) conspiracy to commit major fraud, make false statements, make false claims, and wire fraud from June 2003 through December 2008 (Count 2; Indictment ¶¶ 29-69); (3) major fraud and aiding and abetting major fraud against the United States from June 2004 through December 2005, in violation of 18 U.S.C. §§ 2, 1031 (Count 3; Indictment ¶¶ 70-74); (4) major fraud and aiding and abetting major fraud against the United States from August 2006 through December

---

[2]     As discussed below, the Government's service on Public Warehousing's attorney did not constitute proper service.  There is nothing in the supplemental brief that alters this conclusion.  As a result, it is not necessary to allow the Government to file the supplemental brief on this issue.  Accordingly, the Court **RECOMMENDS** that the Government's motion for leave to supplement, [Doc. 126], be **DENIED**.  Since it is within the District Court's discretion to permit a party to advance new arguments on objection to a Magistrate Judge's Report and Recommendation ("R&R"), *see Stephens v. Tolbert*, 471 F.3d 1173, 1176 (11th Cir. 2006) (holding that district court has discretion to consider argument that had not been presented to magistrate judge), the Court resolves this issue by way of an R&R as opposed to an order.

2007 (Count 4; Indictment ¶¶ 75-79); and (5) wire fraud and aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 2, 1343 (Counts 5 & 6; Indictment ¶¶ 80-82).  Public Warehousing then sought to quash service of process of the indictment on February 8, 2009.  [Doc. 25].

The following day on February 9, a grand jury returned a six-count superseding indictment with the same charges against Public Warehousing, but also adding two additional defendants - - DGS Logistics and Agility DGS Holdings, Inc., ("DGS Holdings").  [Doc. 52].  In this superseding indictment, DGS Logistics was charged in all six counts of the indictment, [*id.* ¶ 3(a)], and DGS Holdings was charged in Counts 2, 4, 5, and 6, [*id.* ¶ 3(b)].

On April 12, 2010, Public Warehousing filed an amended motion to quash service of process on the indictment, [Doc. 54], along with a brief in support of its initial motion to quash and the amended motion to quash, [*see* Doc. 51].  On May 4, 2010, DGS Logistics filed its own motion to quash service of process of the superseding indictment along with a motion to extend the time for filing pre-trial motions.  [Doc. 81].  On June 21, 2010, the Government filed briefs in opposition to Public Warehousing's motion to quash, [Doc. 92], and DGS Logistics' motion to quash,

4

[Doc. 93].  On June 30, 2010, DGS Logistics and Public Warehousing filed reply briefs.  [Docs. 98 (DGS Logistics), 100 (PWC)].

The Government filed a Notice of Additional Service of Process on July 28, 2010, stating that Public Warehousing's attorney was served the summons and complaint at a July 27, 2010, hearing in a civil action brought by Public Warehousing in the United States District Court for the District of Columbia.  [Doc. 117].  On July 29, 2010, Public Warehousing filed a second amended motion to quash service of process relating to the Government's attempt at service of its attorney on July 27, 2010, in Washington, D.C.  [Doc. 118].  The Government filed a response on August 19, 2010.  [Doc. 124].  The Government filed a motion for leave to file a supplemental response to Public Warehousing's second motion to quash.  [Doc. 126].  Public Warehousing filed a reply memorandum in support of its second amended motion to quash on September 1, 2010.  [Doc. 130].

At the various pretrial and status conferences held by the undersigned in this case, counsel for the parties stated that no evidentiary hearing was needed before the Court issued an R&R on the pending motions, and therefore that the parties relied upon the arguments and materials contained in the various motions, responses and replies filed by them.

***Facts***

A.      *Defendant Corporations*

The Government has indicted three corporations: Public Warehousing; DGS Logistics; and DGS Holdings.  [*See* Doc. 52].  The corporate structures of the three companies are as follows.[3]

1.      *Public Warehousing*

The Kuwaiti government established Public Warehousing in 1979.  (Aziz Decl. ¶ 2 in Doc. 51-1 at Exh. A).  In 1997, the Kuwaiti government sold its majority stake in the company, and Public Warehousing's shares are now traded on the Kuwait and

---

[3]      The undersigned notes that the corporations have undergone a number of name changes over the years.  To avoid any confusion in the main text, the undersigned simply refers to each company as either Public Warehousing, DGS Logistics, or DGS Holdings regardless of whether the companies were operating under these names during the events described in this R&R.

To assist the District Court review the documents provided by the parties, the undersigned provides a summary of the variety of name changes.  First, prior to September 2009, DGS Holdings was known as: (1) Agility Defense & Government Services, Inc., between March 2007 and September 2009; and (2) PWC Logistics Services, Inc., prior to 2007.  [*See* Doc. 52 ¶ 3(b); Hoffman Decl. ¶¶ 4-6].  Second, DGS Logistics was known as PWC Logistics Services Company when it was formed in October 2006. [*Id.* ¶ 3(a); Hoffman Decl. ¶ 2].  Finally, Public Warehousing has been known by Agility, its brand name, since November 2006.  (Aziz Decl. ¶ 3 in Doc. 51-1 at Exh. A).  Prior to this renaming, Public Warehousing has indicated that it was referred to as PWC Logistics.  [Doc. 100 at 24 n.18].

6

Dubai stock exchanges.  (Aziz Decl. ¶ 3; *see also* Kuwait Stock Exchange Listing Info in Doc. 100-2 at Exh. B).  Public Warehousing opened an office in Winchester, Virginia in October 2004, and its lease expired in September 2008.  (Nguyen Decl. ¶ 4 in Doc. 92-2 at Exh. B).  Public Warehousing closed the offices in the United States for business reasons in 2008.  (*See* Nelson Decl. ¶¶ 7-10 in Doc. 100-1 at Exh. A).  Public Warehousing's headquarters has been located in Sulaibiya, Kuwait City, Kuwait since 1979.  (Aziz Decl. ¶ 7).

> 2.    *DGS Logistics*

DGS Logistics is a Kuwaiti corporation that was incorporated in July 2003 as a subsidiary of Public Warehousing.  (Moe Decl. ¶¶ 1-2 in Doc. 51-15 at Exh. O).  Public Warehousing owns 99.4% of DGS Logistics while four other Public Warehousing subsidiaries own the remaining .6%.  (*Id.* ¶ 4).  DGS Logistics did not have any operations or employees until January 2007, at which time it began operations to handle new government contracting outside of the United States.  (*Id.* ¶¶ 3-4).  The company submits proposals and performs contracts for governments and international organizations in Europe, the Middle East, and Africa.  (*Id.* ¶ 4).

DGS Logistics has its offices  in Sulaibiya, Kuwait City, Kuwait.  (Mongeon Decl. ¶ 8 in Doc. 51-4 at Exh. D; Moe Decl. ¶ 6).  These offices are located in a

AO 72A
(Rev.8/8
2)

separate building from those of Public Warehousing. (Moe Decl. ¶ 6). DGS Logistics does not have any office or place of business in the United States. (Mongeon Decl. ¶ 8). Daniel Mongeon serves as the Managing Director of DGS Logistics. (Mongeon Decl. ¶ 8 in Doc. 51-4 at Exh. D). DGS Logistics does not share any directors, officers, or employees with Public Warehousing, and it maintains separate budges, books, records, and bank accounts from Public Warehousing. (Moe Decl. ¶ 7; Aziz Decl. ¶ 10).

### 3.    *DGS Holdings*

DGS Holdings, like DGS Logistics, is a subsidiary of Public Warehousing.[4] Unlike DGS Logistics and Public Warehousing, DGS Holdings is a corporation organized under the laws of Delaware. (Aziz Decl. ¶ 11). It maintains its offices at 1725 Duke Street, Suite 450, in Alexandria, Virginia. (Hoffman Decl. ¶ 6 in Doc. 51 at Exh. B). The President and Chief Executive Officer of DGS Holdings is Daniel Mongeon. (Mongeon Decl. ¶ 1 in Doc. 51 at Exh. D). Mongeon is also the sole Director of DGS Holdings. (Mongeon Decl. ¶ 7). DGS Holdings has its own directors,

---

[4]    DGS Holdings' relationship with Public Warehousing appears to be somewhat circumspect. According to the Hoffman Declaration, a Netherlands subsidiary of DGS Logistics was formed in 2006. In 2006, DGS Holdings was organized in Delaware and became a wholly owned subsidiary of the Netherlands subsidiary. (*See* Hoffman Decl. ¶¶ 2-4).

8

officers, and employees, who are separate from Public Warehousing. DGS Holdings also maintains separate budgets, books, records, and bank accounts from Public Warehousing. (Aziz Decl. ¶ 11). DGS Holdings handled bidding on and performance of U.S. government contracts to be performed in the United States until these functions were transferred to another subsidiary of DGS Holdings. (Hoffman Decl. ¶¶ 4, 8).

### 4.    *Interrelationship of the Companies*

Agility Defense and Government Services is a trade name, not a corporation, used for marketing purposes to refer to the government contracting business of Public Warehousing and certain subsidiaries. (Moe Decl. ¶ 9). DGS Logistics is one of the subsidiaries that comprises Agility Defense and Government Services. (Moe Decl. ¶ 9). Since November 2006, Public Warehousing has operated under the Agility brand name. (Aziz Decl. ¶ 3). A press release from November 2006 stated that "[Public Warehousing] and its affiliate companies are proud to announce the unification of the companies' 20,000 employees in 450 offices in 100 countries on 6 continents under the new name, Agility." (*See* Agility Announcement in Doc. 92-10, Exh. J at 5).

The annual reports of Agility from 2006, 2007, 2008 and 2009 provided the financial results of the various companies under the Agility name together. (*See* 2006 Annual Report at 9-10 in Doc. 124-1 at Exh. A; 2007 Annual Report at 18-19 in

9

Doc. 124-2, Exh. B at 11; 2008 Annual Report at 10 in Doc. 92-27 at Exh. AA; 2009 Annual Report in Doc. 124-3, Exh. C at 6-11).

B.    *Corporate Contacts with the United States Government*

The Defense Supply Center Philadelphia, which is a part of the United States Government, contracted with Public Warehousing in May 2003 for Public Warehousing to provide food, warehousing, and delivery to the U.S. armed forces in Kuwait and Qatar.[5]  In June 2003, the contract was modified, so that Public Warehousing started providing services for the military in Iraq.  (Aziz Decl. ¶ 4; Doc. 52 ¶ 9).  As a result, Public Warehousing was the named as the Prime Vendor in the contract to provide supplies in Zone I of the Middle East (Iraq, Kuwait, and Jordan).  Under this contract, Public Warehousing was paid $934 million.  [Doc. 52 ¶ 13].

In February 2005, Public Warehousing received a bridge contract to continue to provide supplies while the U.S. Government solicited bid proposals for a new

_____

[5]    The contract was issued by the Defense Supply Center Philadelphia ("Defense Supply"), which is charged with troop support.  [*See* Doc. 52 ¶¶ 2, 5]. Defense Supply is part of the Defense Logistics Agency, which is a support agency within the United States Department of Defense.  [*Id.* ¶ 4].  This R&R will refer to these governmental entities generically as the "U.S. Government" to avoid any confusion.

10

contract.   [*Id.* ¶ 10].   Public Warehousing was paid $1 billion for this bridge contract.  [*Id.* ¶ 13].

In July 2005, the U.S. Government awarded Public Warehousing another supplies contract, which is known as the Prime Vendor II contract.  The estimated value of the contract was approximately $4.67 billion, [*id.* ¶ 12], but Public Warehousing was ultimately paid $6.6 billion, [*id.* ¶ 13].  The contract called for Public Warehousing to continue providing services until December 2010.  (Aziz Decl. ¶ 6 in Doc. 51-1). Public Warehousing's subsidiaries - - DGS Logistics and DGS Holdings - - helped Public Warehousing perform the U.S. Government contracts following their formation. [Doc. 52 ¶¶ 2, 30].

While performing the 2005 contract, Public Warehousing submitted a request with the U.S. Government for a contractor name change, seeking to change the name on the Prime Vendor II contract to DGS Logistics because the corporate reorganization consolidated the performance of its government contracts to DGS Logistics.  (*See* Letter dated 1/16/2006 in Doc. 92-12 at Exh. L).  The U.S. Government denied the request for a name change and suggested a novation instead.  (*See* Letter dated 8/10/2006 in Doc. 92-13 at Exh. M).  This led Public Warehousing to request a novation in November 2006.  (*See* email chain in Doc. 92-14 at Exh. N; *see also* Amend. of

11

Solicitation dated 11/14/2006 in Doc. 92-23 at Exh. W).  The U.S. Government apparently decided not to approve a novation agreement, so the contract remained in the name of Public Warehousing.  [*See* Doc. 92 at 26; Doc. 100 at 26].

In October 2008, Mongeon, writing on behalf of Agility, indicated that DGS Logistics would submit an alternative proposal for the Prime Vendor III contract to continue to provide food supplies to the U.S. military.  The letter indicated that Mongeon was President and CEO of DGS Logistics.  (*See* Letter dated 10/2/2008 in Doc. 92-25 at Exh. Y (listing Mongeon's title as "President & CEO" of "PWC Logistics Services Co KSC(C)")).  When the U.S. Government awarded the Prime Vendor III contract to another company, Mongeon sent an email in April 2010 indicating that "[w]e" had lost the food supply contract, but that "we" had won the initial contract in 2003 and Agility would continue to provide supplies for the U.S. military for an additional six months under the contract.  (*See* email dated 4/15/2010 in Doc. 92-7 at Exh. G).

     C.    *The Misconduct Alleged in the Superseding Indictment*

        1.    *Count I*

In the bidding process for the 2005 contract (also known as the Prime Vendor II contract), the U.S. Government required bidders to submit invoices for certain prior

orders.  (*See* Superseding Indictment ¶ 28a in Doc. 52). The Government alleges that Public Warehousing and DGS Logistics provided false information in the form of undervalued invoices[6] to obtain the July 2005 contract.  (*See id.* ¶¶ 26, 28a-28f).  The defendants represented that the prices submitted could realistically be achieved.  (*Id.* ¶¶ 28h-28i).  Once the defendants began billing the U.S. Government, the billed prices were as much as 22% higher than the proposed prices.  (*Id.* ¶ 28j).

### 2.    *Count II*

In contracting with the U.S. Government, Public Warehousing was required to perform certain duties in servicing the contract.  The relevant terms of the contract and Public Warehousing's alleged alteration of these terms are as follows.

