IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL INDICTMENT |
| v. | : | |
| | : | NO. 1:09-CR-0490-AJB-TWT |
| THE PUBLIC WAREHOUSING | : | |
| COMPANY, K.S.C., | : | First Superseding |
| a/k/a Agility; | : | |
| AGILITY DGS LOGISTICS | : | |
| SERVICES COMPANY, K.S.C.(c), | : | |
| d/b/a and f/k/a PWC Logistics | : | |
| Services K.S.C.(c); | : | |

Defendants.

## UNITED STATES' BRIEF IN OPPOSITION TO
## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Now comes the United States, by and through its attorneys, F. Gentry Shelnutt,

Acting United States Attorney for the Northern District of Georgia with respect to this

matter, Barbara E. Nelan, Assistant United States Attorney, Richard E. Reed, Special

Assistant United States Attorney, and Steven D. Grimberg and Alana R. Black,

Assistant United States Attorneys, and hereby submits this Brief in Opposition to the

Magistrate Judge's Report and Recommendation issued September 2, 2010,

which recommends that defendants' respective motions to quash service of process be granted.[1] [Doc. 133].

## Factual Background

I.      Relevant Entities/Persons

      A.      THE PUBLIC WAREHOUSING COMPANY K.S.C.

THE PUBLIC WAREHOUSING COMPANY K.S.C., a/k/a Agility (hereinafter "PWC") is a public Kuwaiti shareholding company with a head office located in Sulaibiya, Kuwait. Defendant PWC's principal business activities are logistics and related services. Defendant PWC was the named Prime Vendor pursuant to Contract SP0300-03-D-3061 ("PV-I"), Bridge Contract SPM300-05-D-3119 (the "Bridge Contract"), and Contract SPM300-05-D-3128 ("PV-II"), all issued by the Defense Supply Center Philadelphia ("DSCP") to provide full line food and non-food distribution for authorized customers in the Middle East as more fully described below.

Sam W. McCahon has presented himself to the government contracting agency as "General Counsel, Government Contracts for PWC Logistics [PWC] and all

---

[1] This Court granted the United States' unopposed motion for an extension of time to respond to the Report and Recommendation [Doc. 136], allowing the present opposition to be filed on or before October 18, 2010. [Doc. 138].

subsidiary entities, including but not limited to PWC Logistics Services." [Attached Exh. A].

Richard Deane Jr. is outside counsel for PWC and prior to indictment was the government's principal point of contact on matters related to PWC.

Michael Charness is one of PWC's outside counsel and has represented PWC in multiple matters over a number of years, including: (a) making a general appearance representing PWC in U.S. District Court, D.C., 1:07:CV-01476-RBW, *PWC v. DSCP, et al.,* filed by PWC on August 16, 2007;[2] (b) represented PWC in an appeal to the Armed Services Board of Contract Appeal (ASBCA) on May 29, 2007, and docketed as ASBCA Appeal No. 56022;[3] (c) represented PWC in a certified claim for withheld performance-based distribution fees dated April 27, 2009; (d) represented PWC in an ASBCA Rebates Appeal; (e) represented PWC in a March 2007 challenge to its adverse past performance, first in the U.S. District Court for D.C. (489 F.Supp. 2d 30), and then in the Court of Federal Claims (case 07-366C); (f) represented PWC in a suit filed by PWC in the U.S. District Court for DC (1:08-cv-00464) on March 18, 2008; and (g) represented PWC in a bid protest filed by PWC with GAO

---

[2] Mr. Charness also submitted a FOIA request on behalf of PWC via email dated Feb. 12, 2007, and appealed the initial denial to DLA headquarters by letter dated May 3, 2007.

[3] Edward Hoffman filed the notice of appeal with the ASBCA (May 29, 2007) and submitted the complaint to the ASBCA (July 9, 2007).

(B-400660) on October 1, 2008 challenging various provisions of the Prime Vendor Contract III ("PV-III") solicitation.

### B.     AGILITY DGS LOGISTICS SERVICES COMPANY, K.S.C.(c)

AGILITY DGS LOGISTICS SERVICES COMPANY, K.S.C.(c), formally known as PWC Logistics Services K.S.C.(c) (herein "AGILITY DGS"), is an indirect subsidiary of PWC. "K.S.C.(c)" is a Kuwait company designation indicating the relevant entity is a closed company (versus a publicly traded company).

Retired General Daniel G. Mongeon is the Managing Director of AGILITY DGS and the President and Chief Executive Officer of Agility DGS Holdings, Inc. Paul G. Cerjan is the President of a business unit of AGILITY DGS and prior member of its Board of Directors.[4]

### C.     AGILITY DGS HOLDINGS, INC.[5]

AGILITY DGS HOLDINGS, INC., (f/k/a Agility Defense & Government Services, Inc., f/k/a PWC Logistics Services, Inc.)(herein "AGILITY HOLDINGS") is a United States subsidiary of AGILITY DGS.

---

[4] Mr. Cerjan claims to have resigned from the Board on February 7, 2010.   [Doc.51, Exh. F].

[5] Agility DGS Holdings, Inc. is currently a named defendant to this action but is before the Court on a Report and Recommendation of dismissal without prejudice on the government's motion.

PWC Logistics Services, Inc. was established in April 2006. In the corporate structure diagram PWC presented to the government as part of a novation request in August 2006, AGILITY HOLDINGS (then PWC Logistics Services, Inc.) was purportedly owned 100% by PWC Logistics Services Holding BV, a Netherlands corporation, which was owned 100% by AGILITY DGS (then PWC Logistics Services Co. K.S.C.(c)), which was owned 99.40% by PWC and .6% by four nominee companies. [Attached Exh. B].

In August 2006, AGILITY HOLDINGS (then PWC Logistics Services, Inc.) opened an office at 1725 Duke Street, Suite 450, Alexandria, Virginia. In early 2007, AGILITY HOLDINGS (then PWC Logistics Services, Inc.) changed its name to Agility Defense & Government Services, Inc. In September 2009, the name again was changed to AGILITY DGS HOLDINGS, INC.

As noted above, Retired General Daniel G. Mongeon is the President and Chief Executive Officer of AGILITY HOLDINGS and the Managing Director of AGILITY DGS. Edward Hoffman is Senior Vice President and General Counsel for AGILITY HOLDINGS. [Doc. 51, Exh. B].

D.  <u>Defense Logistics Agency</u>

The Defense Logistics Agency (DLA) is a logistics combat support agency within the Department of Defense (DOD), which is a department of the United States.

E.    Defense Supply Center Philadelphia

Defense Supply Center Philadelphia (DSCP), the troop support center agency of the DLA, is the center for managing four major commodities: medical material, subsistence/garrison feeding, construction and equipment, and clothing and textiles. DSCP is also responsible for managing DOD's prime vendor contracts within those commodities, including prime vendor contracts for subsistence/garrison feeding for military personnel located in the Middle East.

As part of its mission of supporting troops worldwide, in particular in the Middle East, DSCP issued solicitations for the acquisition of foodstuffs and non-food items for various parts of the Middle East, including Iraq, Kuwait and Jordan. These solicitations sought proposals to provide foodstuffs and non-food items pursuant to contracts. The offeror who is awarded such a contract becomes the "Prime Vendor" for that contract.

II.    Relevant Prime Vendor Contracts

A.    Prime Vendor-I

Solicitation SP0300-02-R-4003 was issued on May 10, 2002, by DSCP to establish contracts with prime vendors to provide food and non-food products to the military and other authorized customers of the DLA in three overseas European zones, including  Zone III – the Middle East.  This solicitation was for a one-year base

period, up to four one-year options, and had an estimated total acquisition value of $111,959,520.

Defendant PWC submitted a proposal and on May 28, 2003, DSCP issued a notice of award to PWC awarding it PV-I, to provide full-line food and non-food distribution in Zone III (Kuwait and Qatar).[6]

B.     Bridge Contract

During the solicitation process for a new prime vendor contract, on February 16, 2005, defendant PWC was awarded the "Bridge Contract", which provided for continued prime vendor operations under the terms and conditions of PV-I through December 15, 2005.

