IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

THE PUBLIC WAREHOUSING
COMPANY K.S.C., a/k/a Agility,
AGILITY DGS HOLDINGS, INC.,
f/k/a Agility Defense & Government
Services, Inc., f/k/a PWC Logistics
Services, Inc., and AGILITY DGS
LOGISTICS SERVICES COMPANY,
K.S.C.(c), d/b/a PWC Logistics
Services K.S.C.(c),

 Defendants.

CRIMINAL FILE NO.

1:09-CR-490-TWT

<u>ORDER</u>

This is a criminal case. It is before the Court on the Report and
Recommendation of the Magistrate Judge [Doc. 133] recommending granting the
Defendants' Motions to Quash Service [Docs. 25, 54, 81, & 118] and denying the
Government's Motion for Leave to File a Supplemental Response [Doc. 126]. For the
reasons set forth below, the Court declines to adopt the Report and Recommendation
[Doc. 133]. The Defendants' Motions to Quash Service [Docs. 25, 54, 81, & 118] are

DENIED and the Government's Motion for Leave to File a Supplemental Response [Doc. 126] is DENIED as moot.

## I. Background

This case arises from three contracts (collectively, the "Prime Vendor Contracts") between the Defense Supply Center of Philadelphia, an agency of the United States Government, and Public Warehousing Company K.S.C. ("PWC"), a Kuwaiti company.  The first of these contracts, signed in 2003, obligated PWC to provide food, warehousing, and food delivery to United States armed forces in Kuwait and Qatar (the "PV-I Contract").  PWC was paid $934 million under the PV-1 Contract [Doc. 52 ¶ 13].  In 2005, PWC received a bridge contract (the "Bridge Contract") worth $1 billion to continue providing food services to the military.  Id. In July 2005, the Defense Supply Center awarded PWC another contract under which it was paid $6.6 billion (the "PV-II Contract").

Two of PWC's subsidiaries, Agility DGS Logistics Services Company ("Agility Logistics") and Agility DGS Holdings, Inc. ("Agility Holdings"), were involved in performing the Prime Vendor Contracts.  PWC owns over 99% of Agility Logistics. In turn, Agility Logistics, through a Dutch subsidiary, owns 100% of Agility Holdings.  As a U.S. based subsidiary, Agility Holdings oversees government contracting for PWC in the United States.  Agility Logistics manages government

contracting elsewhere in the world.  (Moe Decl., ¶ 3, Doc. 51, Ex. O.)  While Agility

Holdings maintains an office in Alexandria, Virginia, Agility Logistics has never had

an office in the United States.  (Hoffman Decl. ¶ 6, Doc. 51, Ex. B; Mongeon Decl.

¶ 8, Doc. 51, Ex. D.)   Until the spring of 2008, PWC maintained an office in

Winchester, Virginia.

In 2006, PWC and its subsidiaries began using the "Agility" trade name.  On

October 19, 2006, Tarek Sultan, the managing director of PWC, stated that the name

change would "unify our company and services into one global team." [Doc. 92, Ex.

I].  Further, while performing the PV-II Contract, PWC requested that Agility

Logistics be substituted as the contractor of record, noting that a reorganization had

assigned responsibility for the PV-II Contract to Agility Logistics.  Ultimately, the

Government denied this request.  In 2008, Daniel Mongeon, the managing director of

Agility Logistics and the president and CEO of Agility Holdings, sent a letter

indicating that Agility Logistics would submit a bid for an additional contract to

provide food supplies to the U.S. military [Doc. 92, Ex. Y].  The letter indicated that

Mongeon was president and CEO of Agility Logistics.  Id.  The Government,

however, eventually awarded this contract to another company.

On November 9, 2009, a grand jury for the Northern District of Georgia

returned a six-count indictment alleging that PWC had fraudulently overcharged the

United States under the Prime Vendor Contracts [Doc. 52].   Specifically, the indictment alleged conspiracy to commit fraud (See 18 U.S.C. § 1031), making false statements (See 18 U.S.C. § 1001), making false, fictitious, and fraudulent claims (See 18 U.S.C. § 287), and wire fraud (See 18 U.S.C. § 1343).   In response to the indictment, Dr. Mohammad Sabah Al-Salem Al-Sabah, the Kuwaiti Deputy Prime Minister & Minister of Foreign Affairs, wrote a letter to United States Secretary of State Hillary Clinton.   (See Doc. 51, Ex. M.)   Dr. Al-Salem Al-Sabah informed Secretary Clinton that under Kuwaiti law, Kuwaiti courts had exclusive jurisdiction over criminal actions related to contracts with Kuwaiti companies.   (Id.)   He requested that the case be resolved without litigation.   (Id.)