First, the contracts between the U.S. Government and Public Warehousing required that Public Warehousing (and its subsidiaries DGS Logistics and DGS Holdings) purchase specific brand items ("hard-speced") items, unless the U.S. Government approved an alternative product.  (*Id.* ¶ 32).  The Government alleges that the defendants provided false statements to the U.S. Government in explaining its

---

[6]    The Government alleges that the invoices were undervalued because the defendants submitted invoices in which the price of items were temporarily discounted by vendors to foster a business relationship with defendants instead of invoices that reflected the true market value for the items.  (*See* Doc. 52 ¶¶ 28d -28f).

13

reasons for not purchasing hard speced items.  (*See id.* ¶ 35).  For instance, the U.S. Government informed Public Warehousing that it should purchase ground beef from G.S. because G.S. was "hard speced" as the ground beef supplier in August 2004. (*Id.* ¶ 33).  Public Warehousing did not comply with this requirement and represented to the U.S. Government in September 2005 and March 2006 that it was purchasing ground beef from a different vendor than G.S. because the other vendor's prices were lower, which apparently was untrue.  (*Id.* ¶¶ 36a-36c).

Second, the contracts between Public Warehousing and the U.S. Government specified the proper formula for billing.  The Government was to pay Public Warehousing the unit price for products, which was the sum of the "delivered price" and the "fee."  (*Id.* ¶ 38).  The "delivered price" consisted of the actual cost of the product to Public Warehousing while the "fee" was to consist of Public Warehousing's expenses, overhead, profit, insurance, packaging costs, and transportation costs. (*See id.* ¶¶ 39-40).  Public Warehousing had vendors include warehousing and port servicing costs in the invoices, making these part of the "delivered price" instead of the "fee," contrary to the terms of the contract.  (*Id.* ¶¶ 46, 50a-50d).

Third, the contracts between Public Warehousing and the U.S. Government required Public Warehousing to pursue and return any rebates, coupons, or discounts

14

to the Government. (*Id.* ¶¶ 52-55). The Government alleges that Public Warehousing violated these terms in a number of ways. For instance, Public Warehousing demanded that vendors include their distribution fees in the "delivered price" of products and it purchased products from vendors when the same product could be obtained more cheaply from another vendor. (*Id.* ¶ 57a). It also kept allowances given to it by vendors instead of returning the allowances to the U.S. Government. (*Id.* ¶¶ 57b-57d). Additionally, Public Warehousing kept rebates provided to it by companies, (*see id.* ¶¶ 59, 60a-60b), or hid the rebates offered by companies as early payment discounts, which were not credited to the U.S. Government despite Public Warehousing receiving the discounts, (*see id.* ¶¶ 62, 63a, 63c, 63f). Further, Public Warehousing requested that vendors decrease the amount of product in each case to increase the distribution fees, leading the U.S. Government to pay more for certain products. (*See id.* ¶¶ 65, 66a-66d). Finally, Public Warehousing did not refund a rebate from one of its subcontractors to the U.S. Government. (*See id.* ¶¶ 68-69d).

### 3.    *Count III*

Concerning the Prime Vendor I contract, Public Warehousing and DGS Logistics requested that a vendor in Rome, Georgia, create smaller pack sizes in October 2004 and December 2005. These smaller sizes increased the fee paid to Public Warehousing,

which led the Government to pay approximately $1.4 million more for the product. (*Id.* ¶ 74).

### 4.    Count IV

Following the award of the July 2005 contract, all three defendants from August 2006 to December 2007 increased the "delivered price" for a product sold by G.S. by having G.S. invoice certain warehousing and port services as part of the product cost. The inflated "delivered price" was then billed to the U.S. Government.  (*Id.* ¶¶ 78-79).

### 5.    Counts V and VI

On August 1 and 18, 2006, Public Warehousing used wire communications to defraud by arranging to include warehousing and port services in the "delivered price," which was contrary to the contracts with the U.S. Government.  (*Id.* ¶¶ 81-82).

### D.    The Kuwaiti Government's Response to the Initial Indictment

Dr. Mohammad Sabah Al-Salem Al-Sabah, the Deputy Prime Minister & Minister of Foreign Affairs, wrote a letter to the United States Secretary of State, Hillary Clinton, on December 13, 2009, discussing the November 16, 2009, indictment against Public Warehousing.  (*See* Letter dated 12/13/2009 in Doc. 51-13 at Exh. M). Dr. Al-Salem Al-Sabah informed Secretary Clinton that under Kuwaiti laws, Kuwaiti courts had exclusive jurisdiction over criminal cases related to contracts executed in

16

AO 72A
(Rev.8/8
2)

Kuwait with Kuwaiti companies.  He also requested that the dispute be settled amicably without resort to criminal adjudication.  (*Id.*).

        E.      *Service of the Summonses and Indictments*

            1.      *The Initial Indictment*

On November 16, 2009, two special agents arrived at DGS Holdings' office and indicated that they wanted to serve an indictment.  (*See* DeBerry Decl. ¶¶ 3-4 in Doc. 51-5 at Exh. E).  Suzanne DeBerry, the Executive Assistant to General Daniel Mongeon (Ret.), the President and CEO of DGS Holdings, greeted the agents. (*Id.* ¶¶ 1, 4).  The agents then handed DeBerry the indictment and summons.  (*Id.* ¶ 7). At this time, Mongeon was out of the country.  (*Id.* ¶ 8).  DeBerry has never been authorized to accept service on behalf of DGS Holdings, Public Warehousing, or Mongeon.  (*Id.* ¶ 9).

On November 17, 2009, the Government served a summons and indictment for Public Warehousing on CT Corporation.  (*See* Service of Process Transmittal dated 11/17/2009 in Doc. 51-3 at Exh. C).

The Board of Directors of Public Warehousing appointed Ahmed Alsayed Abdulaziz to be the only person authorized to receive service of process on behalf of Public Warehousing on November 25, 2009.  (Abdulaziz Decl. ¶ 3 in Doc. 51-11 at

Exh. K).  Public Warehousing informed the Kuwait Ministry of Justice of this decision

shortly after November 25.  (*Id.* ¶ 4).[7]

## 2.     *The Superseding Indictment*

On February 12, 2010, the CT Corporation, the registered agent for DGS

Holdings, received a summons from this Court indicating that DGS Holdings had been

named as a defendant in this case.  (Hoffman Decl. ¶ 11in Doc. 51-2 at Exh. B).

On February 18, 2010, an FBI agent handed Daniel Mongeon, the President and

Chief Executive Officer of DGS Holdings, three summonses at Ronald Reagan

National Airport in Arlington, Virginia.  (*See* Mongeon Decl. ¶¶ 1-3 in Doc. 51-4 at

Exh. B).  The summonses were for DGS Holdings, DGS Logistics, and Public

Warehousing.  (Mongeon Decl. ¶¶ 3-6).

On February 18, 2010, two FBI agents served three summonses from this

criminal action on Paul Cerjan, the President of Europe/Middle East & Africa unit of

DGS Logistics,[8] at JFK airport in New York City following his flight from Kuwait.

---

[7]     According to Abdulaziz, service of legal papers in Kuwait must be made through authorized representatives of the Kuwait Ministry of Justice.  Kuwaiti law does not recognize the service of legal process by any person other than one of these authorized representatives.  (Abdulaziz Decl. ¶ 4).

[8]     Until his February 7, 2010, resignation, Cerjan served on the Board of Directors for DGS Logistics.  (Cerjan Decl. ¶ 7).

18

(Cerjan Decl. ¶¶ 1-3 in Doc. 51-6 at Exh. F).  Cerjan's offices are in Kuwait City, Kuwait.  (*Id.* ¶ 8).  The summonses were for DGS Holdings, DGS Logistics, and Public Warehousing.  (*Id.* ¶¶ 4-7).  Cerjan is not an employee, officer, or director of Public Warehousing, and he does not have the authority to accept service on its behalf.  (*Id.* ¶ 9).

A Federal Express package addressed to DGS Holdings arrived at the Alexandria, Virginia, office on February 23, 2010, and contained three summons, which separately named Public Warehousing, DGS Logistics, and DGS Holdings as the defendants in this case.  (Hoffman Decl. ¶ 13).

On March 23, 2010, an agent from the Defense Criminal Investigative Service handed Edward Hoffman, the Senior Vice President for DGS Holdings, summonses for DGS Holdings, DGS Logistics, and Public Warehousing.  (Hoffman Decl. ¶¶ 1, 14).

On July 28, 2010, the Government served a summons and the superseding indictment in a Washington D.C. federal courtroom on attorney Michael R. Charness who had entered an appearance on behalf of Public Warehousing in a civil case.  [Doc. 117].  On this same day, the Government sent a summons and the superseding indictment by Federal Express to an address in Winchester, Virginia,

19

which the Government asserts is the last known address for Public Warehousing's United States operations. [*See* Doc. 121].

**Discussion**

Although the parties' briefs raise a number of legal issues, the two main issues that the Court must resolve are the following: (1) whether the Court should apply the fugitive disentitlement doctrine to Public Warehousing's and DGS Logistics' motions to quash; and (2) whether the Government properly served process on Public Warehousing and DGS Logistics pursuant to FED. R. CRIM. P. 4(c)(3)(C). The undersigned first turns to the applicability of the fugitive disentitlement doctrine.

A.   *Fugitive Disentitlement Doctrine*

1.   *Parties' Contentions*

The Government argues that Public Warehousing and DGS Logistics (collectively "the defendants") are fugitives from justice and that their motions to quash subpoenas should not be entertained pursuant to the fugitive disentitlement doctrine. [*See* Doc. 92 at 8-17 (PWC); Doc. 93 at 6-14 (DGS Logistics)]. The Government contends that the defendants are fugitives because they have knowledge of the criminal proceedings but are unwilling to face the charges. As for Public Warehousing, the Government specifically asserts that this defendant has knowledge

20

of the pending charges given public comments and actions by its board members, and that this defendant fled the United States in anticipation of the grand jury's indictment. [Doc. 92 at 13-14]. As for DGS Logistics, the Government contends that (1) it has knowledge of the case from the extensive media coverage and (2) the corporate officers of the parent company (Public Warehousing) have knowledge of the suit. [Doc. 93 at 11-12]. The Government contends that the Court should follow cases such as *United States v. Kashamu*, 656 F. Supp. 2d. 863, 866 (N.D. Ill. 2009), in which federal courts have refused to rule on motions to dismiss the indictment due to a fugitive's status. [Doc. 92 at 14-15; Doc. 93 at 12]. The Government notes two cases where courts have ruled on a motion to dismiss the indictment - - *In Re Hijazi*, 589 F.3d 401 (7th Cir. 2009), and *United States v. Noriega*, 683 F. Supp. 1373 (S.D. Fla. 1988) - - but argues that these cases are distinguishable given that Public Warehousing is in privity of contract with the U.S. Government, Public Warehousing has received $8.5 billion dollars to service these contracts, and the defendants have numerous contacts with the U.S. Government. [Doc. 92 at 16-17; Doc. 93 at 13-14].

Additionally, the Government argues that the equities weigh overwhelmingly in favor of applying the fugitive disentitlement doctrine because: (1) the defendants have received over $8.5 billion in taxpayer money yet seek to evade criminal prosecution;

21

(2) the defendants have used the United States courts in civil litigation; (3) the defendants executed the contracts within the United States and had daily contacts in this country; and (4) Public Warehousing has sought to evade service by (a) appointing only one individual to accept service who is outside of the United States and (b) seeking and receiving safe passage for its employees.  [Doc. 92 at 9-12; Doc. 93 at 8-9].

The defendants argue that the fugitive disentitlement doctrine does not apply to them.  [*See* Doc. 98 at 7-10 (DGS Logistics); Doc. 100 at 6-19 (PWC)].  Because their arguments are distinct, the undersigned summarizes the defendants' arguments separately.

DGS Logistics argues that the Government's constructive flight theory is meritless as applied to it because the Government cannot show that DGS Logistics was ever present in the United States.  [Doc. 98 at 8].  Without the initial presence, DGS Logistics argues that the Government cannot show that it has decided not to return.  [*Id.* at 8-9].  DGS Logistics then argues that it should not be (1) forced to appear in the United States to accept service of the indictment or (2) found a fugitive because it cannot be served under Fed. R. Crim. P. 4(c)(3)(C) given that it has no principal place of business in the United States.  [*Id.* at 9-10].

22

Public Warehousing observes that any analysis of the fugitive disentitlement doctrine must take note that the doctrine is disfavored.  [Doc. 100 at 9-10].  Public Warehousing argues that it is merely asserting its rights to challenge service of the summons and should not be deprived this right merely because it is a Kuwaiti company.  [Doc. 100 at 6-7].  It contends that the Government's recourse to the fugitive disentitlement doctrine would render FED. R. CRIM. P. 4(c)(3)(C) obsolete in that the Government could identify any defendant who challenges service under Rule 4(c)(3)(C) as a fugitive, which would obviate the need for international agreements and diplomatic process.  [*Id.* at 7].  Public Warehousing asserts that it has always been a Kuwaiti-incorporated company and that it did not leave the United States with the intent to avoid prosecution.  Instead, Public Warehousing maintains that it closed its small United States office after concluding that there was no business purpose for it.  [*Id.* at 8-9].  Public Warehousing contends that application of the disentitlement doctrine would prevent it from challenging the Government's inadequate service.  [*Id.* at 9].  Contrary to the Government's argument, Public Warehousing argues that the Seventh Circuit's *Hijazi* decision is "particularly relevant" given the similar facts of both cases and the Seventh Circuit's order that the district court rule on a threshold jurisdictional question.  [*See id.* at 11-14].  Public Warehousing also contends that the Government's reliance

23

on *Kashamu* is suspect in that *Kashamu* has since been undermined by the *Hijazi* decision. [*Id.* at 14 n.8]. Public Warehousing also criticizes the Government's reading of *Noriega* by noting that, like the *Noriega* case, the instant case raises foreign relations concerns in that the State of Kuwait remains a substantial shareholder in Public Warehousing and has objected to the Government's criminal prosecution. [*Id.* at 15]. Public Warehousing finally argues that the closure of its United States office was for business purposes and the Government's argument that the closure was to evade service is premised on "sheer innuendo" without any factual basis. [*Id.* at 16-19].

### 2.   *Relevant Law: Fugitive Disentitlement Doctrine*[9]

The fugitive disentitlement doctrine "limits access to the courts by fugitives from justice." *F.D.I.C. v. Pharaon*, 178 F.3d 1159, 1161 (11th Cir. 1999). "Although traditionally applied by the courts of appeal to dismiss the appeals of fugitives, the district courts may sanction . . . parties on the basis of their fugitive status." *Magluta v. Samples*, 162 F.3d 662, 664 (11th Cir. 1998); *see also Ortega-Rodriguez v. United States*, 507 U.S. 234, 246 (1993) ("[I]t is the District Court that has the authority to defend its own dignity, by sanctioning an act of defiance [*i.e.*, flight by a defendant]

---

[9]    This doctrine is also referred to as the "fugitive from justice doctrine." *United States v. One Parcel of Real Estate at 7707 S.W. 74th Lane*, 868 F.2d 1214, 1215 (11th Cir. 1989).