C.     Prime Vendor-II

Solicitation SPM300-04-R-0323 was issued on September 3, 2004, by DSCP to establish a prime vendor contract for the acquisition of food and non-food items for the military and other authorized customers in several Middle East Zones, including Zone I comprised of Iraq, Kuwait, and Jordan.  On July 7, 2005, DSCP

---

[6]  On June 27, 2003, DSCP issued Modification P00001 to PV-I, which provided that the maximum total acquisition value limit of PV-I could increase by as much as 1200% over the estimated contract dollar value.

awarded PV-II to PWC. The estimated value of PV-II over the life of the contract with options was $4,668,890,200.[7]

## Procedural Background

### I. Pre-Indictment

The criminal investigation that led to the present indictment began as a result of a 2005 *qui tam* complaint and civil investigation. On November 18, 2005, Relator, Kamal Mustafa Al-Sultan, filed a Complaint in the Northern District of Georgia under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 (FCA). In his Complaint, the Relator alleged that the Public Warehousing Company K.S.C. d/b/a PWC Logistics (PWC), along with defendants The Sultan Center Food Products Company, K.S.C. (TSC), Tarek Abbul Aziz Sultan Al-Essa (Tarek Sultan), Charles Tobias ("Toby") Switzer (Switzer), and Emad Al-Saleh (Emad), had engaged in a scheme to falsely and fraudulently inflate the prices charged the United States pursuant to several Prime Vendor ("PV") contracts.[8] On September 25, 2006, the Relator filed a First Amended Complaint adding allegations that the defendants further conspired with various vendors in the United States, Kuwait and abroad to obtain

---

[7] For the duration of the prime vendor contracts defendant PWC was paid the following approximate amounts: PV-I- $934,000,000; Bridge- $1 Billion; PV-II- $6.6 Billion.

[8] These PV contracts, discussed in further detail below, are for food products provided to United States armed service members operating in the Middle East.

discounts, rebates and kickbacks that they unlawfully failed to disclose or pass through to the government, as required by PWC's PV contracts.[9]

In connection with the civil *qui tam* investigation, approximately 35 Inspector General ("IG") subpoenas were issued. The civil investigation became known to PWC at least by January 4, 2007, when an IG subpoena to PWC was served by Special Agent Shane O'Neill (DCIS) on Blair Hicks[10] in an office located at Winchester, Virginia.[11] After this service, PWC's counsel, Sam W. McCahon contacted the civil division of the United States Attorney's Office, acknowledged service of the subpoena and set up a meeting with the USAO civil division to discuss the civil investigation.

While Mr. McCahon acknowledged service of the civil IG subpoena, PWC's response to the document requests therein were, as they were with the subsequent grand jury subpoena, at best, slow and incomplete.

In October 2007, two articles appeared in the Wall Street Journal. One article outlined allegations against PWC with probable sources being vendors who had

---

[9] On October 1, 2009, Relator filed a Second Amended Complaint alleging that PWC's schemes have not ceased.

[10] Based upon documents reviewed in relation to the civil investigation it appeared to the civil division of the USAO that Blair Hicks was an employee of PWC or a PWC subsidiary performing work related to the PV contracts.

[11] While the USAO criminal division monitored the civil action and reviewed documents received in response to the IG subpoenas beginning in early 2006, no criminal subpoenas were issued until the Spring of 2008.

received IG subpoenas. The second article discussed a federal case in the Southern District of Texas against a United States food distributor to PWC, American Grocers, and its owner Samir Itani.

On or about March 28, 2008, a grand jury in the Northern District of Georgia issued a subpoena to PWC. This subpoena was accepted on behalf of PWC by its attorney F. Whitten Peters. At approximately the same time, the grand jury issued subpoenas to approximately 85 food vendors who supplied PWC, as well as several individuals and financial institutions.

Pursuant to an *ex parte* order partially lifting the seal, PWC was made aware of the existence of the *qui tam* complaint on or about May 12, 2009.[12] A second civil IG subpoena was served on PWC and accepted by Sam McCahon in a meeting at the USAO on June 24, 2009.

PWC knew about the impending indictment at least by October 23, 2009. On that day in an e-mail communication, counsel for the United States asked defendant PWC's local counsel (Richard Deane Jr.) to "identify a PWC representative who will accept a summons with respect to an initial appearance/arraignment." On October 30, 2009, Mr. Deane responded in relevant part that: "I spoke with Sam McCahon regarding the availability of someone to receive a summons on behalf of PWC. He

---

[12] On November 21, 2007, the United States obtained an *ex parte* order partially lifting the seal to disclose the existence of the *qui tam* action to PWC.

noted that PWC's senior staff travels a great deal and often on short notice so it is it [sic] not always predictable as to who will be where at a particular time.  He did note that if you can provide perhaps as little as a week's notice, he should be able to specify someone for your process.  If not himself."

II.    Post-Indictment

On November 9, 2009, a grand jury in the Northern District of Georgia returned a six-count indictment[13] charging PUBLIC WAREHOUSING COMPANY, a/k/a Agility with (1) conspiracy to commit major fraud against the United States (18 U.S.C. § 1031) and to make false statements to the United States (18 U.S.C. § 1001) from 2004 through at least mid-2006, in violation of 18 U.S.C. § 371; (2) conspiracy to commit major fraud against the United States (18 U.S.C. § 1031), to make false statements to the United States (18 U.S.C. § 1001), to make false, fictitious and fraudulent claims (18 U.S.C. § 287) and to commit wire fraud (18 U.S.C. § 1343) from June 2003 through at least December 2008, in violation of 18 U.S.C. § 371; (3) major fraud against the United States and aiding and abetting such fraud from June 2004 through December 2005, in violation of 18 U.S.C. §§ 1031 and 2; (4) major fraud against the United States and aiding and abetting such fraud from August 2006 through December 2007, in violation of 18 U.S.C. §§ 1031 and 2; (5 and 6) wire fraud

---

[13]  Indictment 1:09-CR-490.  The six counts charged correspond to the numbering of summary of charges given herein.

and aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. This indictment was sealed until November 16, 2009, at which time it was unsealed by order of the court and the following delivery of the Indictment and Summons occurred:

| Date | Summons/indictment | Service |
|---|---|---|
| 11/16/2009 | Summons and original Indictment | Hand delivery to office of PWC's outside counsel, Richard Deane Jr. |
| 11/16/2009 | Summons and original Indictment | CT Corporation in Delaware, the registered agent for AGILITY HOLDINGS |
| 11/16/2009 | Summons and original Indictment | Hand delivery to the office of Daniel Mongeon at 1725 Duke Street, Alexandria, Virginia |

The summons issued set the arraignment for November 20, 2009, at 9:30 A.M. in front of Magistrate Janet King. [Doc.4]. On November 19, 2009, PWC filed a Notice of Special Appearance and motion to continue the initial appearance. [Doc. 9]. While the Government opposed the continuance sought, it was granted and the initial appearance was re-scheduled for December 1, 2009. [Doc. 11]. PWC again moved for a continuance on November 25, 2009 [Doc. 14], on December 28, 2009 [Doc. 16], on January 7, 2010 [Doc. 18], and on January 29, 2010 [Doc. 21]. In an initial appearance before Judge King on February 9, 2010, the court entered a not guilty plea

on behalf of PWC and assigned the case to Magistrate Judge Alan Baverman and to this Court. [Doc. 24].

On February 8, 2010, PWC filed a motion to quash the summons. [Doc. 25]. On February 9, 2010, a grand jury in the Northern District of Georgia returned a First Superseding Indictment which was filed under seal. [Doc. 52, as unsealed April 12, 2010]. In this Superseding Indictment PWC was charged in the same six counts. In addition, AGILITY HOLDINGS, f/k/a Agility Defense & Government Services, Inc., f/k/a PWC Logistics Services, Inc. was charged in Counts 2, and 4 through 6 and AGILITY DGS, d/b/a and f/k/a PWC Logistics Services, K.S.C. was charged in Counts 1 through 6. Following return of this First Superseding Indictment, the following delivery of the Superseding Indictment and Summons occurred:

| Date | Summons/indictment | Service |
|------|--------------------|---------|
| 02/12/2010 | Summons for all three defendants and First Superseding Indictment | CT Corporation in Delaware, the registered agent for AGILITY HOLDINGS |
| 02/12/2010 | Summons for all three defendants and First Superseding Indictment | Mail delivery to the office of Daniel Mongeon at 1725 Duke Street, Alexandria, Virginia |
| 02/18/2010 | Summons for all three defendants and First Superseding Indictment | Hand delivery to retired General Daniel G. Mongeon |
| 03/23/2010 | Summons for all three defendants and First Superseding Indictment | Hand delivery to Edward Hoffman at the 1725 Duke Street, Alexandria, Virginia office |

| 07/23/2010 | Summons for PWC and First Superseding Indictment | Hand delivery to PWC counsel Michael Charness |
| 07/29/2010 | Summons for PWC regarding First Superseding Indictment | Sent by Federal Express to PWC at 180 Prosperity Drive, Suite 1, Winchester, VA |

A series of motions/ briefs and reply briefs followed on the issue of service on PWC and AGILITY DGS.  On September 2, 2010, Magistrate Judge Alan Baverman issued a Report and Recommendation (R&R) on the motions pertaining to service. Attachment Exhibit C to this Brief outlines the relevant pleadings and the associated R&R.