Nevertheless, in the months following the indictment, the Government made several attempts to serve PWC.   On November 16, 2009, the Government served a copy of the indictment on Daniel Mongeon's secretary at Agility Holdings' office in Alexandria, Virginia.   (See DeBerry Decl. ¶¶ 3-4, Doc. 51, Ex. E.)   On November 17, 2009, the Government served a summons and indictment on CT Corporation, the registered agent for Agility Holdings.[1]   On November 25, 2009, PWC's Board of Directors appointed Ahmed Alsayed Abdulaziz, a Kuwaiti citizen, as the only person authorized to receive service of process on behalf of PWC.   (Abdulaziz Decl. ¶ 3, Doc.

---

[1]CT Corporation is not the registered agent for PWC.

51, Ex. K.) On February 8, 2010, PWC filed a Motion to Quash the Summons [Doc. 25] for failure to serve PWC.

On February 9, 2010, a grand jury returned a Superseding Indictment [Doc. 52]. The Superseding Indictment charged PWC with the same six counts included in the original indictment, added Agility Logistics as a defendant on all six counts, and charged Agility Holdings on Counts 2, 4, and 6.  Id.  The Government then attempted to serve the Superseding Indictment on all three Defendants.  On February 12, 2010, the Government served a summons for all three Defendants on CT Corporation, the registered agent for Agility Holdings.  The same day, the Government mailed a summons to Agility Holdings' office at 1725 Duke Street, Alexandria, Virginia.  The summons arrived on February 23, 2010.  On February 18, 2010, at Reagan National Airport, the Government personally served Mongeon with a copy of the summonses for all three Defendants.  The same day, FBI agents served summonses on Paul Cerjan, the president of Agility Logistics in Europe, the Middle East, and Africa.[2]  On July 23, 2010, the Government served a copy of the summons for PWC on Michael Charness, an attorney representing PWC in a civil case in Washington, D.C.  On July 29, 2010, the Government mailed a summons for PWC to 180 Prosperity Drive, Suite 1, Winchester, Virginia.  Although PWC had maintained an office at this address since

---

[2]Cerjan also served on Agility Logistics' Board of Directors until February 7, 2010.

2004, it had closed the office in spring 2008.  PWC claims that it closed this office for business reasons. (Nelson Decl. ¶¶ 8-10, Doc. 100, Ex. A.)  Thus, at the time the Government attempted service on PWC, it had no office in the United States.

On April 12, 2010, PWC filed an Amended Motion to Quash Service [Doc. 54]. On May 4, 2010, Agility Logistics filed its own Motion to Quash Service [Doc. 81]. On July 29, 2010, PWC filed a Second Amended Motion to Quash Service [Doc. 118]. The Government then filed a Motion for Leave to File a Supplemental Response [Doc. 126].  On September 2, 2010, the Magistrate Judge issued his Report and Recommendation recommending that this Court grant the Defendants' Motions to Quash [Docs. 25, 54, 81, & 118] and deny the Government's Motion for Leave to File a Supplemental Response [Doc. 133].  On October 18, 2010, the Government filed its Objections to the Report and Recommendation [Doc. 143].

## II.  Standard of Review

When a party files timely objections to a magistrate judge's recommended disposition of a motion to quash service in a criminal case, the district judge must make a de novo determination as to any portion of the disposition or proposed findings to which objection is made. 28 U.S.C. § 636(b)(1)(B).  Consequently, this Court will review the portions of the Report and Recommendation to which the Government objects on a de novo basis.