24

that occurred solely within its domain."). Courts have applied the doctrine to pretrial motions in criminal cases. *See United States v. Kashamu*, 656 F. Supp. 2d 863, 867 (N.D. Ill. 2009)[10] (citing cases including *United States v. Oliveri*, 190 F. Supp. 2d 933, 935 (S.D. Tex. 2001), and *United States v. Stanzione*, 391 F. Supp. 1201, 1201 (S.D.N.Y. 1975)); *see also United States v. Nabepanha*, 200 F.R.D. 480, 482-84 (S.D. Fla. 2001) (applying doctrine to deny criminal defendant's motion for discovery).

The fugitive disentitlement doctrine is derived from equity "and rests on the power of the courts to administer the federal courts system." *Pesin v. Rodriguez*, 244 F.3d 1250, 1252 (11th Cir. 2001). Thus, an individual's "fugitive status 'does not strip the case of its character as an adjudicable case or controversy[, but] it disentitles the [fugitive] to call upon the resources of the Court for determination of his claims.' " *Pharaon*, 178 F.3d at 1161 (quoting *United States v. Barnette*, 129 F.3d 1179, 1184 (11th Cir. 1997)). A court's use of the sanction of "disentitlement is most severe."

---

[10]     The undersigned recognizes that although the *Kashamu* Court initially denied the defendant's motion to quash arrest and motion to dismiss indictment on the grounds that the fugitive disentitlement doctrine applied, the Court reconsidered its decision following the Seventh Circuit's *In re Hijazi* decision and ruled on the merits of the motions. *See Kashamu*, No. 94-cr-172, 2010 WL 2836727 (N.D. Ill. July 15, 2010). The subsequent reconsideration does not undermine the *Kashamu*'s observation that courts have applied the fugitive disentitlement doctrine to pretrial criminal motions. Indeed, the Eleventh Circuit's *Magluta* decision indicates that district courts may apply the doctrine. *Magluta*, 162 F.3d at 664.

AO 72A
(Rev.8/8
2)

*Degen v. United States*, 517 U.S. 820, 828 (1996). Finally, courts have "great latitude in their application of the fugitive disentitlement doctrine." *Lynn v. United States*, 365 F.3d 1225, 1241 (11th Cir. 2004).

For a court to apply the fugitive disentitlement doctrine, the following three conditions must be present: (1) the party is a fugitive from justice; (2) the party's fugitive status has a connection, or nexus, to the court proceedings that he seeks to utilize, *Barnette*, 129 F.3d at 1183; and (3) the sanction used by the court is necessary to effectuate the concerns underlying the doctrine, *Magluta*, 162 F.3d at 664. The contours of each element are discussed separately below. Also, the undersigned identifies factors that courts have used in disregarding the disentitlement doctrine.

### a.   Fugitive from Justice

The issue of "[w]hether a defendant is a fugitive from justice is a question of fact to be determined by his acts and intent." *Nabepanha*, 200 F.R.D. at 482. A fugitive may be a person "who has fled a criminal conviction," *Magluta*, 162 F.3d at 664, but the term also encompasses more than just those who flee following a conviction. A fugitive also is "[a] criminal suspect . . . who flees, evades, or escapes arrest, prosecution, imprisonment, *service of process*, or the giving of testimony, esp. by fleeing the jurisdiction or by hiding." Black's Law Dictionary (8th ed. 2004) (citing

26

AO 72A
(Rev.8/8
2)

18 U.S.C. § 1073[11]) (emphasis added); *Kashamu*, 656 F. Supp. 2d at 867 ("Courts define the term 'fugitive' as someone who seeks to evade prosecution by either actively avoiding the authorities, or remaining in a geographic location that is out of the authorities' reach.").[12]  Thus, a fugitive "has been defined as a person who, having committed a crime, flees from the jurisdiction of the court where a crime was committed[[13]] or departs from his usual place of abode and conceals himself within the district." *Barnette*, 129 F.3d at 1183 (quoting *Empire Blue Cross and Blue Shield v. Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997) (internal punctuation omitted)).

---

[11]     Section 1073 makes it a crime to flee a prosecution by proscribing, *inter alia*, the following behavior:

> Whoever moves or travels in interstate or foreign commerce with intent . . . to avoid prosecution . . . under the laws of the place from which he flees, for a crime, or an attempt to commit a crime, . . . which is a felony under the laws of the place from which the fugitive flees . . . .

18 U.S.C. § 1073.

[12]     Thus, an individual does not have to be convicted or to have pleaded guilty to be considered a fugitive, so an individual outside of the country who actively seeks to avoid prosecution such as by, *inter alia*, resisting extradition may be deemed a fugitive. *Schuster v. United States*, 765 F.2d 1047, 1050-51 (11th Cir. 1985).

[13]     "A person is still a fugitive even if his location is known, when that location is beyond the jurisdictional reach of the court." *Xiang Feng Zhou v. U.S. Atty. Gen.*, 290 Fed. Appx. 278, 280 (11th Cir. Aug. 18, 2008) (citing *Barnette*, 129 F.3d at 1185 n.11).

AO 72A
(Rev.8/8
2)

However, "[m]ere absence from the jurisdiction in which a crime occurred does not render the suspect a fugitive from justice; he must be found to have absented himself from the jurisdiction with the intent to avoid prosecution." *United States v. Fonseca-Machado*, 53 F.3d 1242, 1243-44 (11th Cir. 1995). Courts apply the concept of "constructive flight" to the disentitlement doctrine context, *i.e.*, the situation where "a person who departs for a legitimate reason from the jurisdiction in which his crime was committed but who later remains outside that jurisdiction for the purpose of avoiding prosecution is a fugitive from justice." *Id.* at 1244 & n.5. "The critical element of proof is knowledge of a pending charge. The defendant's intent can be inferred from his failure to surrender to authorities once he learns of the charges while outside of the jurisdiction." *Nabepanha*, 200 F.R.D. at 482.

Based on this case law, an individual/entity is a "fugitive from justice" when the following four elements are present: (1) pending criminal charges (or their equivalent); (2) knowledge of the pending charges; (3) intent to flee from the charges; and (4) absence from or concealment within the jurisdiction.

### b.    Nexus

A court will apply the fugitive disentitlement doctrine only when there is some connection between the defendant's fugitive status and the court process he seeks to

28

utilize, so that the court's sanction (in the form of disentitlement) is a reasonable response. *See Ortega-Rodriguez v. United States*, 507 U.S. 234, 244 (1993); *Barnette*, 129 F.3d at 1183.   In other words, "[i]f the individual's fugitive status has no 'connection' to the present proceedings in the sense that it neither affects the court's ability to carry out its judicial business nor prejudices the government as a litigant, [the defendant's motion] may not be dismissed" on disentitlement grounds. *Lazaridis v. U.S. Dep't of Justice*, --- F. Supp. 2d ----, ----, 2010 WL 2093405, *4 (D.D.C. May 26, 2010) (quoting *Daccarett-Ghia v. C.I.R.*, 70 F.3d 621, 626 (D.C. Cir. 1995)).

> ### c.    Policy Concerns

The rationales for applying the doctrine include: (1) the difficulty of enforcing judgment against a fugitive; (2) promoting the efficient operation of the courts; (3) discouraging flights from justice; (4) avoiding prejudice to the other side caused by the fugitive status, *Pesin*, 244 F.3d at 1253; and/or (5) the inequity of allowing a fugitive to use court resources only if the outcome will assist the fugitive, *Magluta*, 162 F.3d at 664; *see also Ortega-Rodriguez*, 507 U.S. at 240-42; *Hanson v. Phillips*, 442 F.3d 789, 795 (2d Cir. 2006) ("There are four independent justifications for disentitlement: (1) assuring the enforceability of a decision against a fugitive; (2) imposing a penalty for flouting the judicial process; (3) discouraging flights from

29

justice to promote efficient operation of the courts; and (4) avoiding prejudice to the other side engendered by a defendant's flight.").

### d.     Declining to Invoke the Doctrine[14]

As mentioned, the fugitive disentitlement doctrine is based in equity, and courts therefore have discretion in applying or declining to apply the doctrine. *See Nabepanha*, 200 F.R.D. at 483; *Noriega*, 683 F. Supp. at 1374 n.2. Courts have opted not to apply the doctrine in a number of circumstances, citing, *inter alia*, to the following reasons for declining to apply the doctrine: (1) the lack of disrespect in a challenge to a court's *in personam* jurisdiction, *see Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 427 (5th Cir. 2006); (2) the lack of cases in which the doctrine has been applied to foreign instrumentalities, *id.* at 427-28; (3) basic notions of due process, *Noriega*, 683 F. Supp. at 1375; (4) the presumption of innocence, *id.*; and (5) the assurance of "mutuality," *i.e.*, the defendant will submit to the court if an unfavorable

---

[14]     The Eleventh Circuit has held that the disentitlement doctrine does not apply in the non-criminal context as follows: (1) in an immigration case where the Department of Homeland Security should have known petitioner's address and the petitioner did not attempt to hide, *Xiang Feng Zhou*, 290 Fed. Appx. at 281; (2) in a 28 U.S.C. § 2255 motion to vacate where the doctrine was applied in the direct appeal because traditional principles of procedural default should apply, *Lynn v. United States*, 365 F.3d 1225, 1242-43 (11th Cir. 2004); and (3) in a civil case in which the fugitive is defending claims brought against him, *Pharaon*, 178 F.3d at 1162.

AO 72A
(Rev.8/8
2)

result is obtained, *United States v. Shapiro*, 391 F. Supp. 689, 693 (S.D.N.Y. 1975), or there will be adverse results to the defendant if the court issues an adverse ruling, *In re Hijazi*, 589 F.3d at 413.

          3.     *Application of the Law*

              a.     *Public Warehousing*

The Court concludes Public Warehousing is not a fugitive, so the fugitive disentitlement doctrine does not apply.  The undersigned agrees with the Government that Public Warehousing falls within three (of four) requirements for being a fugitive, namely there are pending criminal charges, Public Warehousing has knowledge of the charges, and Public Warehousing is absent from this Court's jurisdiction. The problem with the Government's argument relates to the intent to flee requirement.  The undersigned agrees with Public Warehousing that the Government has provided no evidence of this intent to flee, but instead only speculates as to Public Warehousing's intent to close its Winchester, Virginia office.  The Government cites to Exhibits A and B attached to its brief in support of the following statement:

> While the lease agreement continued until the fall of 2008, the office was abandoned in the spring of 2008, just after defendant PWC received the initial subpoena from the grand jury that ultimately indicted it.

31

[Doc. 92 at 6].  The problem with this evidence is that Exhibits A and B merely show that Public Warehousing had offices in Winchester, Virginia, until September 2008. These exhibits do not show or imply, as the Government's brief does, that the closing was related to the Government's criminal inquiry.  Indeed, Public Warehousing has produced a sworn declaration that the closing was for business reasons.  (*See* Nelson Decl. ¶¶ 8-10 in Doc. 100-1 at Exh. A).  The Government's speculation does not undermine this sworn evidence.

As for the Government's argument that Public Warehousing's failure to surrender to authorities is evidence of its fugitive status, the undersigned disagrees. The undersigned views Public Warehousing's challenge to service as legitimate given that courts have considered motions to quash service in other criminal cases.  *See, e.g.*, *Danziger v. United States*, 161 F.2d 299, 301 (9th Cir. 1947).  As discussed in greater detail in the service of process section of this R&R, Public Warehousing has raised legitimate concerns regarding the Government's ability to serve process on it under FED. R. CRIM. P. 4(c)(3)(C). Public Warehousing's argument that the Government must comply with the service rules before it will submit to the Court's jurisdiction is a legitimate response to the Government's attempts at service under Rule 4(c)(3)(C). Although the Government may find trying to apply FED. R. CRIM. P. 4(c)(3)(C)

32

frustrating in this case, this does not mean that Public Warehousing cannot require the Government to explain why it has complied with this Rule.

The Court concludes that even assuming that Public Warehousing is a fugitive, the fugitive disentitlement doctrine should not be applied on equitable grounds. The undersigned recognizes the Government's frustration with Public Warehousing's response to the criminal indictment given the corporation's use of the federal courts to litigate civil matters and given the large payments made by the U.S. Government to it. This frustration does not tilt the equities in the Government's favor, for there are a number of countervailing factors in Public Warehousing's favor. First, although the exact ownership interest is unclear, the Kuwaiti Government has some ownership in the corporation, raising foreign relations concerns. (*See* Aziz Decl. ¶ 3 (noting that the Government of Kuwait sold its majority stake in PWS)); [*see also* Doc. 100 at 15]. *See Af-Cap, Inc.*, 462 F.3d at 427 ("Sovereignty assertions . . . are different than blatant disrespect for the legal process."). Second, Public Warehousing's challenge to this Court's personal jurisdiction is a valid response to the Government's service. *See Danziger*, 161 F.2d at 301. Third, there is no indication that Public Warehousing will seek to avoid any adverse ruling in that it has retained counsel and seems to be willing

33

to submit to the Court's jurisdiction if the Court rules against it.[15]   Fourth, it is unfair

to allow the Government to request invocation of the disentitlement doctrine whenever

an organization challenges the Government's service.   To invoke the doctrine would

essentially render FED. R. CRIM. P. 4 a nullity.   Fifth, the whereabouts of Public

Warehousing are known to the Government.   That Rule 4(c)(3)(C) makes it difficult (if

not impossible) to serve an foreign corporation with no offices in the United States

should not be held against Public Warehousing, for it is a matter that should be

remedied by Congress or the drafters of the federal rules.[16]   Finally, the Government

---

[15]     The undersigned also notes that Public Warehousing appears willing to submit to this Court's jurisdiction if the Government follows diplomatic or other means in effecting service of process.  [*See* Doc. 100 at 6, 7].