## Argument

At the outset, it must be emphasized that defendants' motions to quash do not concern a lack of notice and opportunity to be heard, or claim a deprivation of Due Process or other constitutional rights.  Rather, defendants' motions are solely based on its position that the United States has failed to satisfy the procedural technical requirements of serving process to an organization under the Federal Rules of Criminal Procedure.  The rule on which they rely, Rule 4(c)(3)(C), has two facets. First, that process be served on an officer or legally authorized agent; and second, that process be mailed to the organization's last known address within the district or to its principal place of business elsewhere in the United States.

The United States' positions in opposition to the defendants' motions are three-fold. First, under any reasonable definition, the defendants are fugitives from justice, and their motions should not be entertained by this Court as a matter of equity. Second, if Rule 4(c)(3)(C) is in fact the appropriate framework, then the totality of the circumstances commands the conclusion that these defendants have been served.

Third, and alternatively, the United States urges the Court to recognize the obvious: the drafters of Rule 4 simply did not contemplate the possibility of criminal actions against foreign corporations that purport to not maintain officers, agents or even a place of business within the territorial limits of the United States. Because if the defendants' arguments supporting their motions to quash are to be believed, then not only have the defendants not been served with process in this case, but no foreign entity residing in a country that lacks diplomatic agreements for service with the United States can ever be held accountable in a United States court. Such a result would shock the conscience of the average American taxpayer, particularly where, as here, the defendants reaped over $8.5 billion from contracts with the United States government.

The solution resides in examining Rule 4 in the context of Rule 2 of the Federal Rules of Criminal Procedure, which authorizes this Court in its discretion to interpret the Federal Rules in a manner that secures simplicity, fairness, and "eliminate[s] unjustifiable expense and delay." Particularly where, as here, there is no question that

the defendants (a) have received fair and adequate notice of the proceeding, (b) have received copies of process (multiple copies in fact); and (c) have fled and/or absented themselves from the country. The United States respectfully objects to the conclusions reached by the Magistrate Court and requests that this Court deny defendants' motions to quash.

The United States incorporates by reference the arguments made with regard to the motions to quash service of process before the Magistrate Court . [Docs. 92, 93, 124, 126].

I.      The Defendants' Motions to Quash Should Not Be Addressed By The Court At This Time Based Upon Application Of The Fugitive Disentitlement Doctrine.

The defendants' motions to quash service of process should not be entertained by this Court because the defendants are fugitives from justice, and they should be dis-entitled from seeking recourse in the very Court from which they are hiding. As the Supreme Court has stated, a "fugitive from justice has demonstrated such disrespect for the legal processes that [it] has no right to call upon the court to adjudicate [its] claim." Ortega-Rodriguez v. United States, 507 U.S. 234, 246-47 (1993). The fugitive disentitlement doctrine is based on equitable principles, see United States v. Sharpe, 470 U.S. 675, 681 n.2 (1985), and the equities in this case tilt overwhelmingly in favor of invoking the doctrine and dismissing defendants' respective motions to quash.

As noted by the Magistrate Court in its R&R, the Eleventh Circuit has recognized a three-part test for applying the fugitive disentitlement doctrine. First, the party must be a fugitive from justice. Second, the party's fugitive status must have a connection, or nexus, to the court proceedings that it seeks to utilize. Third, the sanction used by the court (i.e., disentitlement from moving to quash service) must be necessary to effectuate the policy concerns underlying the doctrine. (R&R at 26) (citing Magluta v. Samples, 162 F.3d 662, 664 (11th Cir. 1998)).[14] In this case, all three parts of this test are met.

A.     The Defendants Are Fugitives

The first part of the three-part test for invoking fugitive disentitlement, i.e., determining whether the defendants are in fact 'fugitives from justice,' has important implications beyond the motions to quash service currently before this Court. See, e.g., United States. v. Deleon, 710 F.2d 1218, 1221-222 (1983) (affirming denial of motion to dismiss for want of prosecution where delay was the result of defendant's fugitive status); United States v. Bailey, 444 U.S. 394, 413-14 (1980) (holding  that normally applicable statutes of limitations are tolled while fugitive remains at large) (citing 18 U.S.C. § 3290, which commands that  no statute of limitations shall extend

---

[14]Magluta cited this three-part fugitive disentitlement test for purposes of a civil action. 162 F.3d at 664.  The Government accepts the Magistrate Court's application of this test to the case at bar for purposes of this briefing, but takes no position on whether it is the appropriate test in the criminal context.

to fugitives). In fact, the United States District Court for the District of Columbia, in a FOIA action currently pending before it, *PWC v. Defense Supply Center Philadelphia*, Case No. 07-1476 (RBW), has deferred ruling on whether PWC is a fugitive as it awaits a decision from this Court.[15]   A finding of fugitive status could also very well have administrative implications for PWC in terms of its eligibility to serve as a contractor or subcontractor on future government contracts. For these reasons, the United States respectfully requests that the District Court make a specific finding as to whether the defendants satisfy the definition of "fugitives from justice," whether or not the Court wishes to invoke the fugitive disentitlement doctrine for purposes of the motions currently at issue.

In its R&R, the Magistrate Court identified four elements that must be present to find that a party is a "fugitive from justice": (1) pending criminal charges (or their equivalent); (2) knowledge of the pending charges; (3) intent to flee from the charges; and (4) absence from or concealment within the jurisdiction.  (R&R at 28) (citing, *inter alia*, Magluta, 162 F.3d at 664; United States v. Barnette, 129 F.3d 1179, 1184 (11th Cir. 1997); United States v. Nabepanha, 200 F.R.D. 480, 482-84 (S.D. Fl. 2001); United States v. Kashamu, 656 F. Supp. 2d 863, 867 (N.D. Ill. 2009)).  The Magistrate

_____

[15]It is notable that PWC continues to press this FOIA action, which seeks the government's price negotiation memorandum relating to the award of the prime vendor contracts (a document that, at least in redacted form, is arguably discoverable in this criminal action), while simultaneously attempting to delay the criminal case on a procedural technicality.

Court concluded that the defendants fall within three of the four requirements for fugitive status, namely that there are pending charges against the defendants, that the defendants have knowledge of the charges, and that the defendants are absent from the Court's jurisdiction. But the Magistrate Court declined to find that the defendants have operated with an intent to flee. (R&R at 31, 36.) The United States respectfully, but strongly, disagrees.

The Eleventh Circuit has made clear that "intent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities" once the defendant learns of the charges while outside of the jurisdiction. Barnette, 129 F.3d at 1184. Courts apply this concept of "constructive flight" to "a person who departs for a legitimate reason from the jurisdiction in which his crime was committed but who later remains outside that jurisdiction for the purpose of avoiding prosecution." United States v. Fonseca-Machado, 53 F.3d 1242, 1243-44 (11th Cir. 1995).

The courts have not read the requirement of fugitive status in an overly technical manner, but have aimed to sweep up defendants "who know that they are subject to arrest in this country and who, therefore, refuse to enter its jurisdiction in order to avoid prosecution." Collazos v. United States, 368 F.3d 190, 197 (2nd Cir. 2004); see also Brin v. Marsh, 596 F.Supp. 1007, 1010 (D.D.C. 1984) (applying "fugitive from justice" doctrine to court-martialed soldier who remained "at large," though somewhere in the United States); United States v. Eng, 951 F.2d 461, 464 (2d

Cir. 1991) ("A defendant is a fugitive from justice when he 'actively resists returning from abroad to face [criminal] charges.'"); United States v. Contents of Account Number 68108021, 228 F. Supp. 2d 436, 443 (S.D.N.Y. 2002) (claimant was fugitive where she knew she was subject to arrest but "declined to face the charges against her").

Defendant PWC's actions in absenting itself from the jurisdiction of this Court could not be more transparent in its attempt to evade answering the criminal charges against it. As noted *supra*, prior to its indictment, PWC accepted service of both civil and grand jury subpoenas through its employee and counsel. Shortly after receiving its first grand jury subpoena in the Spring of 2008, however, PWC abandoned and later closed its only staffed office in the United States, located in Winchester, Virginia. During the briefing before the Magistrate Court, PWC submitted a declaration from Steven L. Nelson, an officer of the company, claiming that it closed the Winchester office for business reasons unrelated to the Government's criminal investigation. (Doc. 100, Exh. A.) Notably, Mr. Nelson's affidavit is based largely on hearsay and matters for which he has no personal knowledge, yet the Magistrate Court accepted the affidavit at face value. Although the United States has no functional method for challenging the assertions made in Mr. Nelson's affidavit, the timing of the office closing appears more than just merely coincidental as PWC contends. After all, PWC and its subsidiaries were in the midst of numerous contracts

with the United States government – hardly a time where there would be no "business justification" for maintaining a United States office. (<u>Id</u>. ¶ 8.) Indeed, the only business justification that logically comports with the timing of the Winchester office closing is the evasion of significant criminal exposure for the company and its officers and directors.