## III.  Discussion

A.    Fugitive Disentitlement Doctrine

First, the Government argues that the fugitive disentitlement doctrine prevents PWC and Agility Logistics from challenging service of process.   The fugitive disentitlement doctrine "limits access to the courts by fugitives from justice." F.D.I.C. v. Pharaon, 178 F.3d 1159, 1161 (11th Cir. 1999).  "Although traditionally applied by the courts of appeal to dismiss the appeals of fugitives, the district courts may sanction or enter judgment against parties on the basis of their fugitive status." Magluta v. Samples, 162 F.3d 662, 664 (11th Cir. 1998).  The doctrine "does not strip the case of its character as an adjudicable case or controversy[, but] disentitles the [fugitive] to call upon the resources of the Court for determination of his claims." Pharaon, 178 F.3d at 1161 (quoting United States v. Barnette, 129 F.3d 1179, 1184 (11th Cir. 1997)).  To apply the fugitive disentitlement doctrine, the party must (1) be a fugitive, (2) its fugitive status must have some connection to the court proceeding it seeks to utilize, and (3) the sanction must effectuate the policies underlying the doctrine.  See Barnette, 129 F.3d at 1184; Magluta, 162 F.3d at 664.

"A fugitive from justice has been defined as [a] person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district."

Barnette, 129 F.3d at 1183 (quoting Empire Blue Cross and Blue Shield v. Finkelstein, 111 F.3d 278, 281 (2d Cir. 1997) (internal quotation marks omitted)). "Mere absence from the jurisdiction in which a crime occurred does not render the suspect a fugitive from justice; he must be found to have absented himself from the jurisdiction with the intent to avoid prosecution." United States v. Fonseca-Machado, 53 F.3d 1242, 1243-44 (11th Cir. 1995).  Further, under the "constructive flight" doctrine, "a person who departs for a legitimate reason from the jurisdiction in which his crime was committed but who later remains outside that jurisdiction for the purpose of avoiding prosecution is [also] a fugitive from justice." Id.

To apply the fugitive disentitlement doctrine, the party's fugitive status must have some connection to the litigation at hand.  See Barnette, 129 F.3d at 1183. Finally, disentitlement must further the concerns underlying the doctrine, including the "difficulty of enforcing a judgment against a fugitive, . . . promoting the efficient operation of the courts, discouraging flights from justice, and avoiding prejudice to the other side caused by the appellant's fugitive status." Pesin v. Rodriguez, 244 F.3d 1250, 1253 (11th Cir. 2001).

1.   PWC

First, the Government argues that the Magistrate Judge incorrectly found that PWC is not a fugitive from justice.  Specifically, the Government contends that PWC

fled prosecution by closing its Winchester, Virginia office in the spring of 2008, several months before its lease expired. The Government, however, has not produced any evidence showing that PWC closed its office with the *intent* to avoid criminal prosecution. See Fonseca-Machado, 53 F.3d at 1244 (to apply doctrine, defendant "must be found to have absented himself from the jurisdiction with the intent to avoid prosecution."). Rather, PWC has offered uncontroverted testimony that it closed its U.S. office for business reasons. (See Nelson Decl. ¶¶ 8-10, Doc. 100, Ex. A.) PWC asserts that as of spring 2008, it had no reason to maintain an office in the United States. Although PWC left the United States, the Government has not shown that PWC "absented [itself] from the jurisdiction with the intent to avoid prosecution." Fonseca-Machado, 53 F.3d at 1244.

Alternatively, the Government argues that PWC constructively fled prosecution by refusing to return to the United States after learning of this proceeding. Although PWC left the United States, the Government has not shown that PWC "remains outside [the United States] *for the purpose* of avoiding prosecution." Id. (emphasis added). Indeed, PWC has presented evidence that it remains outside the United States because it has no reason to be here. (See Nelson Decl. ¶¶ 8-10, Doc. 100, Ex. A.) Under the Government's reading of the fugitive disentitlement doctrine, PWC must either return to the United States to accept process or be denied a forum to challenge

the sufficiency of that process.  This choice would nullify the service requirements of Rule 4.  Indeed, if Rule 4's requirements are to have any meaning, PWC must be allowed to challenge the Government's failure to comply with them.  See Danziger v. United States, 161 F.2d 299, 301 (9th Cir. 1947) (considering motion to quash service in criminal case).  For these reasons, PWC is not a fugitive.  Thus, the fugitive disentitlement doctrine does not apply.

2.     Agility Logistics

The Government also contends that the fugitive disentitlement doctrine should apply to Agility Logistics.  Specifically, the Government argues that Agility Logistics has constructively fled the Court's jurisdiction.  Agility Logistics, however, has never maintained an office in the United States.  Thus, Agility Logistics never *fled* the Court's jurisdiction.  Further, like PWC, the Government has not shown that Agility Logistics remains outside the United States for the *purpose* of avoiding prosecution. Thus, the fugitive disentitlement doctrine does not apply to Agility Logistics.