[16]     The undersigned also notes that under FED. R. CRIM. P. 57, "[a] judge may regulate practice in any manner consistent with federal law, [the federal] rules [of criminal procedure], and the local rules of the district" when there is no controlling law relating to a procedure.  *See* FED. R. CRIM. P. 57(b).  Courts have indicated that this provision allows courts to borrow from a rule of civil procedure or civil practice "[w]here there is no specific rule on a subject covered in the Federal Rules of Criminal Procedure." *United States v. Khan*, 325 F. Supp. 2d 218, 227 (E.D.N.Y. 2004); *see also O'Neal v. United States*, 264 F.2d 809, 812 (5th Cir. 1959) ("Perhaps the Rules of Civil Procedure may be considered when the procedure is not specifically proscribed by the Rules of Criminal Procedure."); *United States v. Richter*, 488 F.2d 170, 173 (9th Cir. 1973).  Here, the criminal procedural rules do not have any provision for serving a corporation that has no offices in the United States.  The undersigned recognizes that "[a]lthough not dispositive, the absence of a Criminal Rule authorizing [service on a foreign corporation] counsels caution," but such caution does not necessarily mean that service on a foreign corporation outside of the United States "in criminal cases [is]

34

of Kuwait has opposed the Government's criminal prosecution, indicating that the legal

issues in this case should be resolved because a decision on the merits may make the

Kuwaiti Government "less confident in resisting diplomatic pressure from the United

States if they are no longer able to protest that [the service and prosecution] is legally

flawed as a matter of U.S. law." *In re Hijazi*, 589 F.3d at 413.  Given these factors, the

undersigned concludes that even if Public Warehousing is a fugitive, the Court should

not apply the fugitive disentitlement doctrine in this case.

Accordingly, the undersigned **RECOMMENDS** that the District Court **NOT**

**APPLY** the fugitive disentitlement doctrine to Public Warehousing's motion to quash

service.

---

never appropriate." *See Black v. United States*, 130 S. Ct. 2963, 2969 & n.11 (2010).
Any attempt to seek an alternative form of service for a foreign corporation would have
to explain why the Court must ignore the requirement in FED. R. CRIM. P. 4(c)(2) that
the summons be served either "within the jurisdiction of the United States" or
"anywhere else a federal statute authorizes an arrest" since there does not appear to be
any statute authorizing service on a foreign corporation outside of the United States.
*See* Wright & Leipold 1 Fed. Pract. & Proc. Crim. § 53 & n.4 (4th ed.) (listing only two
statutes as authorizing arrests overseas, one for military personnel and the other for the
Coast Guard).  The undersigned mentions Rule 57 as a potential avenue because it
seems that at least Public Warehousing is amenable to service in Kuwait given that it
has appointed Kuwaiti citizen as the only authorized PWC employee to receive service
of process following the return of the criminal indictment.

AO 72A
(Rev.8/8
2)

b.      *DGS Logistics*

The undersigned concludes that the fugitive disentitlement doctrine should not be applied to DGS Logistics' motion to quash.  First, the Government has not shown that DGS Logistics is a fugitive.   Although DGS Logistics' decision to retain an attorney in this matter demonstrates that it has knowledge of the pending criminal charges, the Government has not demonstrated that DGS Logistics has an intent to flee from the charges.  As DGS Logistics itself notes, the only method by which the Government can demonstrate flight by DGS Logistics is through the constructive flight doctrine, which the Eleventh Circuit has defined as "a person *who departs for a legitimate reason from the jurisdiction* in which his crime was committed but who later remains outside that jurisdiction for the purpose of avoiding prosecution."  *Fonseca-Machado*, 53 F.3d at 1244 & n.4.  The Government has not shown that DGS Logistics was ever present in the Northern District of Georgia or even in the United States.  Instead, the evidence shows that DGS Logistics is based and has always been based in Kuwait and has never had offices in the United States.  (*See* Mongeon Decl. ¶ 8).  As a result, the Government cannot show that DGS Logistics ever departed from this Court's jurisdiction.  Without such a departure, the undersigned concludes that the constructive flight doctrine does not apply to DGS Logistics.  The Government cannot

36

AO 72A
(Rev.8/8
2)

therefore establish the intent to flee requirement to establish that DGS Logistics is a fugitive. Without this showing, the fugitive disentitlement doctrine cannot apply. *Cf. United States v. Gonzalez*, 300 F.3d 1048, 1051 (9th Cir. 2002) (holding that disentitlement doctrine did not apply because the Government did not show that the defendant had fled from the jurisdiction of the court).

Second, even assuming that DGS Logistics is a fugitive, the undersigned concludes that the equities do not weigh in favor of applying the disentitlement doctrine in the case. The undersigned is persuaded that requiring the defendants to submit to the jurisdiction of the Court to dispute the Court's jurisdiction is not equitable. Rule 4 of the Federal Rules of Criminal Procedure establishes the method for serving a summons on an organization. When the procedures are not followed, courts have allowed criminal defendants to file motions to quash service of process and have granted these motions. *See, e.g.*, *Danziger*, 161 F.2d at 301; *United States v. Johnson Matthey PLC*, No. 2:06-cr-169, 2007 WL 634269 (D. Utah, Feb. 26, 2007), 2007 WL 2254676 (D. Utah Aug. 2, 2007). It therefore makes little sense to deny DGS Logistics the opportunity to challenge the Government's service solely because the Government is having a difficult time serving DGS Logistics pursuant to FED. R. CRIM. P. 4(c)(3)(C). *Cf. Sheets v. Yamaha Motors Corp., U.S.A.*, 849 F.2d 179, 185 n.5 (5th Cir. 1988)

37

(noting that foreign corporation "clearly had the right to be served under the proper service procedure").  That the Government is having such difficulty seems to bolster, not diminish, the defendants' position that they be allowed to challenge service of process without first submitting to the Court's jurisdiction.

Accordingly, the undersigned **RECOMMENDS** that the Court **NOT APPLY** the fugitive disentitlement doctrine to DGS Logistics' motion to quash service.

B.    *Service of Process*

1.    *Parties' Arguments*

a.    *Public Warehousing*

Public Warehousing argues that none of the Government's multiple attempts at service are sufficient under FED. R. CRIM. P. 4(c)(3)(C).  [*See generally* Docs. 51, 118]. First, Public Warehousing notes that foreign relations concerns exist in this case because: (1) FED. R. CRIM. P. 4(c)'s requirements acknowledge the territorial constraints on federal jurisdiction; (2) Public Warehousing is a Kuwaiti-based corporation without a place of business in the United States; and (3) the Kuwaiti

38

AO 72A
(Rev.8/8
2)

Government opposes the criminal prosecution.  [*Id.* at 12-15].[17]  It is not clear, what if

any relief, Public Warehousing seeks based on these international relations concerns.

Second, Public Warehousing asserts that the Government has not properly served

the summons and indictments under FED. R. CRIM. P. 4 and 9 because the Government

has not made personal service on an officer or agent of Public Warehousing and has not

mailed a copy to its last known address.  [*Id.* at 16-19].  Public Warehousing argues that

the Government's attempts at service on Mongeon and Cerjan are insufficient because

these individuals are neither employed by Public Warehousing nor authorized to accept

service on its behalf.  [*Id.* at 17-18].  Also, Public Warehousing argues that the

Government's mailing to the offices of DGS Holdings is insufficient as mailing to

Public Warehousing's last known address.  [*Id.* at 19].

Third, Public Warehousing, relying heavily on the *United States v. Johnson*

*Matthey* case, argues that the Government's service on DGS Holdings and DGS

_____

[17]      Public Warehousing also contends that the Government improperly created
a ruse when it attempted to lure Abdulaziz (the individual whom Public Warehousing
identified as the designated individual for service in Kuwait) to the U.S. embassy in
Kuwait for service.  [Doc. 51 at 15].  The Government denies this allegation, [Doc. 92
at 36-37], and Public Warehousing implies that the Government is lying, [Doc. 100 at
19 n.14].  The intrigue surrounding alleged attempt to serve Abdulaziz is peripheral to
the legal issues before the Court, so the undersigned merely notes the dispute without
addressing its merits.  The undersigned expects that the parties will drop this trivial
matter in any future briefing with the Court.

AO 72A
(Rev.8/8
2)

Logistics is insufficient because service on subsidiaries cannot effect service on the parent company.  [*Id.* at 19-24].  Although Public Warehousing acknowledges the *United States v. Chitron Electronics Co.* case authorized service of a subsidiary to effectuate service of the parent company under FED. R. CRIM. P. 4, Public Warehousing suggests that the case may not have been correctly decided and argues that it is distinguishable because the Government cannot show that either DGS Holdings or DGS Logistics are alter egos of Public Warehousing.  [*Id.* at 24-29].

Fourth, Public Warehousing argues that service on its attorney, Michael Charness, at a summary judgment hearing in the United States District Court for the District of Columbia does not constitute proper service.  [Doc. 118 at 6-9].

The Government responds that service was properly effectuated under FED. R. CRIM. P. 4.  [Doc. 92 at 17-35; Doc. 124].  First, the Government argues that service on Mongeon, Cerjan, and Hoffman was proper because these three individuals were agents of Public Warehousing at the time of service who gave notice of the criminal action to superiors at Public Warehousing.  [*Id.* at 18, 22-24].  As for Mongeon, the Government points to the following evidence: a December 2005 email indicating that Mongeon was "joining PWC"; documents indicating that Mongeon was promoted to president of DGS Holdings; statements by Mongeon regarding prime

40

vendor contracts; a correction to a Wall Street Journal article indicating that Mongeon was at Public Warehousing; and an email by Mongeon to all Agility employees that Agility did not receive the Prime Vendor III contract with the U.S. Government. [*Id.* at 18-19]. As for Cerjan, the Government points to an announcement indicating that Cerjan would be responsible for the contract covering food supplies to troops in Iraq and Kuwait. [*Id.* at 20]. As for Hoffman, the Government points to his position as vice president and general counsel for DGS Holdings, and states (without citing to evidence) that Hoffman along with Mongeon met with the U.S. Government to discuss a settlement of the criminal case when Public Warehousing was the only defendant. [*Id.*].

Second, the Government argues that Public Warehousing's designation of Abdulaziz as the authorized agent for service does not preclude service to a managing or general agent under Rule 4. [*Id.* at 24].

Third, the Government argues that service on the subsidiary DGS Holdings is service on Public Warehousing because DGS Holdings is an alter ego of Public Warehousing. [*Id.* at 24-31]. As proof of an alter ego relationship, the Government cites to the following evidence: (1) a 2006 announcement that the Public Warehousing companies would be known as Agility, [*id.* at 25-26]; (2) the request for a name change

41

in the prime vendor contract to reflect that "PWC Logistics Services," a subsidiary of Public Warehousing would perform the contract, [*id.* at 26]; (3) Public Warehousing's request for a novation in the prime vendor contract to the name Agility, [*id.*]; (4) Public Warehousing's signature on contract modifications as Agility, [*id.* at 27]; (5) an October 2008 proposal for a contract with the U.S. Government signed by Mongeon which mentioned Cerjan as key personnel, [*id.* at 27-28]; and (6) Agility's annual report containing consolidated financial results, [*id.* at 28]. The Government contends that service on an alter ego subsidiary is service on the parent, especially in this case given that (1) the subsidiaries performed the vendor contracts held by Public Warehousing and (2) Agility was an integrated business unit with a unitary nature. [*Id.* at 28-31].

Fourth, the Government argues that its mailing to DGS Holdings' Alexandria address meets the mailing requirement of Rule 4(c)(3)(C) since DGS Holdings is the alter ego for Public Warehousing. [*Id.* at 31-32]. The Government contends that Public Warehousing's reliance on the *Johnson Matthey* case is misplaced because the *Chitron* case applies. [*Id.* at 32-33].

Fifth, the Government contends that Public Warehousing's foreign relations concerns should not preclude the Government from enforcing the laws of the United States. The Government contends that the Court may exercise jurisdiction over Public

AO 72A
(Rev.8/8
2)

Warehousing because the corporation has a contractual relationship with the U.S. Government, has or had a corporate presence in the United States, engaged in illegal conduct in the United States, has contacts with the United States, and has utilized the federal courts in other cases. [*Id.* at 33-36].

Finally, the Government argues that service on Public Warehousing's attorney, Mr. Charness, constituted valid service. [*See* Doc. 124]. First, the Government notes that Charness has actively and continuously represented Public Warehousing in a long line of cases, [*id.* at 7-8], and was an active participant in one meeting concerning the criminal investigation, [*id.* at 10]. Second, the Government asserts (without citation) that Public Warehousing's attorneys have accepted service "on multiple occasions." [*Id.*]. Third, the Government asserts that its mailing of the summons to the last known address of Public Warehousing in the United States constitutes service. [*Id.* at 10-11]. The Government concludes by noting that service by diplomatic channels would not work given that the Kuwaiti Government objects to the criminal prosecution and that there is no extradition agreement with Kuwait. [*Id.* at 12].

Public Warehousing first replies that the Government's unsworn evidence to prove the alter ego relationship prevents it from showing that the subsidiaries were not separately maintained. [Doc. 100 at 19-20]. Public Warehousing argues that the

43

Government failed to prove that DGS Holdings is a mere conduit or alter ego of Public Warehousing in that the Government's brief contains no analysis of the alter ego test. [*Id.* at 21-22]. Public Warehousing contends that the Government's evidence of press releases relating to the creation of the Agility brand name does not dissolve the separate corporate structures. [*Id.* at 22-23]. As for Public Warehousing's attempt to change the name on its Government contracts to that of DGS Logistics and for novation of the contracts, it argues that the U.S. Government rejected the requests, indicating the Government viewed the entities as separate. [*Id.* at 25-26]. Public Warehousing also asserts that the Government failed to provide the evidence that typically is used to prove the alter ego theory and notes that consolidated corporate reports are normal features of the parent-subsidiary relationship. [*Id.* at 26-27]. Additionally, Public Warehousing asserts that the Government has not provided evidence similar to that used to pierce the corporate veil in the *Chitron* case. [*Id.* at 28].

Second, Public Warehousing argues that the Government failed to serve its agents given that the Government made service on three non-employees - - Mongeon, Cerjan, and Hoffman. [*Id.* at 29-34]. Public Warehousing recognizes that in the civil context, courts have determined that service of a subsidiary's agent was sufficient service the parent, but it argues that the criminal rules should be applied more

44

stringently.  [*Id.* at 30].  Public Warehousing next argues that the Government's evidence has not established that Mongeon, Cerjan, or Hoffman were its managing or general agents.  As for Mongeon, Public Warehousing argues that the Government's evidence merely shows that he worked for DGS Holdings and/or DGS Logistics, not Public Warehousing.  [*Id.* at 31].  As for Cerjan, Public Warehousing contends that the press release relied on by the Government was for public marketing purposes and made no attempt to distinguish the corporate entities.  [*Id.* at 32].  As for Hoffman, Public Warehousing contends that he was an employee with DGS Holdings.  [*Id.*].  Public Warehousing asserts (without evidence) that Hoffman's and Mongeon's presence at the settlement discussions were a result of their statuses as representatives of the subsidiaries, not Public Warehousing.  [*Id.* at 32-33].