On November 9, 2009, a grand jury sitting in this District returned an indictment against PWC. (Doc. 1.) On November 16, 2009, the day the indictment was unsealed, federal agents left a summons and a copy of the indictment with the office of PWC's counsel in Atlanta, Georgia. Notwithstanding PWC's pre-indictment representations, as discussed *supra*, that it would identify a representative to accept service of the summons and indictment, no such designation occurred. Instead, less than ten days later, PWC's board of directors purportedly passed a resolution stating in relevant part that "PWC has determined that it is in the best interests of PWC to appoint a single officer to acknowledge or receive service of lawful process for and on behalf of PWC in any action against PWC instituted in any court of any jurisdiction." (Doc. 51, Exh. K.) The resolution went on to state that PWC did "appoint and authorize Ahmed Alsayed Abdulziz as the only officer of [PWC] to acknowledge or receive service of lawful process, for and on behalf of the Company, in any action against the Company, instituted in any court of any jurisdiction." (Id.)

Mr. Abdulziz is a lawyer employed by PWC who resides in Kuwait City, Kuwait. (Id. ¶¶ 1, 5.)

PWC's actions and inactions, representations and misrepresentations, all clearly demonstrate an intent to flee from the jurisdiction of this Court. Upon learning of the criminal investigation, PWC closed its principal place of business in the United States and, upon being indicted, designated one and only one person, conveniently residing within the protective confines of Kuwait, who was authorized to accept service of process on behalf of its worldwide company. If ever a company was capable of thumbing its nose at a court, this would be it.

But even if the Court is unwilling to make the logical inference of intent to flee, it can and should find PWC to be a fugitive from justice under the constructive flight doctrine endorsed by the Eleventh Circuit. Although the Magistrate Court's R&R makes a passing reference to the constructive flight doctrine (R&R at 28), it apparently declined (without discussion) to apply the doctrine to PWC even though the undisputed facts squarely fit within its reach. For even if the Court assumes that PWC had legitimate reasons for leaving the jurisdiction (a bold assumption), there is no question that PWC now has knowledge of the pending charges and remains outside the jurisdiction for the purpose of evading prosecution. See Fonseca-Machado, 53 F.3d at 1244 ("[A] person who departs for a legitimate reason from the jurisdiction in which his crime was committed but who later remains outside that jurisdiction for the

purpose of avoiding prosecution is a fugitive from justice.").  In fact, as noted by PWC's counsel (*see supra*), its employees were well traveled prior to indictment, yet since the indictment was returned PWC's management-level

employees have avoided traveling to the United States unless they receive a safe passage guarantee from the Government.  (Doc. 92, at 8.)

The United States concedes that, unlike defendant PWC, defendant AGILITY DGS did not physically flee from the jurisdiction because AGILITY DGS itself never maintained an office in the Northern District of Georgia or the United States.  The Government avers, however, that the constructive flight doctrine should still apply as to AGILITY DGS because there is no dispute that it has knowledge of the pending charges yet refuses to enter the jurisdiction and answer for them.  AGILITY DGS, like PWC, should not be allowed to seek recourse from the Court by filing motions where the possible results are "heads I win, tails you lose".

B.    The Defendants' Fugitive Status Has a Nexus to this Court Proceeding

In its R&R, the Magistrate Court never addressed the second or third parts of the three-part test for invoking the fugitive disentitlement doctrine.  The second part of the test examines the nexus between the defendants' fugitive status and the court proceeding at issue.  A court will apply the fugitive disentitlement doctrine only when there is some connection between the defendant's fugitive status and the court process the defendant seeks to utilize, so that the court's sanction (i.e., disentitlement) is a

reasonable response.  (R&R at 28-29, citing, *inter alia*, <u>Ortega-Rodriguez v. United States</u>, 507 U.S. 234, 244 (1993)).

Here, as discussed *supra*, there is no question that the defendants' fugitive status is directly connected and, in fact, a direct response to this court proceeding.  The defendants have absented themselves from this Court's jurisdiction for the purpose of evading service of process, and now come into court requesting that the service already effected on them be quashed.  The second part of the fugitive disentitlement doctrine test is satisfied with regard to both PWC and AGILITY DGS.

> C.     <u>Policy Concerns Supporting Fugitive Disentitlement Are Present</u>

The third and final part of the test for invoking the fugitive disentitlement doctrine requires an examination of the policy concerns underlying the doctrine, and whether disentitlement as a sanction would effectuate those concerns.  Those concerns include: (1) the difficulty of enforcing judgment against a fugitive; (2) promoting the efficient operation of the courts; (3) discouraging flights from justice; (4) avoiding prejudice to the other side caused by the fugitive status; and (5) the inequity of allowing a fugitive to use court resources only if the outcome will assist the fugitive.  (R&R at 29, citing, *inter alia*, <u>Pesin v. Rodriguez</u>, 244 F.3d 1250, 1253 (11th Cir. 2001); and <u>Magluta</u>, 162 F.3d at 664).

Here, there are at least three policy concerns underlying the fugitive disentitlement doctrine that weigh heavily in favor of the doctrine's application to

these defendants and their motions to quash service. First and foremost, there is no mutuality to the consequences of the Court's decision on defendants' motions. If the Court grants the defendants' motions to quash, the defendants win. If the Court denies the defendants' motions to quash, they will remain fugitives and continue to evade the jurisdiction of this Court. This is exactly the kind of inequity that the fugitive disentitlement doctrine is designed to combat. See <u>United States v. Oliveri</u>, 190 F.Supp.2d 933, 936 (S.D. Tex. 2001) (declining to rule on defendant's motion to dismiss the indictment because defendant remained outside the jurisdiction of the court and risked no consequence from an adverse ruling). In its R&R, the Magistrate Court appeared to accept the inference from defendants' briefings that they would accept service through diplomatic channels as a substitute for the requirements of Rule 4. The defendants have never made any such representation.

Second, disentitling the defendants from moving to quash service will discourage similar flights from justice by other foreign corporations with business in the United States. It will send a message to other foreign corporations that they cannot, upon learning of a grand jury investigation, simply close up shop in the United States and retreat back to their home country in order to avoid accountability. That is exactly what the defendants here have done, and rewarding this behavior by entertaining their motions to quash will only serve to encourage similar actions by other foreign corporations that find themselves in the same position.

Third, invoking the fugitive disentitlement doctrine here will serve to avoid unfair prejudice against the United States and the judicial process as a result of the continued delay in reaching the merits of this case. As is often the case with the undue passages of time, the United States could face difficulties locating witnesses and presenting evidence at the eventual trial of this case if procedural delays continue. See Ortega-Rodriguez, 507 U.S. at 249; United States v. Rosales, 13 F.3d 1461, 1463 (11th Cir. 1994) (dismissing defendant's appeal where defendant's fugitive flight between his conviction and sentence caused a lapse of time that unduly burdened the government in the event that a retrial was necessary, and caused significant interference with the judicial process). The defendants' attempt to seek redress from the Court while at the same time causing unfair prejudice to the merits of the Government's case and to the efficient operation of the court system by intentionally evading service, is a strong policy consideration that favors disentitling the defendants from the redress they seek.

D. The Equities Overwhelmingly Favor Invoking the Fugitive Disentitlement Doctrine Against These Defendants

As stated at the outset, the fugitive disentitlement doctrine is based on equitable principles, and therefore courts have discretion on whether or not to apply it in any given case. See, e.g., United States v. Nabepanha, 200 F.R.D. 480, 483 (S.D.

Fla. 2001). The equities in this case tilt overwhelmingly in favor of invoking the doctrine, considering:

• The defendants are corporations, not individuals, so property and not liberty is at stake. See Dusenberry v. United States, 534 U.S. 161, 170-71 (2002) (holding in administrative forfeiture case that when property interests are at stake, the Due Process Clause does not require heroic efforts by the Government; only efforts reasonably calculated to apprise a party of the pendency of the action).