B.     Service Under Rule 4

Next, the Government argues that it has properly served PWC and Agility Logistics under Rule 4.  Federal Rule of Criminal Procedure 4(c)(3)(C) provides that:

> A summons is served on an organization by delivering a copy to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process. A copy must also be

mailed to the organization's last known address within the district or to
its principal place of business elsewhere in the United States.

FED. R. CRIM. P. 4(c)(3)(C).  Here, neither PWC nor Agility Logistics has an office

in the United States.  As discussed above, PWC closed its Winchester, Virginia office

in spring 2008 and has never had an office in the Northern District of Georgia.

Agility Logistics has never had an office in the United States.

Nevertheless, the Government argues that it properly served PWC and Agility

Logistics by serving their alter ego, Agility Holdings.  "Generally speaking, in a civil

context, service of process on a wholly owned subsidiary does not constitute service

of process on the parent corporation where separate corporate identities are

maintained."[3] United States v. Chitron Electronics Co., 668 F. Supp. 2d 298, 304-305

(D. Mass. 2009) (citing Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 334-

35 (1925)); but see Heise v. Olympus Optical Co., 111 F.R.D. 1, 6 (N.D. Ind. 1986)

(holding service on managing agent of subsidiary sufficient for service on parent

where managing agent "is a person whose position is one of sufficient responsibility

so that it is reasonable to assume that he would transmit notices to [parent].").  Service

on a subsidiary, however, constitutes service on the parent where the subsidiary is the

alter ego of the parent.  Exter Shipping Ltd. v. Kilakos, 310 F. Supp. 2d 1301, 1315

---

[3]Although there is significant case law dealing with alter ego entities in the civil
liability context, there is little precedent dealing with service in criminal cases.

(N.D. Ga. 2004). In United Steelworkers of America v. Connors Steel Co., 855 F.2d

1499 (11th Cir. 1988), the Eleventh Circuit set forth a list of factors that bear on

whether a subsidiary is the alter ego of its parent:

(1) the parent and the subsidiary have common stock ownership;

(2) the parent and the subsidiary have common directors or officers;

(3) the parent and the subsidiary have common business departments;

(4) the parent and the subsidiary file consolidated financial statements

and tax returns;

(5) the parent finances the subsidiary;

(6) the parent caused the incorporation of the subsidiary;

(7) the subsidiary operates with grossly inadequate capital;

(8) the parent pays the salaries and other expenses of the subsidiary;

(9) the subsidiary receives no business except that given to it by the

parent;

(10) the parent uses the subsidiary's property as its own;

(11) the daily operations of the two corporations are not kept separate;

and

(12) the subsidiary does not observe the basic corporate formalities, such

as keeping separate books and records and holding shareholder and

board meetings.

Id. at 1505 (quoting United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 691-92 (5th

Cir.1985)).  Despite this list of factors, "there is no litmus test for determining whether

a subsidiary is the alter ego of its parent. Instead, [the Court] must look to the totality

of the circumstances."  Id. at 1506.  Further, "[r]esolution of the alter ego issue is

heavily fact-specific and, as such, is peculiarly within the province of the trial court."

Id.

Notably, Connors Steel addressed the civil liability of a parent for the actions

of its subsidiary.  By contrast, United States v. Chitron Electronics Co., addressed the

alter ego doctrine in the context of criminal service of process under Rule 4.  In

Chitron, the government served a criminal summons on the U.S. subsidiary of a

Chinese corporation.  The subsidiary was the purchasing office of the foreign

corporation.  Further, the agents of the Chinese parent directed the activities of the

subsidiary, shared business lists with the subsidiary, and held themselves out to be

employees of the subsidiary.  Id. at 306.  The court found a "sufficient

interrelationship between Chitron–China and Chitron–US to hold that service of the

summon on [the subsidiary's agent] . . . was sufficient to effect service on the foreign

parent corporation." Id.  By contrast, in United States v. Johnson Matthey, PLC, No.

2:06-CR-169, 2007 WL 2254676 (D. Utah Aug. 2, 2007), the government served the

U.S. subsidiary of an English corporation.  Without any evidence that the subsidiary

was the alter ego of the parent, the court held that "service upon the subsidiary is not

sufficient service on the parent company." Id. at *2.  The Government objects to the

portions of the Report and Recommendation finding that Agility Holdings is not the

alter ego of PWC or Agility Logistics.