Finally, Public Warehousing argues that the Government cannot meet the mailing requirement of FED. R. CRIM. P. 4(c)(3)(C) since it does not have offices in the United States and DGS Holdings is not a mere conduit.  [*Id.* at 34-35].

In its reply memorandum in support of its second amended motion to quash, Public Warehousing first argues that service on its outside counsel is not service on it.  [Doc. 130 at 3-5].  Next, it replies that mailing the summons to its closed Winchester, Virginia, office nearly two years after it was closed does not comport with

45

Rule 4(c)(3)(C). [Doc. 130 at 6-7]. In any event, it contends that since the rule requires a mailing to an organization's "last known address within the district or to its principal place of business elsewhere in the United States," the rule's requirements are not satisfied since it never had an office in the Northern District of Georgia, and its principal place of business has always been in Kuwait. [ *Id.* at 7].

Public Warehousing next argues that its acceptance of an investigative subpoena at the Winchester office in January 2007 does not preclude it from challenging service in this case, and contends that the Government's action on that occasion demonstrates that it knew that Public Warehousing's office at the time was in Winchester and not at the location of a subsidiary in Arlington, Virginia. [*Id.* at 8 n.4].

Public Warehousing also argues that the Government's reliance on Federal Rule of Criminal Procedure 2 in support of its argument for flexibility to dispense with the specific requirements of Rule 4 is accompanied by no citation of authority and runs contrary to the Supreme Court's rejection of applying Rule 2 in *Carlisle v. United States*, 517 U.S. 416, 424 (1996), where the Court held that Rule 2 could be utilized to construe ambiguous rules, but not to supersede clear rules. Public Warehousing contends that the requirements of Rule 4(c)(3)(C) are clear. [Doc. 130 at 8-9].

46

Public Warehousing next reiterates that service on DGS Holdings was not lawful service on it.  It contends that filing consolidated financial statements does not qualify as a veil-piercing event, for if it did, a number of the largest multi-national companies, like Johnson & Johnson, General Electric, Proctor & Gamble, and Siemens AG, whose consolidated financial statements include their subsidiaries and excerpts of the same are attached as exhibits to PWC's reply, similarly would be subject to the Government's veil-piercing analysis.  [*Id.* at 9-12].

Public Warehousing further replies that service upon it must be effectuated through diplomatic means.  [*Id.* at 12].  It argues that Congress and the courts have wisely limited the scope of Rule 4 to domestic corporations.  [*Id.* at 12-14].

Finally, Public Warehousing replies that the fact that the Prime Vendor contracts incorporate a choice of law provision for contract disputes does not apply to how a foreign contractor may be served with a criminal summons.  [*Id.* at 14 n.10].

### b.     *DGS Logistics*

Relying on the *Johnson Matthey* decisions, DGS Logistics argues that the Government cannot serve it under FED. R. CRIM. P. 4(c)(3)(C) because DGS Logistics does not have an address in this District or a principal place of business in the United States.  [Doc. 81 at 4-6].  DGS Logistics argues that the DGS Holdings office in

47

Alexandria, Virginia, is not DGS Logistics' nerve center or headquarters because DGS Logistics is based in Kuwait.  [*Id.* at 7].  DGS Logistics also contends that service on DGS Holdings does not constitute service on DGS Logistics since the two are separate entities.  [*Id.* at 8].

The Government responds by first noting that DGS Logistics received actual notice of the superseding indictment.  [Doc. 93 at 15].  The Government next argues that it served agents of DGS Logistics by serving the summons and superseding indictment on Mongeon and Cerjan who the Government identifies as agents of DGS Logistics and Public Warehousing.  [*Id.* at 15-18].  The Government also asserts that service of DGS Holdings' registered agent was also service on DGS Logistics because they are a unitary entity.  [*Id.* at 18-19].  The Government next argues that DGS Logistics is an alter ego for its parent company, Public Warehousing, given (1) the Agility name by which all defendants operate under, (2) the attempted name change on Public Warehousing's contract with the Government, (3) the modifications of the contracts reflected the Agility name, (4) DGS Logistics' contract bid suggested its ties to Agility, (5) the unitary image that Agility/Public Warehousing created for the world, and (6) the credit that all three defendants took for being the prime vendor.  [*Id.* at 19-23].  The Government asserts that the instant case is similar to the *Chitron* case and that

48

the *Johnson Matthey* case is inapposite given that the alter ego theory applies.  [*Id.* at 26-27].

In reply, DGS Logistics criticizes the Government for failing to actually identify the elements necessary to establish the alter ego theory and argues that the Agility branding effort does not transform the subsidiaries into alter egos of Public Warehousing.  [Doc. 98 at 11].  DGS Logistics adopts Public Warehousing's brief on the alter ego issue, but emphasizes two points: (1) the Government failed to present evidence that the defendants did not maintain corporate formalities; and (2) the U.S. Government's rejection of the name change in the contract indicated that it viewed the entities as separate.  [*Id.* at 12-13].  DGS Logistics contends that the Government's emphasis on the consolidated annual report is not evidence of an alter ego, but is a common practice among parent companies and their subsidiaries.  [*Id.* at 13 n.10].  DGS Logistics also argues that the Government's reliance on the alter ego theory demonstrates that the Government has not rebutted the mailing argument proposed by DGS Logistics.  [*Id.* at 11 n.8].

> 2.   *Relevant Law*

"To exercise personal jurisdiction over a foreign corporation, the government must 'succeed in getting [the corporation] within [the court's] power.' " *Chitron,*

49

668 F. Supp. 2d at 304 (quoting *Strassheim v. Daily*, 221 U.S. 280, 285 (1911)). "It is elementary that one is not bound by a judgment in personam resulting from litigation . . . to which he has not been made a party by service of process." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969). Rules 4 and 9 of the Federal Rules of Criminal Procedure govern the service necessary to bring a corporate defendant into a court's personal jurisdiction in a criminal case. *See Chitron*, 668 F. Supp. 2d at 304. Under FED. R. CRIM. P. 9, the court must, if the Government requests, issue a summons for each defendant named in an indictment. FED. R. CRIM. P. 9(a). When a summons is issued for an organization, the summons is served as provided by FED. R. CRIM. P. 4(c)(3)(C). *See* FED. R. CRIM. P. 9(c)(1)(A). Rule 4(c)(3)(C) provides that an organization is served if the following two requirements are established: (1) delivery of a copy of the summons (a) "to an officer, to a managing or general agent," or (b) "to another agent appointed or legally authorized to receive service of process"; and (2) the mailing of the summons (a) "to the organization's last known address within the district" or (b) "to its principal place of business elsewhere in the United States." FED. R. CRIM. P. 4(c)(3)(C).

The parties' briefs raise arguments relating to the following three issues: (1) whether DGS Logistics, DGS Holdings, and Public Warehousing are alter egos for

50

the same entity; (2) whether employees of DGS Holdings are agents of DGS Logistics or Public Warehousing; and (3) whether the Government can establish Rule 4(c)(3)(C)'s mailing requirement for a foreign corporation. The relevant law for each issue is outlined below.

###### a.  Alter Ego

Courts have generally found in civil cases that service on a subsidiary is inadequate to serve the parent company or another subsidiary of the parent company. *See Chitron*, 668 F. Supp. 2d at 304-05; *see also Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 n. (1988) ("[I]t is not self-evident that substituted service on a subsidiary is sufficient with respect to the parent. In the only cases in which it has considered the question, this Court held that the activities of a subsidiary are not necessarily enough to render a parent subject to a court's jurisdiction, for service of process or otherwise.") (citing *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336-37 (1925); *Consolidated Textile Corp. v. Gregory*, 289 U.S. 85, 88 (1933)); *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1293 (11th Cir. 2000); *Delta Constructors, Inc. v. Roediger Vacuum, GmbH*, 259 F.R.D. 245, 249 (S.D. Miss. 2009) ("[N]o court of the United States has ever found service upon a domestic sister corporation or cosubsidiary sufficient to perfect service upon a foreign sister

51

corporation."); *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 515 (D.N.J. 2008) (noting inquiry is "not whether two companies share a parent, but rather the level of control exercised by one entity over another"); Fletcher Cyclopedia of the Law of Corporations Ch. 67, IX, E § 8773 (updated through June 2010); Wright & Miller, 4A Fed. Pract. & Proc. § 1104 (3d ed.).

Courts have deemed, however, service on the subsidiary as service on the parent or another subsidiary when: (1) the subsidiary is an agent of the parent; or (2) the subsidiary is the alter ego of the parent.  *See Exter Shipping Ltd. v. Kilakos*, 310 F. Supp. 2d 1301, 1313, 1315 (N.D. Ga. 2004) (Thrash, J.); Wright & Miller, 4A Fed. Pract. & Proc. § 1069.4 & nn. 10-17, 18; § 1104 & nn. 11-12 ("The cases indicate that to sustain service on the parent through the subsidiary, or vice versa, a showing that the subsidiary corporation is acting as an agent for the parent corporation's separate business within the state[] or that the two corporations are not really separate entities has been required."); *see also Bally Export Corp. v. Balicar, Ltd.*, 804 F.2d 398, 405 (7th Cir. 1986) ("Where one corporation so controls another corporation that, as a practical matter, the two entities function as one, service on one corporation is effective as to both."); *Chitron*, 668 F. Supp. 2d at 305 (noting that service on a subsidiary will constitute service on a parent if the subsidiary is "a mere

52

conduit" for the parent's activities); *Delta Constructors*, 259 F.R.D. at 249 ("[T]here are numerous cases, . . . which lend support to [plaintiff's] position that a sister or cosubsidiary corporation may be the 'agent at law' for service of process on a sister/cosubsidiary if the plaintiff can make a sufficient showing of the existence of an agency or alter ego relationship between the two."); *Potts v. Dyncorp Int'l, LLC*, No. 3:06-cv-124, 2007 WL 899040, *1 (M.D. Ala. Mar. 23, 2007) (noting that service on parent corporation will suffice as service on subsidiary where the two corporations are not separate entities) (citing *I.A.M. Nat'l Pension Fund, Benefit Plan A v. Wakefield Indus., Inc., Div. of Capehart Corp.*, 699 F.2d 1254, 1259 (D.C. Cir. 1983)).  The imputation of service on the parent through service on the subsidiary on alter ego grounds has been applied in at least one criminal case.  *See Chitron*, 668 F. Supp. 2d

53

at 305-06.[18]   The Government now tries to apply the alter ego theory to this criminal

_____

[18]      Although the defendants do not explicitly argue that the *Chitron* decision was wrongly decided, they appear to imply that *Chitron* is not good law or question its persuasive value.  [*See* Doc. 51 at 7 n.8, at 24 (noting that *Chitron* is unique among federal criminal cases in applying the alter ego theory to service of summons), at 25 n.23 (noting that *Chitron* has not been followed or tested on appeal); Doc. 100 at 21-22 (refusing to concede that *Chitron* was correctly decided but offering no criticism as to why it was not); Doc. 98 at 14 (noting that the Government has not made the showing made acceptable in *Chitron* even "assuming that the holding of *Chitron* is correct")].  The undersigned sees no reason why the alter ego holding in *Chitron* constitutes an improper application of federal law or an unpersuasive decision.  The Supreme Court has suggested that if a court litigates an alter ego issue and the court determines that a parent company and its subsidiary are the same entity so that jurisdiction over the subsidiary gives the court jurisdiction over the parent, a judgment may be entered against a parent if the parent appears and has a full opportunity to contest jurisdiction.  *Zenith Radio Corp.*, 395 U.S. at 111 ("If the alter ego issue had been litigated, and if the trial court had decided that [the subsidiary] and [the parent] were one and the same entity and that jurisdiction over [the subsidiary] gave the court jurisdiction over [the parent], perhaps [the parent's] appearance before judgment with full opportunity to contest jurisdiction would warrant entry of judgment against it.").  The *Chitron* Court appears to have followed the procedure outlined by the Supreme Court in that the parent appeared before the court to contest jurisdiction and the district court made findings on the alter ego issue with the parent company litigating the issue.  *See generally Chitron*, 668 F. Supp. 2d 298.  That the relatively recent *Chitron* decision has neither been cited nor reviewed on appeal does not render it less persuasive, especially given that the issues confronting *Chitron* (and this Court) relating to service of a foreign organization in a criminal case are not well reported in the case law.  Additionally, the *Chitron* decision is consistent with federal law, namely that "federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over . . . a corporation that would not ordinarily be subject to personal jurisdiction in that court when the . . . corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court" because "the two corporations . . . are the *same entity*."  *Patin v. Thoroughbred Power Boats*, 294 F.3d 640, 653 (5th Cir. 2002) (emphasis in original) (citing cases).

54

case.[19]

_____

[19]     The Government has not explicitly argued that service was appropriate on agency grounds, so the undersigned does not discuss the issue in the main text.  To the extent that the Government's use of the term "alter ego" was meant to implicate the agency theory, the undersigned addresses the issue in some detail in this footnote.

"Principles of agency [ ] permit one corporation or business organization to be the agent of another institution so that service of process on an officer or on a managing or general agent of one organization can be valid service on another[.]"  4A Wright & Miller, Fed. Pract. and Proc. § 1104 & n. 4 (3d ed. 2002); *see also Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 419 (9th Cir. 1977).  A parent-subsidiary relationship by itself does not establish agency.  *U.S. ex rel. Thomas v. Siemens AG*, --- F. Supp. 2d ----, ----, 2010 W 1688582, *11 (E.D. Pa. Apr. 23, 2010); *Exter Shipping*, 310 F. Supp. 2d at 1313 ("[W]hen a parent and a subsidiary are separate and distinct corporate entities, the presence of one in a forum . . . may not necessarily be attributed to the other."); *Jones v. Volkswagen of Am., Inc.*, 82 F.R.D. 334, 335 (E.D. Tenn. 1978).  At a minimum, there must be control of the subsidiary by the parent for an agency relationship to exist.  Restatement (Third) of Agency § 1.01 cmt. c (2006) ("A relationship is not one of agency within the common-law definition unless ... the principal has the right . . . to control the agent's acts.").  Concerning the issue of control, one court has noted that "[c]ourts have long struggled, often with confusing results, to explain how much control is required before parent and subsidiary may be deemed principal and agent."  *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000).