• The defendants have received over $8.5 billion of United States taxpayers' monies pursuant to several prime vendor contracts with the government and now seek to evade litigating criminal conduct that will prove the defendants fraudulently and massively overcharged the United States during the performance of those contracts.

• The defendants have previously sought and continue to seek relief from numerous United States courts as plaintiffs; yet, they evade service of process in this case.

• The defendants are trying to litigate these claims in the court of public opinion by repeatedly boasting in the media that they wish to vindicate their reputation, while at the same time remaining fugitives and avoiding their day in court.

Notwithstanding these and other equitable factors weighing significantly in favor of invoking the fugitive disentitlement doctrine to these defendants, the Magistrate Court concluded that certain countervailing factors warrant restraint. (R&R at 33-35.) The United States respectfully submits that the Magistrate Court's concerns in this regard are misplaced.

The first "countervailing factor" that the Magistrate Court cited is foreign relations concerns. While acknowledging that the exact ownership is unclear, the Magistrate Court noted that the Kuwaiti Government has some ownership in defendant PWC. It appears that the Kuwaiti Social Security Agency does or did own some small percentage of defendant PWC, but proceeding with this action does not rise to the level of "foreign relations concerns." To the extent that Congress was concerned about lawsuits against foreign states in United States courts, those concerns were addressed by it in 1976 with the passage of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1602 et seq. FSIA provides that, while foreign states generally are immune from suits in United States courts, foreign states and their agencies or instrumentalities are not always immune from suit in United States courts. There are several exceptions to such immunity from suit, in particular, the "commercial activity" exception. See 28 U.S.C. § 1605 (a)(2). The "commercial activity" exception provides that a foreign state shall not be immune from the jurisdiction of United States courts if the action is based upon a commercial activity

carried on in the United States by the foreign state, or an act performed in the United States in connection with commercial activity of the foreign state elsewhere, or an act outside of the United States in connection with a commercial activity of the foreign state elsewhere when that act causes a direct effect in the United States. Id. Thus, even if defendant PWC is or was partially owned by the Kuwaiti Government, given the nature of the activity, which clearly was and is commercial, it can and should be subject to suits in United States courts, and Congress's willingness to allow such suits to proceed clearly suggests a lack of foreign relations concerns on the part of the Congress.

The second "countervailing factor" cited by the Magistrate Court is that defendants' challenge to this Court's personal jurisdiction is a valid response to the Government's service. As discussed *supra*, however, the Magistrate Court failed to fully consider the constructive flight doctrine as a basis for demonstrating the defendants' intent to flee and resulting fugitive status.

The third "countervailing factor" cited by the Magistrate Court is its conclusion that defendant PWC will not seek to avoid any adverse ruling and seems willing to submit to the Court's jurisdiction. The United States respectfully submits that this conclusion is mere speculation given that absolutely no such assurances have been given by either PWC or AGILITY DGS, and that defendant PWC's actions to date in fact demonstrate that it is not willing to answer criminal charges in a United States

court.  The Magistrate Court further noted that defendant PWC appears willing to submit to this Court's jurisdiction if the Government follows diplomatic or other international means to effect service.  Despite a general suggestion that the United States could perfect service through diplomatic means, defendant PWC knows or should know that there is no Mutual Legal Assistance Treaty between the United States and Kuwait and, thus, no enforceable mechanism to perfect service through diplomatic means.  Nor have the defendants ever represented that they would accept service through diplomatic means as a substitute for the requirements of Rule 4.[16]

The Magistrate Court identifies as the fourth "countervailing factor" what it perceives to be the unfairness in allowing the Government to request invocation of the fugitive disentitlement doctrine whenever a defendant challenges service of process.  The Magistrate Court's R&R suggests that taking such action in this case would gut the service requirement in all cases.  Such a position ignores the totality of the circumstances here, a criminal action against a foreign corporate entity, which has actual notice of the proceedings and has taken intentional steps to absent themselves from the jurisdiction of the United States.  As witnessed by the paucity of legal precedent for the issues at bar, this is an extraordinary if not unique situation.  If

---

[16]The United States Department of Justice, Office of International Affairs, is unaware of any means to perfect service with a foreign entity residing in Kuwait.  Nevertheless, in large part because of the inferences included in defendants' previous briefings, the Government has undertaken the process of attempting to obtain service through diplomatic channels.

unfairness is the issue, then the Court should find in favor of invoking the doctrine because it is unfair for a company reaping billions from the United States Government and repeatedly using United States courts to seek relief to then refuse to face charges that it defrauded the U.S. Government of hundreds of millions, if not billions, of dollars.

For the fifth "countervailing factor," the Magistrate Court notes that the whereabouts of the defendants are known to the Government and that the difficulty in serving a foreign corporation should be remedied by the Congress or the drafters of the federal rules. The United States agrees that the Congress and the drafters of the federal rules may well wish to address the issues that this case raises. However, there is nothing that Congress or the drafters of the federal rules could do about fugitive defendants who refuse to answer charges. Just because the prosecuting authority knows where a fugitive defendant may be located does not change the fact that, if the defendant cannot be reached, it still is a fugitive.

Finally, the Magistrate Court notes that the Government of Kuwait opposes this prosecution. While that may be so, as discussed *supra*, Congress's passage of FSIA demonstrates Congress's view on litigation against foreign states or foreign entities or instrumentalities for purely commercial activities, as were those of the defendants in the instant case. The fact that this criminal proceeding is apparently opposed by the Government of Kuwait makes the chances of service through diplomatic means even

more improbable.  This Court should not allow a foreign country to dictate the prosecution of United States laws, particularly where, as here, the defendants are accused of having committed massive fraud against the United States.

In short, the Magistrate Court, respectfully, got it wrong when it did not see the defendants' actions and inactions for what they were: an intentional and methodical attempt to flee the jurisdiction and evade service.  The "countervailing factors" cited by the Magistrate Court are misplaced and outweighed significantly by the equities that favor invocation of the fugitive disentitlement doctrine against these defendants.

## II.     Service In This Case Meets The Requirements of Rule 4

Service in this case was properly effectuated under the dictates of the Federal Rules of Criminal Procedure.  As noted *supra*, summons in the present case was served on: CT Corporation, the registered agent for AGILITY HOLDINGS; Daniel Mongeon, the Managing Director of AGILITY DGS and President and CEO of AGILITY HOLDINGS; Paul Cerjan, an officer and prior board member of AGILITY DGS; Edward Hoffman, a Senior Vice President and General Counsel for AGILITY HOLDINGS; Richard Deane Jr., counsel for PWC in the present case; and Michael Charness, counsel for PWC in numerous cases in United States courts involving Prime Vendor contractual issues.  Summons was also mailed to the office of Edward Hoffman and Daniel Mongeon in Alexandria, Virginia; and to PWC's last known address in the United  States in Winchester, Virginia.

Federal Rule of Criminal Procedure 4 provides in relevant part that, "[a] summons is served on an organization by delivering a copy to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process" and "[a] copy must also be mailed to the organization's last known address within the district or to its principal place of business elsewhere in the United States." Fed. R. Crim. Pro. 4(c)(3)(C).

PWC and AGILITY DGS have notice. Actual notice is not an issue in this case. PWC and AGILITY DGS have actual notice because of the extensive delivery of service of the summons and indictment.[17] However, PWC and AGILITY DGS have taken the position that, regardless of their extensive contacts with the United States, regardless of the fact that this case involved direct contractual dealings with the United States and alleged fraud on the United States, regardless of the fact that these entities bring legal actions in United States courts concerning their contractual relations with the United States, if their respective principal places of business are in another country, they are - for all intents and purposes - immune from criminal accountability for their actions. Stated more succinctly, PWC and AGILITY DGS

---

[17] It is regrettable that the R&R adopts the defendants' characterization of the government's extensive service as a "scattershot approach." (R&R at 86). This characterization does not assist the assessment of the issues in front of the court. Obviously, the present case is unusual. In fact, the Government is not aware of any situation in which effective service of process on a responsible corporation doing extensive business in and with the United States required the extensive service utilized in this case.

claim their common subsidiary, AGILITY HOLDINGS is not an alter ego or agent for service of process so they, PWC and AGILITY DGS, can never be served pursuant to Rule 4.

III.    PWC and AGILITY DGS Have Been Effectively Served Through Service On Their Alter Ego/Agent

The Magistrate Court properly concluded that, in certain circumstances in both a criminal or civil case, service on a United States subsidiary which is the alter ego or agent of the foreign parent can be sufficient to effect service on the foreign parent. (R&R at 66),  See United States v. Chitron Electronics Company, Ltd., 668 F. Supp.2d 298 (D.Mass. 2009); Heise V. Olympus Optical Co. Ltd., 111 F.R.D. 1 (N.D. Ind. 1986).