        1.    PWC

        Here, the Government properly served Agility Holdings by delivering a copy

of all three summonses to Daniel Mongeon, the president and CEO of Agility

Holdings, and mailing a copy of the summonses to Agility Holdings' principal place

of business in Alexandria, Virginia.  Agility Holdings is a subsidiary of PWC.[4]

Nevertheless, PWC argues that service upon Agility Holdings is not sufficient service

on PWC.  Further, the Defendant asserts, the Government has not shown that Agility

Holdings is an alter ego of PWC.

        The Government, however, has shown that PWC indirectly owns over 99% of

Agility Holdings and that the two companies file joint financial statements [Docs. 143,

─────────────

        [4]Agility Logistic, through a Dutch subsidiary, owns 100% of Agility Holdings.
PWC, in turn, owns more than 99% of Agility Logistics.  (Government's Objections
to Report and Recommendations, Ex. B.)

Ex. B; 124-2, Ex. B; 92-27, Ex. AA; 124-3, Ex. C].  See Connors Steel, 855 F.2d at

1506 (noting common ownership and consolidated financial statements are factors in

alter ego analysis).  Further, there is evidence that daily operations are not kept

separate.  See id. (noting whether daily operations kept separate factor in alter ego

analysis).  Following an announcement that all PWC entities would be known as

"Agility," Tarek Sultan, the managing director of PWC, noted that "employees and

offices around the world will be working in unison as one team to become market

leaders. . . "[5] [Doc. 92, Ex. I].  Thus, Connors Steel factors 1, 4, and 11 weigh in favor

of the Government.  As noted in Connors Steel, "it is not necessary that [the

Government] prove the existence of all twelve factors."  Connors Steel, 855 F.2d at

1505.

        Further, while Connors Steel dealt with the civil liability of a parent for the acts

of its subsidiary, Chitron addressed facts much more similar to those presented here.[6]

In Chitron, the subsidiary was the U.S. purchasing agent for its foreign parent.

Similarly, here, Agility Holdings handled government contracts for PWC in the

_____

        [5]The Magistrate Judge addressed evidence from the Defendants' internal
correspondence and financial statements, but discounted much of it as "unsworn."
[Doc. 133 at 71].  PWC's records and statements constitute admissions by a party
opponent.

        [6]The Report and Recommendation notes that Chitron is good law but briefly
distinguishes it from the case at hand.  (See Report and Recommendation, p. 85.)

United States.  (See Moe Decl., ¶ 3, Doc. 51, Ex. O.)  Further, as in Chitron, the PWC group consistently held itself out as a single entity.  See Chitron, 668 F. Supp. 2d at 306 (noting that parent and subsidiary shared phone numbers to "disguise the ultimate destination of purchases" and parent's employees held "themselves out to be employees of [the subsidiary].").  In 2006, all PWC entities began using the "Agility" trade name.  PWC emails included a footer referring to a singular "'company' known as Agility Defense & Government Services which includes PWC Logistics Services . . . and their subsidiaries." [Doc. 92, Ex. K].  As in Chitron, where the parent and subsidiary used a single telephone number, PWC and Agility Holdings maintained a joint website.[7]  Further, in joint financial statements, PWC asserted that it had the "power directly or indirectly to govern the financial and operating policies of [Agility Holdings] so as to obtain benefits from its activities."  [See Docs. 124-2, Ex. B; 92-27, Ex. AA; 124-3, Ex. C].  Similarly, as mentioned above, Tarek Sultan announced PWC's 2006 change to the "Agility" brand by noting that "the market demand[ed] we unify our company and services into *one global team*." [Doc. 92, Ex. I] (emphasis added).  Thus, as in Chitron, the PWC entities publicly presented themselves as a single company.

---

[7]The PWC group maintains a website at www.agilitylogistics.com.

Further, Federal Rule of Criminal Procedure 2 supports a finding that Agility Holdings is the alter ego of PWC.  Rule 2 dictates that the Federal Rules of Criminal Procedure should "be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay." FED. R. CRIM. P. 2.  Although Rule 2 cannot supersede other Federal Rules, it may be used to interpret the requirements of an ambiguous Rule.  Carlisle v. United States, 517 U.S. 416, 424 (1996).  Here, Rule 4 is silent on the issue of service on an alter ego.  Thus, Rule 2 informs the Court's interpretation of the alter ego issue presented here.  In this case, PWC has notice of this proceeding and has received copies of process.  Further, the United States Government has paid PWC over $8.5 billion under the Prime Vendor Contracts. PWC maintains a subsidiary in the United States to handle such government contracts. (Moe Decl. ¶ 3, Doc. 51, Ex. O.) Indeed, PWC is not a stranger to the United States, maintaining an office here from 2004 to 2008.  It has litigated as a Plaintiff in the courts of the United States.  Thus, a finding that service on Agility Holdings is sufficient against its alter ego, PWC, is consistent with Rule 2's instructions "to secure simplicity . . . and eliminate unjustifiable expense and delay." FED. R. CRIM. P. 2.