Given this lack of consensus, courts have established a number of tests for determining whether a subsidiary is an agent of a parent corporation.  The Third Circuit (applying Colorado law) has indicated that "a wholly owned subsidiary may be an agent [ ] when its activities as an agent are of such a character as to amount to doing business of the parent."  *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 108 (3d Cir. 2009).  The Ninth Circuit has stated a related test by noting that "[t]he agency test is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform

55

them, the corporation's own officials would undertake to perform substantially similar services.' " *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001) (quoting *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994)). The District Court in this case has indicated that there is no agency relationship "where the 'subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent." *Exter Shipping Ltd.*, 310 F. Supp. 2d at 1313 (quoting *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000)). An agency relationship will exist only if the subsidiary's corporate existence is a mere formality. *Id.* Illinois courts have developed a multi-factor test for determining whether a subsidiary is the parent's agent for service of process purposes. *See, e.g.*, *In re Subpoena to Huawei Techs. Co., Ltd.*, --- F. Supp.2d ----, ----, 2010 WL 2266365, *3 (N.D. Ill. June 2, 2010) (listing 13 factors).

Along with control, courts have identified the following factors as establishing agency between a subsidiary and a parent:

> when the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.

*Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000) (citing Restatement (Second) of Agency § 1); *cf. In re Cyclobenzaprine Hydrochloride*, 693 F. Supp. 2d 409, 420 (D. Del. 2010) ("Under the agency theory, the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction.") (quoting *C.R. Bard, Inc. v. Guidant Corp.*, 997 F. Supp. 556, 559 (D. Del.1998)). The burden of proving agency is on the party asserting an agency relationship exists. *Bogue Elec. Mfg. Co. v. Coconut Grove Bank*, 269 F.2d 1, 4 (5th Cir. 1959).

To the extent that the Government has sought to establish service under the agency theory, it has not met its burden at this time. First, the undersigned recognizes

The parties' discussion of the Government's alter ego theory identified neither the controlling law for the Court to apply nor the substantive requirements for establishing the alter ego theory.   Before the Court can identify the substantive

---

that there is evidence that DGS Holdings and DGS Logistics are closely related given Mongeon's involvement in both corporations.   However, the Government has not provided any evidence that DGS Logistics controlled DGS Holdings or that DGS Holdings performed services that were sufficiently important to DGS Logistics such that DGS Logistics would perform the services absent DGS Holdings.   Simply put, the Government has not actually explained what DGS Logistics does, what DGS Holdings does, or how the two companies' operations are intertwined.   Although the superseding indictment indicates that DGS Holdings and DGS Logistics helped Public Warehousing service the prime vendor contracts, this does not provide insight into the relationship between DGS Logistics and DGS Holdings.   Using the District Court's standard, the Government has not shown that DGS Holdings' presence in the U.S. was to carry on the business of DGS Logistics.   *See Exter Shipping Ltd.*, 310 F. Supp. 2d at 1313.

Second, the undersigned concludes that the Government has not shown that DGS Holdings and DGS Logistics are the agents of Public Warehousing.   Again, the Government has not provided any evidence of the actual operations of the three companies and how they interacted.   Although there may have been evidence of Mongeon's role acting on behalf of DGS Holdings, DGS Logistics, and Public Warehousing, this does not indicate that DGS Holdings was working on behalf of Public Warehousing or that Public Warehousing was directing the activities of DGS Holdings.   For instance, the Government has not provided evidence that employees of DGS Holdings or DGS Logistics served as contacts for suppliers of the prime vendor contracts.   Nor has the Government provided evidence that the U.S. Government's contacts for Public Warehousing were actually employees of DGS Holdings or DGS Logistics.   The emails, press releases, annual reports, and evidence of a unifying trade name do not establish agency because these documents say little about control by Public Warehousing.

57

requirements for establishing that a subsidiary is the parent company's alter ego, the undersigned must first determine what jurisdiction's law controls.

"[I]n a federal prosecution federal law applies, not state law." *United States v. Lee*, 223 Fed. Appx. 905, 906 (11th Cir. Apr. 30, 2007); *see also United States v. Pforzheimer*, 826 F.2d 200, 203 (2d Cir. 1987) (agreeing that "federal law governs federal prosecutions in federal court"). The undersigned recognizes that courts ordinarily make this statement in the context of determining whether the admissibility of evidence in criminal cases is governed by federal or state law. *See, e.g.*, *United States v. Bailey*, 123 F.3d 1381, 1395 n.20 (11th Cir. 1997) ("[F]ederal law governs the admissibility of evidence in a federal prosecution, even if the evidence is obtained in violation of state law . . . or in violation of internal governmental regulations."); *United States v. Mastrangelo*, 733 F.2d 793, 799 (11th Cir. 1984). The policy in support of this rule is that "it is important that there be uniformity of evidentiary rules among the federal courts." *Pforzheimer*, 826 F.2d at 204. The undersigned sees no reason why federal courts would also not want uniformity in applying federal rules of criminal procedure,[20] especially given that "[t]he Federal Rules of Criminal Procedure were

---

[20]     *Cf. United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979) ("Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of considerations always relevant to the nature

AO 72A
(Rev.8/8
2)

designed to provide a uniform set of procedures to govern criminal cases within the federal courts consistent with the requirements of justice and sound administration." *United States v. Weinstein*, 452 F.2d 704, 715 (2d Cir. 1971). The undersigned believes that this policy of uniformity would be thwarted if the Court resorted to state (or international) law to supply the law for applying the service rules under Rules 4 and 9. Additionally, the undersigned notes that FED. R. CRIM. P. 2[21] requires the rules to be interpreted to "to secure simplicity in procedure," and resort to federal common law on the issue of the Government's alter ego theory achieves this goal, especially in light of the fact that the Court might otherwise have to engage in an examination of whether the alter ego issue should be governed by Kuwaiti (the place of incorporation and headquarters for PWS and DGS Logistics), Delaware (DGS Holdings' place of incorporation), Virginia (location of DGS Holdings' corporate office), or Georgia (state

---

of the specific Governmental interests and to the effects upon them of applying state law.' ") (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 310 (1947)).

[21]    The Court also questions whether Rule 2 offers assistance in deciding the present controversy, given the Supreme Court's recent admonition that a specific provision (in this case, Rule 4(c)(3)(C)) controls one of more general application, i.e., Rule 2. *See Bloate v. United States*, 130 S. Ct. 1345, 1354 (2010); *see also Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) (same).

of the instant criminal action where certain alleged fraud occurred).[22]  As a result, the

_____

[22]       In a forfeiture proceeding under 18 U.S.C. § 981, a federal court determined that "whether a corporation is the alter ego of the fugitive for the purposes of becoming disentitled to maintain a claim in a forfeiture proceeding is an issue of federal law that is determined by reference to state law, provided the state law does not conflict with the federal statute.  *See United States v. Funds Held in Name or for Ben. of Wetterer*, 899 F. Supp. 1013, 1025 (E.D.N.Y. 1995).  Given this finding that state law should be applied, the court then engaged in a choice of law analysis under federal law, which required that it apply the law of the jurisdiction having the greatest interest in the litigation, leading the court to identify four possible jurisdictions - - New York, Texas, Florida, and Guatemala.  *Id.* at 1025-27.  The Court then applied the law of New York and Texas, which the court found to have essentially the same requirements for establishing the alter ego theory.  *Id.* at 1027.  Although the *Wetterer* decision opted to decide veil piercing under state law, the undersigned need not follow *Wetterer* given that the case involved forfeiture proceedings and did not address the policy issues of maintaining uniform rules for criminal procedure.

       Additionally, the undersigned notes that the application of federal common law may not matter in the end because courts have noted that state law and federal common law relating to the alter ego theory is similar in many cases.  *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F. Supp. 22, 33 (D. Mass.1987) (noting that, since "federal common law draws upon state law for guidance, . . . the choice between state and federal [veil-piercing law] may in many cases present questions of academic interest, but little practical significance").  Of relevance to this case, courts have noted that: (1) federal and Georgia law on piercing the corporate veil "apply a similar rubric," *Exter Shipping Ltd.*, 310 F. Supp. 2d at 1317 n.6; (2) federal and Delaware law alter ego standards "are substantially identical," *Matter of Sims*, 994 F.2d 210, 218 n.11 (5th Cir. 1993); and (3) Virginia and federal law examine the similar factors in determining whether there was domination or control of the subsidiary, *cf. In re County Green Ltd. Partnership*, 438 F. Supp. 701, 705-06 (W.D. Va.1977), *cited with approval by O'Hazza v. Exec. Credit Corp.*, 246 Va. 111, 116 (1993).  As a result, any error in the undersigned applying federal common law would be harmless if one of these other state's laws were found to control.

undersigned applies federal common to determine whether DGS Holdings is the alter ego for DGS Logistics and/or Public Warehousing.

"A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities," so "[a] corporate parent which owns the shares of a subsidiary does not . . . own or have legal title to the assets of the subsidiary." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). This "veil separating corporations and their shareholders may be pierced in some circumstances," but "[t]he doctrine of piercing the corporate veil [ ] is the rare exception, applied in the case of fraud or certain other exceptional circumstances." *Id.* "The federal common law in this area emerges from the general principle that 'a corporate entity may be disregarded in the interests of public convenience, fairness and equity.' " *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F. Supp. 22, 33 (D. Mass. 1987) (quoting *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir. 1981)).

The Eleventh Circuit has identified three components of the federal common law alter ego principle: (1) control or domination; (2) fraud or other wrong;[23] and

_____

[23]     The "control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights." *United Steelworkers of America, AFL-CIO-CLC v. Connors Steel Co.*, 855 F.2d 1499, 1507 (11th Cir. 1988) (quoting *United Paperworkers Int'l U. v. Penntech Papers,*

(3) proximate causation.[24]  *United Steelworkers of America, AFL-CIO-CLC v. Connors Steel Co.*, 855 F.2d 1499, 1506-07 (11th Cir. 1988) (citing *United Paperworkers Int'l U. v. Penntech Papers*, 439 F. Supp. 610, 618 (D. Me. 1977)).  "[T]here is no litmus test for determining whether a subsidiary is the alter ego of its parent.  Instead, [courts] must look to the totality of the circumstances," so "[r]esolution of the alter ego issue is heavily fact-specific."  *Id.* (quoting *United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 694 (5th Cir. 1985)); *see also Exter Shipping Ltd.*, 310 F. Supp. 2d at 1317.  Since the Government's showing fails on the first element for the reasons below, the undersigned only outlines the relevant law for the control or domination element and does not examine whether the remaining two elements for establishing the alter ego theory are necessary in the FED. R. CRIM. P. 4(c)(3)(C) service of process context.

To establish the alter ego theory, the Government must establish "[c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practices in respect to the transaction attacked so that the

---

439 F. Supp. 610, 618 (D. Me. 1977)).  The Fifth Circuit has stated that fraud is necessary in a contract case, but not in a tort case.  *United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 692-93 (5th Cir. 1985).

[24]    The "control and breach of duty must proximately cause the injury or unjust loss complained of."  *Connors Steel Co.*, 855 F.2d at 1507 (quoting *Penntech Papers*, 439 F. Supp. at 618).

corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Connors Steel Co.*, 855 F.2d at 1507 (quoting *Penntech Papers*, 439 F. Supp. at 618). The Eleventh Circuit has cited and applied without criticism the following twelve factors as bearing on whether a parent controls a subsidiary:

(1) the parent and the subsidiary have common stock ownership;

(2) the parent and the subsidiary have common directors or officers;

(3) the parent and the subsidiary have common business departments;

(4) the parent and the subsidiary file consolidated financial statements and tax returns;

(5) the parent finances the subsidiary;

(6) the parent caused the incorporation of the subsidiary;

(7) the subsidiary operates with grossly inadequate capital;

(8) the parent pays the salaries and other expenses of the subsidiary;

(9) the subsidiary receives no business except that given to it by the parent;

(10) the parent uses the subsidiary's property as its own;

(11) the daily operations of the two corporations are not kept separate; and

(12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

AO 72A
(Rev.8/8
2)

*Connors Steel Co.*, 855 F.2d at 1505 (quoting *United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691-92 (5th Cir. 1985)).  A party need not prove each of these elements to establish control or domination.  *Id.* at 1506 (citing with approval district court's statement that " it is not necessary that plaintiffs prove the existence of all twelve factors" and finding the control element met despite failure to meet all elements).

### b.    *Managing or General Agents*

Service of an organization must be made by delivering the summons "to an officer,[25] to a managing or general agent, or to another agent appointed or legally authorized to receive service of process."  FED. R. CRIM. P. 4(c)(3)(C).  Since the undersigned has not found any criminal cases discussing who constitutes a "managing or general agent," the undersigned turns to civil cases interpreting similar language from FED. R. CIV. P. 4(h)(1)(B).[26]  As an initial matter, the undersigned notes that federal law determines whether a person is an agent for purposes of service given that

---

[25]    "An officer is a person 'elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer.' "  *Rogers v. Washington Fairmont Hotel*, 404 F. Supp. 2d 56, 58 (D.D.C. 2005) (quoting Black's Law Dictionary 1117 (8th ed. 2004)).

[26]    This provision provides in relevant part that service may be made "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process."  FED. R. CIV. P. 4(h)(1)(B).

AO 72A
(Rev.8/8
2)

this case is a federal criminal prosecution.  *Cf. Estates of Ungar ex rel. Strachman v. Palestinian Authority*, 153 F. Supp. 2d 76, 89 (D.R.I. 2001) ("In a federal question case, federal law determines whether a person is an agent for purposes of service under Rule 4."); Wright & Miller, 4A Fed. Pract. & Proc. Civ. § 1103 (3d ed.).

A "managing or general agent" is "one invested with general powers involving the exercise of independent judgment and discretion."  *Jim Fox Enters., Inc. v. Air France*, 664 F.2d 63, 64 (5th Cir. Dec. 14, 1981); *see also Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 624 (6th Cir. 2004) (citing *Grammenos v. Lemos*, 457 F.2d 1067, 1073 (2d Cir. 1972)) ("A 'managing agent' is one authorized to transact all business of a particular kind at a particular place and must be vested with powers of discretion rather than being under direct superior control."); Wright & Miller, 4A Fed. Pract. & Proc. § 1103 (3d ed.) ("[E]ven a person who is not in charge of the corporation's activities within the state still may qualify as a managing or general agent for purposes of Rule 4(h)(1) if the individual is in a position of sufficient responsibility so that it is reasonable to assume that the person will transmit notice of the commencement of the action to organizational superiors.").  "To be an agent of a corporation . . ., an individual ordinarily must be in the current employ of the

65

AO 72A
(Rev.8/8
2)

organization upon whom service of the summons and complaint is to be made." Wright & Miller, 4A Fed. Pract. & Proc. § 1101.

Although an agent ordinarily must be in the employ of an organization, courts have determined that an employee of a wholly owned subsidiary of a parent may constitute service on the parent company. *See Heise v. Olympus Optical Co., Ltd.*, 111 F.R.D. 1, 6 (N.D. Ind. 1986) (holding that president of U.S. subsidiary of Japanese parent constituted service on the parent because the subsidiary's president was "a managing or general agent" in that he was in a position "of sufficient responsibility so that it is reasonable to assume that he would transmit notices to [the parent]")[27]. The basis for this conclusion rests on "[p]rinciples of agency." Wright & Miller, Fed. Pract. & Proc. § 1104 & n.4 (3d ed.). As a result, it appears that the subsidiary must be acting as an agent of the parent before service on the subsidiary's agent will constitute service on the parent company. *See Heise*, 111 F.R.D. at 2 (finding sufficient service on parent through subsidiary's agent where subsidiary was an agent of parent in that it was "formed for the purpose of marketing and distributing products manufactured by the parent").

---

[27]  The subsidiary in *Heise* was created to market and distribute products by the parent. *Heise*, 111 F.R.D. at 2.

66

An attorney is not authorized by law to receive process solely because of his or her status as an attorney.  *See Ransom v. Brennan*, 437 F.2d 513 (5th Cir. 1971); *Arthur v. Litton Loan Servicing LP*, 249 F. Supp. 2d 924, 930 (E.D. Tenn. 2002) ("[T]he mere attorney-client relationship between a defendant and his attorney does not, in itself, convey the specific authority necessary for the attorney to receive service of process on the defendant's behalf.").  For service on an attorney to be effective as service on a defendant,

> [t]here must be evidence that the defendant intended to confer upon its agent the specific authority to receive and accept service of process for the defendant.  The defendant's attorney is not deemed an agent appointed to receive service absent a factual basis for believing such an appointment by the defendant has occurred.

*Allstate Ins. Co. v. Funai Corp.*, 249 F.R.D. 157, 162-63 (M.D. Pa. 2008) (quoting *Electroweb Media, Inc. v. Mycashnow.com, Inc.*, No. 1:02-cv-133, 2006 WL 2850132, *2 (E.D. Tenn. Sept.29, 2006)).  Thus, there must be evidence that the defendant either explicitly or implicitly authorized the attorney to accept service in the action.  *In re Focus Media Inc.*, 387 F.3d 1077, 1083 (9th Cir. 2004) (citing *Olympus Corp. v. Dealer Sales & Serv., Inc.*, 107 F.R.D. 300, 306 (E.D.N.Y. 1985)); *Davies v. Jobs & Adverts Online, Gmbh*, 94 F. Supp. 2d 719, 722 (E.D. Va. 2000).  Some courts have determined that there is implied authority to accept service if the record shows that the attorney

67

AO 72A
(Rev.8/8
2)

exercised authority beyond the attorney-client relationship, including the power to accept service. *United States v. Ziegler Bolt & Parts Co.*, 111 F.3d 878, 881 (Fed. Cir. 1997). Other courts have determined that an attorney can impliedly accept service of process on the client's behalf if (1) the attorney has previously represented the client and is representing the client in a related proceeding; and (2) the totality of the circumstances show the client intended to convey the authority. *In re Focus Media Inc.*, 387 F.3d at 1083; *Luedke v. Delta Air Lines, Inc.*, 159 B.R. 385, 395 (S.D.N.Y. 1993) ("An attorney's activities on behalf of a client in proceedings in one court may indicate implied authority to receive service of process in integrally related litigation in another court.").

### c.      Mailing of the Summons

Besides requiring that service be made on an agent of an organization, FED. R. CRIM. P. 4(c)(3)(C) requires that the summons be mailed either to the organization's (1) last known address within the district, or (2) principal place of business[28] elsewhere in the United States. FED. R. CRIM. P. 4(c)(3)(C). When there is

---

[28]      In the context of the diversity of citizenship statute at 28 U.S.C. § 1332, the United States Supreme Court has held that :" 'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities[, *i.e.*, the nerve center]. . . . [I]n practice it should normally be the place where the corporation maintains its headquarters-provided that

a "sufficient interrelationship" between the subsidiary and parent, "it follows that service of a copy of the summons at the address of [the subsidiary] is sufficient to satisfy the [mailing] requirement of the Rule." *Chitron*, 668 F. Supp. 2d at 306.  If the Government fails to comply with the mailing requirement, the attempted service of the summons may be quashed.  *See United States v. Johnson Matthey PLC*, No. 02-cr-169, 2007 WL 2254676, *2 (D. Utah, Aug. 2, 2007); *Johnson Matthey*, 2007 WL 634269 at *2 (D. Utah Feb. 26, 2007).

> 3.    *Application of the Law*
>
>> a.    *DGS Logistics*
>>
>>> i.  *Serving DGS Logistics' Agents*

The Government asserts that it served two agents for DGS Logistics - - Paul Cerjan and Daniel Mongeon - - with the copy of the summons and superseding indictment.  [Doc. 93 at 16-18].  DGS Logistics does not (and cannot) take issue with this argument.  [Doc. 98 at 10-15].  The undisputed evidence shows that service of the

---

the headquarters is the actual center of direction, control, and coordination, i.e., the 'nerve center,' and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192 (2010).  The undersigned does not address whether this definition applies to the term "principal place of business" in FED. R. CRIM. P. 4(c)(3)(C) because the Government's service faces other difficulties.

69

summons and superceding indictment were made on both Mongeon, who served as the Managing Director of DGS Logistics, (*see* Mongeon Decl. ¶¶ 2-3, 5, 8), and Cerjan, who was the President of the Europe/Middle East & Africa unit of DGS, (Cerjan Decl. ¶¶ 1-3). With a director and president of DGS Logistics served, the undersigned concludes that the Government served process on an officer or "managing or general agent" of DGS Logistics.

### ii.  Mailing

The Government has taken the position that mailing the summons and complaint to DGS Holdings in Alexandria, Virginia, completed service under FED. R. CRIM. P. 4(c)(3)(C) because DGS Holdings was the alter ego of Public Warehousing and DGS Logistics.   [Doc. 93 at 19-27].   The undersigned concludes, however, that the Government has not proven that DGS Logistics is the alter ego of DGS Holdings or Public Warehousing.  Initially, the Government has not explicitly asserted that any of the 12 factors for the control from the *Connors Steel* case outlined above are present in this case.  The Government has not provided the Court with any information about the interrelationship of the corporate structures, the finances, the shareholders, or the employees of DGS Holdings, Public Warehousing, and DGS Logistics.  Although DGS Holdings appears to be the subsidiary of a subsidiary of DGS Logistics and DGS

70

Logistics is a subsidiary of Public Warehousing, the Government has not shown that DGS Logistics controls or dominates DGS Holdings or that Public Warehousing controls or dominates DGS Logistics.

In fact, the Government's evidence is slim in that it has merely produced unsworn copies of emails, announcements, corporate reports, and press releases. This unsworn evidence by itself is hardly what the undersigned would expect to establish that one corporation dominates or controls another. There is no information about DGS Logistics' finances as they relate to Public Warehousing or DGS Holdings. There is also no information about how DGS Logistics was controlled by Public Warehousing or how DGS Logistics controlled DGS Holdings. There is no information that DGS Logistics was undercapitalized, relied on Public Warehousing/DGS Holdings for operations, and maintained the same books. Instead, affidavits from the defendants demonstrate that the books, employees, and officers were separate. (Moe Decl. ¶ 7 at Doc. 51-15). Also, the Government has not shown that Public Warehousing paid wages and expenses of DGS Logistics.

As for the Government's proof, the undersigned concludes that it does not implicitly reach the factors listed in the *Connors Steel* case. First, the 2006 press release announcing the PWC group of companies would be known as Agility does not

71

suggest that the companies lost their corporate structures.  *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001) (noting that "courts have refused to pierce the veil even when subsidiary corporations use the trade name of the parent"); *In re Washington Mut., Inc.*, No. 08-br-12229, 2010 WL 3238903, *14 (Bkrtcy. Del. Aug. 13, 2010) ("[A] common trade name is frequently used in parent-subsidiary relationships and is not a basis for disregarding the corporate form.").  As noted, the evidence shows that Public Warehousing and DGS Holdings and Public Warehousing and DGS Logistics maintained separate books, separate employees, and separate directors.  (Aziz Decl. ¶¶ 10-11).[29]

Second, the Government has not cited to any case law to prove that a footer on emails is a factor to consider in the alter ego theory.  The footer in question only stated in relevant part: "The information contained within this document (electronic or otherwise) is the property of 'the company' known as Agility Defense & Government Services which includes PWC Logistics Services, KSC (closed) and Agility Defense

---

[29]    As for DGS Holdings and DGS Logistics, it is not clear whether the two companies maintained separate books, but it is clear that the two companies shared the same Director - - Mongeon who was the Director, President, and CEO of DGS Holdings as well as the Managing Director of DGS Logistics.  (*See* Mongeon Decl. ¶¶ 1, 7-8).  The Government has not shown, however, that Mongeon's role in both companies made one the alter ego for the other because there is no evidence of what precisely Mongeon did for each company.

& Government Services, Inc. and their subsidiaries and affiliates." (*See* Disclaimer in email dated 3/25/2008 in Doc. 92-11 at Exh. K). This statement without more does not demonstrate that one company is a mere conduit for another or controlled any other company.

Third, the name change and novation requests by Public Warehousing on the U.S. Government contract does not show that the corporate structures between Public Warehousing and DGS Logistics were non-existent. *See BLH Inc. v. United States*, 13 Cl. Ct. 265, 274-75 (1987) (noting that failed attempt to obtain a novation did not establish alter ego relationship).

Fourth, the Government's attempt to suggest that PWC Logistics's efforts at taking credit for the U.S. Government contracts in 2005 can be attributed to DGS Logistics is misplaced because the only sworn evidence before the Court is that DGS Logistics was a "dormant entity" until late 2006.[30] (Moe Decl. ¶¶ 3-4 at Doc. 51-15 at Exh. O).[31]

––––––––––––––––––––

[30]   The undersigned notes, however, that DGS Logistics apparently had some operations in 2006 if it could establish a subsidiary in the Netherlands, which then established the subsidiary in the United States known as DGS Holdings. (*See* Hoffman Decl. ¶¶ 3-4 in Doc. 51-2 at Exh. B).

[31]   Without citing to any sworn testimony, Public Warehousing has also indicated that "[p]rior to the 2006 re-branding effort, PWC often referred to itself using

73

Fifth, the undersigned is unpersuaded by the Government's contention that since Agility DGS took credit for U.S. Government contracts in 2007, it has provided evidence of its alter ego theory.  The defendants have provided sworn testimony that this Agility designation was a trade name.  (Moe Decl. ¶ 9).  It does not follow that Public Warehousing controlled its subsidiaries merely because Public Warehousing, DGS Holdings, and DGS Logistics all fall within that trade name.  As explained above, a party can only prevail on the alter ego theory if it provides evidence of control or domination.  The Government's focus on the trade name and unproven allegations of a unitary entity are simply unpersuasive because these assertions do not show that Public Warehousing controlled its subsidiaries to such an extent that the Court should pierce the corporate veil in this case.

Sixth, that invoices were submitted in the name of "PWC Logistics" or "Agility Prime Vendor" says very little about the corporate structure and finances of the three defendants or that any entity controlled or dominated another.  For instance, the Government has not shown where these payments ultimately ended up or whether they were used by Public Warehousing to fund the operations of DGS Holdings or DGS

_____

the name 'PWC Logistics,' " and it has asserted that "PWC Logistics was therefor a brand name for PWC and not 'the predecessor to defendant [DGS Logistics.]' " [*See* Doc. 100 at 24 n.18].

74

Logistics.  The undersigned reiterates that the Government's burden is to show control or domination, and the evidence of invoices does not show such domination.

Seventh, the Government's evidence of Mongeon signing a contract bid for the Prime Vendor III contract as President and CEO of DGS Logistics in 2008 is not evidence of an interrelationship between Public Warehousing and DGS Logistics.[32]  It shows a relationship with DGS Logistics and DGS Holdings, but without further evidence, it is unclear how the evidence proves the Government's alter ego theory.

Eighth, the evidence of consolidated financial results may be some evidence of control as listed above, *see Connors Steel*, 885 F.2d at 1505 (item 4), but as the defendants point out, this cannot be dispositive given that subsidiaries and parent companies customarily report results together.  *See Lowell Staats Mining Co. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1264 (10th Cir. 1989) ("[W]e do not consider the fact of consolidated financial reports to be a sufficient basis to impose liability under the alter ego doctrine."); *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 144-45 (E.D.N.Y. 2009) (collecting cases and holding that consolidated financial  reports and

---

[32]     The undersigned notes that the proposal does suggest overlap between the operations of DGS Holdings and DGS Logistics.  The Government has not explained however how this relationship requires piercing the corporate veils of these two companies.

75

overlapping directors and officers "are commonplace as generally-accepted corporate form, and are insufficient without more, as a matter of law, to eviscerate the presumption of corporate separateness."); *Corporate Safe Specialists, Inc. v. Tidel Technologies, Inc.*, No. 05-cv-3421, 2005 WL 1705826, *5 (N.D. Ill. July 15, 2005) (citing *Calvert v. Huckins*, 875 F. Supp. 674, 678-79 (E.D. Cal. 1995) (stating that a parent company's annual reports which consolidate the financial results of subsidiary companies "is not evidence of comingled funds").[33]

Finally, the Government's reliance on *Lamb v. Volkswagenwer AK-Tiengeselleschaft (VWAF)*, 104 F.R.D. 95 (S.D. Fla. 1985), is unpersuasive.  The court in *Lamb* held that "the parent-subsidiary relationship . . . is such as to make it more than reasonably certain that [the subsidiary] will turn over the process served on it for [the parent] to [the parent] and that the service of process on [the subsidiary] . . . was

---

[33]   The undersigned recognizes that the 2007, 2008, and 2009 annual reports from Agility contain the following statement: "The financial statements of the subsidiaries are prepared for the same reporting year as the Parent Company, using consistent accounting policies.  Subsidiaries are *those enterprises controlled by the Parent Company*.  Control exists when the Parent Company has the power directly or indirectly to govern the financial and operating policies of entity so as to obtain benefits from its activities."  (*See, e.g.*, 2007 Annual Report at 24 in Doc. 124-2, Exh. B at 14 (emphasis added); *see also* 2008 Annual Report at 24 in Doc. 92-27, Exh. AA at 24; 2009 Consol. Fin. Statements at 11 in Doc. 124-3, Exh. C at 15).  However, the Court is not an accountant and cannot conclude from this unsworn statement that this is definitive evidence to establish control.

76

sufficient to give adequate notice to the parent corporation." *Id.* at 101.  The *Lamb* Court reached this conclusion based on the "voluminous documents and overwhelming evidence bearing on the degree of control" necessary to make service on the subsidiary sufficient to be service on the parent under the common law agency theory, including pleadings in other cases indicating the parent's control over the subsidiary, and an importer agreement governing the relationship between the parent and subsidiary. *Id.* at 99-100.  Initially, the undersigned notes that the *Lamb* case involved service based on the common law agency theory, but the Government has sought to show service under the alter ego theory.[34]  As a result, *Lamb* does not seem to be relevant to the Government's alter ego theory.  However, even if *Lamb* does have some relevance, the Government has produced no documents (accompanied by sworn statements) demonstrating how Public Warehousing (1) controlled DGS Logistics or DGS Holdings or (2) directed DGS Logistics or DGS Holdings.  As a result, the Government has not provided "voluminous documents and overwhelming evidence bearing on the degree of control" with which the court in *Lamb* was confronted.  Without such a showing, the

---

[34]     The Government's citation to the *Lamb* case may be an indication that the Government sought to show service through agency, *i.e.*, that DGS Holdings was an agent for DGS Logistics and/or Public Warehousing.  As discussed in footnote 19 *supra*, the Government's evidence currently is insufficient to prove that service was appropriate under agency principles.

AO 72A
(Rev.8/8
2)

undersigned cannot assume that mailing service on DGS Holdings was sufficient to mail the summons to DGS Logistics.

Given the above discussion, the undersigned concludes that the Government has not proven that DGS Holdings or Public Warehousing was an alter ego of DGS Logistics.  As a result, the Government's mailing of the summons to DGS Holdings's address (or Public Warehousing's former United States address) was not proper service of DGS Logistics for purposes of FED. R. CRIM. P. 4(c)(3)(C).  *See Matthey PLC*, 2007 WL 634269 at *2, 2007 WL 2254676 at *2 (granting motions to quash service where copy of summons was not mailed to foreign company's address within the district or to its principal place of business in the United States).

### b.    *Public Warehousing*

Public Warehousing has moved to quash service of the original indictment, [Doc. 25], and the superseding indictment, [Docs. 54, 118].  The following discussion explains why these motions should be granted.

### i. *Serving Public Warehousing through Managing or General Agents*

The Government has indicated that service on Public Warehousing's attorney, Michael Charness, was sufficient to serve the superseding indictment.  It also contends that service on various officers or agents of DGS Logistics and DGS Holdings - -

78

Mongeon, Cerjan, and Hoffman - - constitutes service on Public Warehousing because these individuals were also agents of Public Warehousing.  It finally contends that service on employees of the two subsidiaries constitute proper service because these two subsidiaries are alter egos of Public Warehousing.  The undersigned concludes that: (1) service on Charness does not constitute service on Public Warehousing; (2) service on Mongeon, Cerjan, and Hoffman does not constitute service on Public Warehousing; and (3) service on the basis of the alter ego theory was not established.  Each conclusion is discussed separately below.

### Attorney Charness

The Government's attempt to serve attorney Charness of Public Warehousing in Washington, D.C. is insufficient.  As an attorney, Charness is not an agent of Public Warehousing who generally may accept service.  *See Ransom*, 437 F.2d at 513; *Arthur*, 249 F. Supp. 2d at 9.  Additionally, the Government cannot claim that Charness can be implicitly viewed as capable of accepting service.  The sworn evidence from Public Warehousing indicates that Public Warehousing identified Ahmed Alsayed Abdulaziz as the only agent who could accept service on its behalf.  (*See* Abdulaziz Decl. ¶ 3 in Doc. 51-11).  The Government argues that Mr. Charness was involved in representing Public Warehousing in federal court litigation in matters relating to the criminal

79

prosecution. [*See* Doc. 124 at 9-10]. Regardless of Charness's past, present, and future representation, the Government cannot claim that Public Warehousing impliedly allowed him to accept service on its behalf because in November 2009, Public Warehousing identified only one person, Abdulaziz, as being authorized to accept service. Without any "indication that defendant's counsel was an agent authorized to receive process on defendant's behalf, service upon defendant's counsel was not sufficient to serve the defendant." *Dalal v. Goldman Sachs & Co.*, No. 06-cv-1061, 2007 WL 1334972, *3 (D.D.C. May 7, 2007). As a result, the undersigned concludes that service of the superseding indictment on Charness in the Washington, D.C., federal court was not sufficient to serve Public Warehousing.

### *Mongeon, Cerjan, and Hoffman*

The undersigned concludes that Mongeon, Cerjan, and Hoffman are not "managing or general agents" of Public Warehousing. At the time of service, the evidence shows that each individual was not working directly for Public Warehousing. *See* Wright & Miller, 4A Fed. Pract. & Proc. § 1101 (stating that an agent is ordinarily in the employ of the company). As such, these individuals do not exercise independent judgment and discretion in making decisions for Public Warehousing. They are therefore not "managing or general agents" of Public Warehousing.

80

The undersigned recognizes that the Government is not alleging that these three individuals are direct agents of Public Warehousing, but instead that their role as managing agents of subsidiaries is sufficient.   There is case law supporting the Government's position.  *See Hiese*, 111 F.R.D. at 6.  However, the instant case is distinguishable because, as discussed in some detail in footnote 19 *supra*, the Government has failed to make a preliminary showing that DGS Logistics and DGS Holdings are agents for Public Warehousing.  Without this showing, the undersigned concludes that mere service of a subsidiaries' agents is not sufficient to serve the parent company.

As for the Government's arguments, the undersigned is not persuaded.  The Government has not suggested how Public Warehousing controls  Mongeon, Cerjan, and Hoffman.  That an email in 2005 indicated that Mongeon had joined Public Warehousing does not alter the evidence that he was directing or working for DGS Logistics and DGS Holdings in 2009 and 2010 when the Government served him. (Mongeon Decl. ¶¶ 1, 7-8 at 51-4).

As for Cerjan, the announcement that Cerjan was responsible for the contract for troop supplies in Kuwait and Iraq fails to show DGS Logistics, Cerjan's employer, was an agent of Public Warehousing.  Had the Government developed this evidence, it may

81

have shown that DGS Logistics was an agent for Public Warehousing and hence that service on Cerjan was service on Public Warehousing.  The Government has not produced this evidence.  For instance, there is no evidence that any U.S. Government employees who oversaw the Public Warehousing contract interacted with Cerjan or believed that Cerjan carried out the Prime Vendor contract on Public Warehousing's behalf.  Also, there is no evidence that Public Warehousing was paying Cerjan's salary or had any sort of control over him.

As for Hoffman, the Government also has not shown this control.  The unsupported statement in the Government's brief that Hoffman was involved in trying to settle the Public Warehousing case with the Government simply is not evidence.  The Government bears the burden of proving the agency relationship, and bare statements do not meet its burden.  As a result, the undersigned concludes that service of the summons and the indictment or superseding indictments on Mongeon, Cerjan, and Hoffman did not constitute service on Public Warehousing.

### Alter Ego

The undersigned concludes that the Government has not proven that DGS Holdings is the alter ego for Public Warehousing.  As with DGS Logistics, the Government has not explained why its evidence establishes any of the factors relating

82

to control outlined in the *Connors Steel* case.  [*See* Doc. 92 at 24-31].  For instance, the Government has not established that the two companies have common directors or officers, common business departments, or share daily operations.   Also, the Government has not shown that Public Warehousing capitalizes DGS Holdings, pays its employees' salaries, or provides its only business.  Finally, the evidence indicates that the corporate formalities appear to be separate in that DGS Holdings maintains separate books, records, budgets, and bank accounts from Public Warehousing.  (Aziz Decl. ¶ 11 in Doc. 51-1).

As for the Government's evidence of an alter ego relationship between Public Warehousing and its subsidiaries, the undersigned is unpersuaded for similar reasons discussed in relation to the discussion of DGS Logistics.  First, the emails announcing the trade name, Agility, for Public Warehousing and certain subsidiaries does not establish control by Public Warehousing over its subsidiaries.

Second, the request for a name change on the prime vendor contract does not establish control.  At most, it may suggest that DGS Logistics was an agent for Public Warehousing, but the Government is relying on the alter ego theory, not the agency theory, to establish service.  Also, as discussed in footnote 19 *supra*, the Government has not yet provided sufficient evidence of an agency relationship.

83

Third, that an entity called "PWC Logistics" was taking credit for the prime vendor contract in 2005 does not establish the alter ego theory.  Public Warehousing has suggested (albeit without sworn testimony in support) that PWC Logistics was its trade name at the time.  Even if this is not true, the only sworn evidence indicates that DGS Logistics became a functioning entity in late 2006, after the PWC Logistics entity was taking credit for the prime vendor contract.

Fourth, the subsequent use of the trade name, Agility, by Public Warehousing, DGS Logistics, and DGS Holdings does not by itself establish the control element of the alter ego theory.  As for Mongeon's emails on behalf of DGS Logistics relating to servicing the prime vendor contracts since 2003, this says little about the control or domination needed to establish the alter ego theory.  That the various entities were operating under this Agility brand at different times does not show that corporate identities and formalities were ignored.  *See Pearson*, 247 F.3d at 485.

Fifth, the annual reports in which all three defendants' finances were reported is not enough to establish an alter ego.  *See Lowell Staats Mining Co.*, 878 F.2d at 1264; *McAnaney*, 665 F. Supp. 2d at 144-45; *Corporate Safe Specialists, Inc.*, 2005 WL 1705826 at *5.  Sixth, the undersigned is not persuaded that the *Lamb* case requires a different result for the reasons outlined in the DGS Logistics discussion.

84

AO 72A
(Rev.8/8
2)

Finally, the undersigned concludes that the case is currently distinguishable from the *Chitron* case, which the Government urges the Court to apply.  In *Chitron*, the Government established that the U.S. subsidiary of the foreign corporation was the conduit of the parent through the following evidence: (1) the indictment indicated that the foreign parent established the U.S. subsidiary as a "branch office and purchasing office" for the parent; (2) agents of the parent directed and controlled the subsidiary's purchase and export to China of electronics components; (3) the parent and subsidiary shared lists and a toll-free U.S. number to communicate with companies; and (4) the parent's employees held themselves out to be the subsidiary's employees.  *See Chitron*, 668 F. Supp. 2d at 305-06.  The Government in this case has not developed similar evidence and therefore has not established control by Public Warehousing over its subsidiaries.  As a result, the undersigned finds that *Chitron* is distinguishable.

### ii.  Mailing to Public Warehousing

The Government asserts that it has met Rule 4(c)(3)(C)'s mailing requirement by: (1) mailing the summons to DGS Holdings' Virginia office, [Doc. 92 at 31-33]; and (2) mailing the summons to Public Warehousing's former Winchester, Virginia, office, which was closed in 2008, [Doc. 121].  The undersigned finds that neither attempt establishes the mailing requirement.  First, the Government has not demonstrated that

85

DGS Holdings is an agent or alter ego for Public Warehousing.  As a result, mailing the summons and indictments to DGS Holdings does not constitute mailing to Public Warehousing's office in the United States.  Second, the Government's mailing of the summons and indictment to an address where a corporation no longer has offices does not constitute mailing to Public Warehousing's "principal place of business elsewhere in the United States."  Fed. R. Crim. P. 4(c)(3)(C).  If the company no longer conducts business at a location, the address cannot be a principal place of business.  As a result, mailing a summons and indictment to a former address is not sufficient to meet the requirement that the summons be mailed to Public Warehousing's principal place of business in the United States.

Based on the above discussion, the undersigned concludes that the Government has failed to show that it served the summonses or indictments on Public Warehousing. Accordingly, the undersigned **RECOMMENDS** that the Public Warehousing's motions to quash service, [Docs. 25, 54, 118], be **GRANTED**.

### *Conclusion*

For the reasons discussed in abundant detail above, the undersigned agrees with the defendants' characterization of the Government's attempts at service as "a scattershot approach to service," and adds that the Government's showing that its

86

attempts at service suffice under FED. R. CRIM. P. 4(c)(3)(C) in fact is insufficient.  As a result, the undersigned **RECOMMENDS** that Public Warehousing's and DGS Logistics' motions to quash service, [Docs. 25, 54, 81, 118], be **GRANTED**.  As for DGS Logistics' motion to extend pretrial deadlines, which was combined with its motion to quash, [Doc. 81], the undersigned **RECOMMENDS** that the motion be **DENIED AS UNNECESSARY** because DGS Logistics has not yet been properly served.  Finally, the undersigned **RECOMMENDS** that the Government's motion for leave to supplement, [Doc. 126], be **DENIED**.[35]

---

[35]     If the District Court adopts these recommendations, the undersigned adds that the Government need not conclude that foreign corporations accused of defrauding the U.S. Government will be able to avoid this Court's jurisdiction.  First, the Government's primary failure in these motion to quash proceedings was evidentiary.  The Government's evidence fell woefully short of establishing service either through an agency theory or an alter ego theory.  With a better evidentiary showing, it may be possible to show that service on DGS Holdings and its officers and "managing or general agents" will constitute service on DGS Logistics and/or Public Warehousing.  Second, Public Warehousing's attorney, an officer of this Court, has represented that Public Warehousing will be amenable to service through diplomatic means.  [*See* Doc. 51 at 11, 12, 30; Doc. 100 at 6, 21, 35].  Third, if diplomatic means and service through the alter ego / agency theories prove to be unsuccessful, the undersigned agrees with the Government that the Federal Criminal Rules are to be interpreted for the just determination of every criminal proceeding and fairness in administration.  *See* FED. R. CRIM. P. 2.  As noted in footnote 16 *supra*, FED. R. CRIM. P. 57 authorizes courts to establish rules when the rules of criminal procedure do not address a situation.  The federal rules do not contemplate service of a corporation with no offices in the United States, so the Court may be able to create a rule under Rule 57 if requested.  As mentioned in footnote 16, the undersigned recognizes that "[a]lthough not dispositive,

AO 72A
(Rev.8/8
2)

**IT IS SO RECOMMENDED**, this the 2d day of September, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

---

the absence of a Criminal Rule authorizing [service on a foreign corporation] counsels caution," but such caution does not necessarily mean that service on a foreign corporation outside of the United States "in criminal cases [is] never appropriate." *See Black*, 130 S. Ct. at 2969 & n.11.  The Government has not requested, however, that the Court exercise its authority under Rule 57 to create a fair and just rule to effectuate service of a summons on a foreign corporation, so the Court has not had an opportunity to determine whether a rule for service on foreign corporations would ever be appropriate.  Although the Government's pursuit of and defending service up to this point is lacking, the Government may still be able to effectuate service of the summons and indictments in this case or show that its past service was sufficient with a better evidentiary showing.

88