The critical issue presented in this case is one of first impression in the Eleventh Circuit.  That issue is, in a case in which the objection to the maintenance of the suit is procedural,  what is the appropriate test to determine the alter ego or the lesser agent status.  The distinction of the context in which the issue of alter ego or agency arises in a case is critical to determining the test to apply and the rigor of that test.  An early recognition of the need for such a distinction was recognized by the Supreme Court in the often-cited case of Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333 (1925). Cannon is a pre- International Shoe[18] case in which the Court examined the

_____

[18]    International Shoe Co. v. Washington, 326 U.S. 310 (1945).

adequacy of service on a subsidiary corporation in the context of a state service statute that required a finding that the defendant was "doing business" in the state to be amenable to suit. The Court was careful to emphasize that "[t]he maintenance of the suit is not procedural - as where it is sought to defeat a suit against a foreign corporation on the ground that process has been served upon one not authorised to act as its agent." Id. at 335. See also In re Acushnet River & New Bedford Harbor Proceedings, 675 F.Supp. 22, 33 (D.Mass. 1987)("The policies underlying the statute in question can direct the emphasis the court will place on the various factors examined in deciding whether to pierce the corporate veil."). The issue of the status of a subsidiary as an alter ego or agent of a parent is examined by courts most frequently in two contexts. First, many courts examine the alter ego and/or the agency status of a subsidiary to determine whether the conduct of the subsidiary can be attributed to the parent for the purpose of personal jurisdiction based upon "doing business" or "minimal contacts" with the forum pursuant to a state long-arm statue and/or due process. Examples of such cases, taken from the cases cited in the R&R include: Cannon Mfg. Co., 267 U.S. at 334-36 (affirming dismissal of case against an out-of-state defendant for lack of personal jurisdiction, and noting "[t]he objection to the maintenance of the suit is **not procedural** – as where it is sought to defeat a suit against a foreign corporation on the ground that process has been served upon one not authorized to act as its agent . . . [t]he obstacle insisted upon is that the court lacked

jurisdiction because the defendant, a foreign corporation, was not within the state.")
(internal citations omitted)(emphasis added); Consolidated Textile Corp. v. Gregory,
289 U.S. 85, 88 (1933)(foreign corporation was not "carrying on business" in
Wisconsin by virtue of its President's visit to that state for a settlement conference);
Consol. Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1293 (11th Cir. 2000) (holding
there was no general personal jurisdiction over Canadian corporate defendant); Exter
Shipping Ltd. v. Kilakos, 310 F.Supp.2d 1301, 1313 (N.D.Ga. 2004)(declining to
assert personal jurisdiction over several Greek principals of a Greek shipping
company, on the basis of the shipping company's contract with a Georgia vendor
providing it with marketing and consulting services); D'Jamoos ex rel. Estate of
Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 108-109 (3d Cir. 2009)(court
examined agency status to impose personal jurisdiction based upon the subsidiary was
"doing business" on behalf of the parent); Doe v. Unocal Corp., 248 F.3d 915, 926-
931 (9th Cir. 2001)(while service was effected under the Hague Convention, the court
examined alter ego and agency theories in the context of imputing contact); In re
Cyclobenzaprine Hydrochloride, 693 F.Supp.2d 409, 419 (D.Del. 2010)(examination
of agency theory for imputing contacts to establish personal jurisdiction per the states
long-arm statue and due process); C.R. Bard, Inc. v. Guidant Corp., 997 F.Supp. 556,
559-562 (D.Del. 1998)(examination of alter ego and agency theories for imputing
contacts to establish personal jurisdiction per the states' long-arm statue and due

process); <u>Dole Food Co. v. Patrickson</u>, 538 U.S. 468 (2003)(issue whether the subsidiary's actions were attributable to its sovereign shareholder); <u>Potts v. Dyncorp International, LLC</u>, No. 3:06-cv-124, 2007 WL 899040 (M.D.Ala. 2007)(issues were both personal jurisdiction and  service and the court held that service on the parent will suffice as service on the subsidiary where the two corporations were not separate entities); <u>In re Acushnet River & New Bedford Harbor Proceedings</u>, 675 F.Supp. 22 (D.Mass. 1987) (declining to find personal jurisdiction against defendant without minimum contacts with forum state through piercing of corporate veil in CERCLA case).

The second common context in which courts examine the alter ego or agency status of a subsidiary is in determining whether to impose liability on the parent. Again taking examples of such cases from the cases cited in the R&R include: <u>Transamerican Leasing, Inc. v. La Republica de Venezuela</u>, 200 F.3d 843 (D.C. Cir. 2000) (declining to disregard sovereign immunity of Venezuela under Foreign Sovereign Immunities Act under theory that it controlled shipping company as agent); <u>United Steelworkers of America, AFL-CIO-CLC v. Connors Steel Co.</u>, 855 F.2d 1499 (11th Cir. 1988)(finding one company liable for another's employee benefits under alter ego theory); <u>Patin v. Thoroughbred Power Boats</u>, 294 F.3d 640 (5th Cir. 2002)(product liability case in which issue was whether to impose successor liability).

The instant criminal case is very different than both of these types of scenarios, as neither liability nor jurisdiction is at issue. Rather, the case at bar deals only with procedural service. While a finding of alter ego or agency under stringent tests applied in the context of minimal contacts or liability cases will obviously satisfy any test of that status for the purpose of procedural service, the test for purposes of procedural service issues does not need to be, nor should it be, as stringent. Because notice is the touchstone of Rule 4, the Government urges the more appropriate test to be one that examines the totality of the circumstances as cited in the R&R from Heise v. Olympus Optical Co., Ltd., 111 F.R.D. 1 (N.D.Ind. 1986). In Heise the court held that a managing or general agent is a person in a position of sufficient responsibility so that it is reasonable to assume that he could transmit notice to [the parent]."

To find that AGILITY HOLDINGS is the alter ego of PWC and AGILITY DGS, the Magistrate Court, citing United Steelworkers of America, AFL-CIO-CLC, v. Connors Steel Co., 855 F.2d 1499, 1507 (11th Cir. 1988), believed itself required to find "[c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practices in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." The court went on to note the twelve factors cited in Connors Steel as bearing on whether a parent controls a subsidiary: 1) the parent and the subsidiary have common stock ownership; 2) the parent and the

subsidiary have common directors or officers; 3) the parent and the subsidiary have common business departments; 4) the parent and the subsidiary file consolidated financials statements and tax returns; 5) the parent finances the subsidiary; 6) the parent caused the incorporation of the subsidiary; 7) the subsidiary operates with grossly inadequate capital; 8) the parent pays the salaries and other expenses of the subsidiary; 9) the subsidiary receives no business except that given to it by the parent; 10) the parent uses the subsidiary's property as its own; 11) the daily operations of the two corporation are not kept separate; and 12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings. Connors Steel Co., 855 F2d at 1505. The Connors Steel case acknowledged that it is not necessary for all of the factors to be present in order to find that two companies are alter egos, noting that "there is no litmus test for determining whether a subsidiary is the alter ego of its parent" and instead a court "must look at the totality of the circumstances." Id. The Connors Steel court thus recognized the required flexibility necessary to adapt the court's fact specific analysis to the issue at hand.

As noted above, it may be that in a case involving the issue of service of process a court has enough information to meet a strict alter ego test applicable in a personal jurisdiction or liability case, but such a finding does not foreclose the appropriateness of the same finding on a lesser quantum of available information. In

fact in some cases, a court may examine the status of a subsidiary regarding both the issue of personal jurisdiction and service. <u>See</u> <u>United State v. Chitron Electronics Co.</u>, 668 F.Supp.2d 298 (D.Mass. 2009) (a criminal case in which a federal district court allowed service of a domestic subsidiary to effectuate service of the foreign parent company under Fed. R. Crim. P. 4). In <u>Chitron</u>, the defendant Shenzen Chitron Electronics Company, Ltd. (Chitron-China) was charged with illegally exporting defense articles and technology. <u>Id.</u> at 299. Chitron-China moved to dismiss the charges on the basis of insufficiency of service of process and lack of personal jurisdiction, even though it had a U.S. subsidiary, Chitron Electronic, Inc. (Chitron-U.S.) which the Government claimed was integrally managed by the Chinese parent. <u>Id.</u> The court denied the defendant's motion to dismiss, concluding that the indictment and other evidence provided by the Government showed a sufficient interrelationship between the Chinese parent and the U.S. subsidiary so that service of the summons on the president of the U.S. subsidiary was sufficient to effect service on the foreign parent.

Regardless of the manner and means by which a test of status is applied, the Magistrate Court erred by disregarding the substantial evidence before it that AGILITY HOLDINGS is an integrally managed alter ego and agent of PWC and AGILITY DGS. Additionally, the Magistrate Court incorrectly evaluated the

evidence of the status of PWC and its subsidiaries in isolation versus, viewing the evidence in the context of a totality of the circumstances.

First and most significantly, the Government presented highly relevant excerpts from PWC's three most recent public annual reports, each of which were approved by its board of directors. The statements from these reports, which are not hearsay because they are admissions by a party-opponent under Fed. R. Evid. 801(d)(2), indicate that:

1) AGILITY HOLDINGS and AGILITY DGS are wholly owned by PWC, the Parent Company;

2) "Subsidiaries are those enterprises controlled by the Parent Company;" and

3) "Control exists when the Parent Company has the power directly or indirectly to govern the financial and operating policies of entity so as to obtain benefits from its activities." (2007 Annual Report at 24 in Doc. 124-2, Exh. B at 14; 2008 Annual Report at 24 in Doc. 92-27, Exh. AA at 24; 2009 Consol. Fin. Statements at 11 in Doc. 124-3, Exh. C at 15). While noting the reports and even quoting from them in the R&R, the Magistrate Court then seemingly disregard the highly relevant admissions they contained, stating "the Court is not an accountant and cannot conclude from this unsworn statement that this is definitive evidence to

establish control." (R&R at 76, n. 33).[19] However, these documents definitively establish factors 1 and 4 articulated by the court in <u>Connors Steel</u>. The Government has also shown factor 2, common officers or directors, through facts including Mongeon's service at both AGILITY HOLDINGS and AGILITY DGS. (<u>See</u> Mongeon Decl. ¶¶ 1, 7-8).[20] <u>See also</u> Sam McCahon's pre-indictment representation that he was General Counsel for PWC and all of its subsidiary entities. [Exh. A].

The Government established factors 11 and 12, through a series of statements, some public and some to DLA and their vendors on the contracts at issue in this case, which show the unified daily operations it shares with its subsidiaries, and which fail to observe basic corporate formalities by conflating the identities of the various entities. Beginning in the Fall of 2006, defendant PWC/Agility announced that the PWC group of companies henceforth would be known as "Agility." In October 2006, Tarek Sultan, Chairman and Managing Director of defendant PWC/Agility in a message to all employees announced the new name noting that, "(w)ith the announcement of this exciting, single global identity, employees and offices around

_____

[19] In addition to arguing that these admissions by PWC were relevant to whether control existed over AGILITY DGS and over AGILITY HOLDINGS, the Government argued that, in any event, PWC should be estopped from denying its control over these entities in light of its formal, recurring, and recent public statements to the contrary. The Magistrate Court did not address this estoppel argument.

[20] The Magistrate Court recognized that Mongeon was the Director, President, and CEO of AGILITY HOLDINGS as well as the Managing Director of AGILITY DGS, but ignored his overlapping roles because "there is no evidence of what precisely Mongeon did for each company." (R&R at 72, n. 29).

the world will be working in unison as one team to become market leaders..." <u>See</u> Government Exhibit I to its Response to Defendant /Agility's Motion. Less than a month later, defendant PWC/Agility announced the change to the world. The message was sent to the U.S. vendors on the PV contract in an announcement signed by Toby Switzer, CEO and President, Agility, Defense & Government Services-International and Maj. General Dan Mongeon, USA (Ret.), President, Agility, Defense & Government Services-US. <u>See</u> Government Exhibit J to its Response to Defendant PWC/Agility's Motion. From that point on, all three defendants were known as Agility. The defendants maintain a joint website at www.agilitylogistics.com. A footer on emails indicated that the "company" was Agility Defense and Government Services which included PWC Logistics Services, K.S.C.(c) and Agility Defense & Government Services, Inc. and their subsidiaries and affiliates. <u>See</u> Government Exhibit K to its Response to Defendant PWC/Agility's Motion.

In January 2006, defendant PWC/Agility requested that there be a name change to the PV contract as "PWC will complete a corporate reorganization whereby it will consolidate the performance and administration of its government contracts to PWC Logistics Services, a newly created wholly owned subsidiary of PWC." <u>See</u> Government Exhibit L to its Response to Defendant PWC/Agility's Motion. Defendant PWC also sought a novation agreement with DLA seeking to change the name on the PV contract to Agility. <u>See</u> Government Exhibits M & N to its Response

to Defendant PWC/Agility's Motion. Ultimately, DLA decided against approving the name change or a novation agreement, and PWC remained the named contractor. As far back as 2005, it was PWC Logistics, the predecessor to defendant Agility DGS Logistics, that was taking credit for holding the PV contract and other contracts awarded by DLA. See Government Exhibits O and P to its Response to Defendant/Agility's Motion, PWC Logistics Awarded DLA Contract. By 2007, it was Agility Defense & Government Services that was taking credit for holding the PV contract and other contracts issued and awarded by DLA. See Government Exhibits Q, R, S, T, U and V to its Response to Defendant PWC's Motion, Agility DGS Awarded $2.8 Billion Option Year on Subsistence Contract; Agility Awarded New Contract for the Subsistence Prime Vendor Contract; Agility DGS Wins Warehousing Contract; Agility Awarded Option Year On U.S. Army's Heavy Lift VI Contract; Agility DGS Awarded Army Vehicle Storage Contracts, Agility DGS Wins Warehousing Contract. Yet, while the contract itself may be in the name of "PWC," defendant PWC and its subsidiaries continued to hold themselves out to the world as Agility. Modifications to the prime vendor contracts have been signed in the name of Agility. See Government Exhibit W to its Response to Defendant PWC's Motion. Invoices for services performed under the contract have been submitted to DLA in the name of PWC Logistics and in the name of Agility Prime Vendor. See Government Exhibit X to its Response to Defendant PWC's Motion.

In 2008, Mongeon signed a contract bid for the Prime Vendor III contract as President and CEO of AGILITY DGS. As conceded by the Magistrate Court, this fact reveals overlap between the operations of AGILITY HOLDINGS and AGILITY DGS, which is relevant to factor 11 in the Connors Steel analysis.

In sum, the Government's evidence established factors 1, 2, 4, and 11 of the Connors Steel factors. As to the majority of the remaining factors, including 3, 5, 6, 7, 8, 9 and 10, neither party submitted relevant evidence. As to factor 12, conflicting evidence was presented by the parties, as the defendants submitted various declarations vouching for their maintenance of separate corporate formalities, while the Government submitted press releases and other pre-indictment communications from the defendants which obliterated those distinctions. The Magistrate Court repeatedly dismissed the evidence submitted on these factors by the Government on the basis that it was unsworn, despite the fact that much of it was nonetheless admissible as a statement of a party opponent. Had the Magistrate Court properly considered this highly relevant evidence, it would have concluded that the Government had made the required showing of alter ego under the Connors Steel factors given the totality of the circumstances.

The totality of circumstances in this case should also include recognition of the defendants pre-indictment representations of unity and control with regard to its subsidiaries. PWC has repeatedly held itself and its subsidiaries out as a unitary

interrelated "Group." These repeated representations of control, unitary effort and interrelated functioning to form the Group, should estop PWC's position on service which seeks to now disavow such connections. See Jordan v. Global Natural Resources, Inc., 564 F.Supp. 59, 69 (S.D. Ohio 1983) (defendant estopped from asserting that service at an address it published to its shareholders was insufficient for the purpose of service); Galley Recording Studios, Inc. v. Discrete Technology Ltd., 1997 WL 695569 (S.D.N.Y. 1997). Such an application of the estoppel doctrine to disallow PWC's denial of its prior representations as a unitary entity is a fair consideration in the context of evaluating whether an alter ego or agency relationship existed in that it prevents PWC from prevailing merely because it controls the availability of information about its inner workings.

Even if this Court does not find AGILITY HOLDINGS to be the alter ego of PWC and AGILITY DGS, it can still find the Government to have properly served both PWC and AGILITY DGS under common law agency principles. As recognized by the Magistrate Court, even without a showing of alter ego, principles of agency permit one corporation or business organization to be the agent of another for purpose of effecting service of process. [R&R at 55, n. 19, citing 4A Wright & Miller, Fed. Pract. And Proc. § 1104 & n. 4 (3d ed. 2002)]. While a parent-subsidiary relationship, by itself, is generally insufficient to demonstrate this type of agency, see, e.g., Consolidated Development Corp. v. Sherritt, Inc., 216 F.3d 1286, 1293 (11th Cir.

2000); <u>Cannon Mfg. Co. v. Cudahy Packing Co.</u>, 267 U.S. 333, 337, 45 S.Ct. 250, 69 L.Ed. 634 (1925)), 100% ownership is a strong factor supporting such agency. In the context of a personal jurisdiction case, this Court has stated that it can be appropriate to find an agency relationship where the resident corporation acts on behalf of foreign affiliates. <u>Exter Shipping Ltd. V. Kilakos</u>, 310 F.Supp.2d 1301, 1313 (N.D.Ga. 2004)(Thrash, J.)(citing<u>Meier v. Sun Intern. Hotels, Ltd.</u>, 288 F.3d 1264, 1273 (11th Cir. 2002)).

The Magistrate Court found, erroneously, that the Government had not made this required showing. Specifically, the Magistrate Court stated that the Government had not provided any evidence that AGILITY DGS controlled AGILITY HOLDINGS or that AGILITY HOLDINGS performed services that were sufficiently important to AGILITY DGS such that it would perform the services absent AGILITY HOLDINGS. [R&R at 57, n. 19]. However, when viewed in its totality, the Government provided ample evidence that both AGILITY DGS and AGILITY HOLDINGS were operating as agents and alter egos of the corporate parent that controlled both of them in common, PWC. The Magistrate Court's conclusion also ignores the fact that AGILITY HOLDINGS is the subsidiary of both AGILITY DGS and PWC. Moreover, whatever their titles, both are general or managing agents of the defendant and its parent, PWC/Agility.

IV.    Federal Rule of Criminal Procedure 2

Federal Rule of Criminal Procedure 2 dictates that the Federal Rules of Criminal Procedure, including Rule 4, "are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay." The R&R noted that PWC argues that application of Rule 2's dictate to interpret the Rules of Procedure to provide for a just determination is contrary to the Supreme Court's decision in Carlisle v. United States, 517 U.S. 416, 116 S.Ct. 1460 (1996). PWC's reliance upon Carlisle is misplaced. In Carlisle, the Court rejected the petitioner's claim that the district court had "inherent supervisory power" to grant an untimely post-verdict motion for judgment of acquittal because "[w]hatever the scope of this 'inherent power,' it does not include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure." Id. at 426, 116 S.Ct. 1460. In contrast to the requested application of Rule 2 in Carlisle, application in the present case does not ignore or decide any issue in conflict with a Federal Rules of Criminal Procedure.   Application of Rule 2 in this case does support the Court's authority to determine such underlying issues as alter ego and/or agency for purpose of service of process in a manner that promotes a just determination, simplifies procedure and promotes fairness in applying Rule 4. The United States respectfully contends that such a just determination will result in a finding that both defendants have been

adequately served through their alter ego / agent and therefore should appear before this Court to answer the allegations in the indictment.

V.    Federal Rule of Criminal Procedure 57

In the R&R, the Magistrate Judge notes that Federal Rule of Criminal Procedure 57 provides that "[a] judge may regulate practice in any manner consistent with federal law, [the federal] rules [of criminal procedure], and the local rules of the district."  FED. R. CRIM. P. 57(b) (R&R at p.34-35 n.16).  The court goes on to find that "the criminal procedural rules do not have any provision for serving a corporation that has no offices in the United States." Id.    First, with regard to a mailing requirement, the United States notes that in the present case, PWC and AGILITY DGS were served through mailing to the office of Daniel Mongeon[21] the Managing Director of AGILITY DGS and President and CEO of AGILITY HOLDINGS and mailing to the last known address of PWC's office in the United States in Winchester, Virginia.  As set out in more detail below, because these persons and entities are the alter ego/agents of defendants, such mailings meet the requirements of Rule 4.  If, however this Court were to find, as the Magistrate seemed to, that criminal service under Rule 4 may never be perfected on an entity without a current office in the

_____

[21]  Edward Hoffman, Senior Vice President and General Counsel for AGILITY HOLDINGS was also served at this office.

United States, then this void in the rules should allow this Court to invoke Rule 57 to fashion a just remedy.

The Magistrate Court's view of Rule 57 as a "potential avenue" of perfecting service is premised on its view that PWC seems "amenable to service in Kuwait given that it has appointed a Kuwaiti citizen[22] as the only authorized PWC employee to receive service of process following the return of the criminal indictment." (R&R at 35 n.16). Later the court noted that Public Warehousing's attorney, an officer of this Court, has represented that Public Warehousing will be amenable to service through diplomatic means." (R&R at 87 n. 35). The United States respectfully views PWC's actions of appointing one person and only one person worldwide to accept service – who has remained in Kuwait – not as a positive sign of willingness to accept service but rather as an act to further its effort to flee. Further, while PWC argues that diplomatic means should be utilized for service, there is no enforceable United States / Kuwait treaty controlling service in Kuwait and the United States is not aware[23] of any such criminal service ever being successful. Moreover, PWC has not represented that they would cooperate with diplomatic service by encouraging Kuwaiti authorities to cooperate with service, by agreeing to make their one authorized person available

---

[22]  It does not appear that the person PWC authorized to accepted service in Kuwait is a Kuwaiti citizen but he does reside in Kuwait.

[23] PWC does not specify any diplomatic means or identify any instance when criminal service was so perfected.

for service, and most importantly, agreeing that such service in Kuwait would meet the requirements of Rule 4.

In its discussion of Rule 57 the Magistrate also indicates that it found that the government presentation of evidence on the issue of alter ego and agency insufficient. It should be noted that unlike the vast majority of cases cited by the court, this case is criminal not civil. There are very few criminal cases on this issue because corporations, particularly major corporations who have extensive contact with the United States and extensive direct contractual dealings with the United States government, do not generally hide from procedural service. While the United States does not have the luxury of discovery on even this preliminary matter, the court is urged to address this procedural service in a way that provides for the just determination of this criminal proceeding and eliminates unjustifiable expense and delay. This outcome can be accomplished by considering the totality of circumstances. The relevant circumstances in this case include recognition of the fact that the United States does not have discovery on any aspect of the service issue[24], the United States had no ability to subpoena PWC or AGILITY DGS employees in

---

[24] See In re Cyclobenzaprine Hydrochloride, 693 F.Supp.2d 409, 414 (D. Del. 2010)(noting that the party who has the burden of demonstrating the facts that establish personal jurisdiction can be allowed jurisdictional discovery; citing Toys "R" Us, Inc. Step Two, S.A.,318 F.3d 446 (3d Cir. 2003); Doe v. Unocal Corp., 248 F.3d 915, 922 (9th Cir. 2001)(noting that the court can order discovery on the jurisdictional issue; citing Data Disc, Inc. v. Systems Technology Assoc. Inc., 557 F.2d 1280 (9th Cir. 1977)).

Kuwait, and the affidavits offered by PWC and AGILITY DGS contain hearsay and are totally unsubstantiated by any verifiable documentation. In spite of these limitations, the Government submits that it has established service on PCW and AGILITY DGS through their United States subsidiary, AGILITY HOLDINGS.

# CONCLUSION

For all of the foregoing reasons, the United States respectfully requests that this Court deny the defendants' respective motions to quash service of process.

Respectfully submitted,

F. GENTRY SHELNUTT
ACTING UNITED STATES ATTORNEY


/s/BARBARA E. NELAN
Barbara E. Nelan
Assistant U.S. Attorney
Georgia Bar No. 537537

/s/RICHARD E. REED
Richard E. Reed
Special Assistant U.S. Attorney
Georgia Bar No. 597745

/s/ STEVEN D. GRIMBERG
Steven D. Grimberg
Assistant U.S. Attorney
Georgia Bar No. 312144

/s/ ALANA R. BLACK
Alana R. Black
Assistant U.S. Attorney
Georgia Bar No. 785045


75 Spring St., S.W., Suite 600
Atlanta, GA  30303
(404)581-6000
(404)581-6181 (Fax)

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the persons listed below a copy of the foregoing document electronically:

Richard H. Deane, Jr., Esq.
Anne Moody Johnson, Esq.
David J. Bailey, Esq.
Jones Day
1420 Peachtree Street, NE
Atlanta, GA 30309-3053
Counsel for Public Warehousing Company K.S.C.

Richard W. Hendrix, Esq.
Finch McCranie
225 Peachtree Street, NE
1700 South Tower
Atlanta, GA 30303
Counsel for Agility DGS Logistics Services Company, K.S.C.(c)

This 18th day of October, 2010.

/s/ Steven D. Grimberg
STEVEN D. GRIMBERG
ASSISTANT UNITED STATES ATTORNEY