Ultimately, "there is no litmus test for determining whether a subsidiary is the alter ego of its parent. Instead, [the Court] must look to the totality of the

circumstances." <u>Connors Steel</u>, 855 F.2d at 1506.  Here, enough evidence has been

presented to indicate that Agility Holdings was the alter ego or conduit of PWC.

Unlike <u>Johnson Matthey</u>, PWC and Agility Holdings shared common ownership, filed

consolidated financial statements, failed to keep daily operations separate, and held

themselves out as a single company.  PWC has not shown any reason for Agility

Holdings to exist other than to conduct PWC's business in the United States.  For

these reasons, the Government has shown a "sufficient interrelationship between

[PWC] and [Agility Holdings] to hold that service of the summons on [Agility

Holdings] . . . was sufficient to effect service on the foreign parent corporation."

<u>Chitron</u>, 668 F. Supp. 2d at 306. The Magistrate Judge failed to give adequate weight

to the totality of the Government's evidence that Agility Holdings is the alter ego or

agent of PWC.  There is no question as to the Defendant's actual notice of the

indictment and the charges against it.

2.   <u>Agility Logistics</u>

Much of the reasoning above also applies to Agility Logistics.  As discussed

above, all PWC entities, including Agility Logistics, adopted the "Agility" trade name

in 2006.  Financial statements, emails, and internal memoranda indicated that all PWC

companies, including Agility Holdings and Agility Logistics, would operate as "one

global team" [Doc. 92, Ex. I].  Indeed, PWC, Agility Holdings, and Agility Logistics

all shared a single website.   Thus, as in <u>Chitron</u>, Agility Logistics and Agility Holdings held themselves out as a single company.   <u>See</u> <u>Chitron</u>, 668 F. Supp. 2d at 306 (noting that subsidiary was alter ego for purposes of Rule 4 because parent and subsidiary shared lists, phone numbers, and held themselves out to be employees of same entity).

Further, like PWC, the Government has shown common ownership between Agility Logistics and Agility Holdings.   Through another subsidiary, Agility Logistics owns 100% of Agility Holdings.   Unlike PWC, however, the Government has also shown that Agility Logistics and Agility Holdings "have common directors or officers."   <u>Connors Steel</u>, 855 F.2d at 1505.   Indeed, Daniel Mongeon served as managing director of Agility Logistics and president and CEO of Agility Holdings. The Government served Mongeon with a summons for both Agility Holdings and Agility Logistics.   This interrelationship is not surprising given that both entities performed similar functions.   Agility Holdings handled government contracting in the United States while Agility Logistics handled government contracting everywhere outside the United States.   (Moe Decl. ¶ 3, Doc. 51, Ex. O.)   Thus, the Government has shown that Agility Logistics is the alter ego of Agility Holdings.   For this reason, service on Agility Holdings constitutes service on Agility Logistics.

   C.   <u>Leave to File Supplemental Response</u>

The Government does not object to the portion of the Report and Recommendation [Doc. 133] of the Magistrate Judge recommending denying the Government's Motion for Leave to File a Supplemental Response [Doc. 126].  The Magistrate Judge concluded that it was unnecessary for the Government to file a supplemental brief because nothing in the supplemental brief altered the Court's conclusion.  (See Report and Recommendation, p. 3 n.2, Doc. 133.)  Further, the Government was free to present new evidence in its Objections to the Magistrate Judge's findings.  For these reasons, the Government's motion is moot.

## IV.  Conclusion

For the reasons set forth above, the Court declines to adopt the Report and Recommendation [Doc. 133].  The Defendants' Motions to Quash Service [Docs. 25, 54, 81, & 118] are DENIED.  The Government's Motion for Leave to File a Supplemental Response [Doc. 126] is DENIED as moot.

SO ORDERED, this 28 day of March, 2011.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge